## LIST OF EXHIBITS – NOTICE OF REMOVAL

**A.**   State of Connecticut Superior Court Docket Sheet, Complaint and Statement of Amount in Demand, *Daley Antoine v. Chipotle Mexican Grill, LLC*, HHD-CV-14-6049810-S.

**B.**   Summons and Return of Service, *Daley Antoine v. Chipotle Mexican Grill, LLC*, HHD-CV-14-6049810-S.

**C.**   Declaration of David Gottlieb.

    **1.**   Form 10-K, Chipotle Mexican Grill, Inc.

**D.**   *Chien v. Commonwealth Biotechnologies, Inc.*, No. 3:12-CV-1378-AWT, 2013 U.S. Dist. LEXIS 74458, 2013 WL 2319331 (D. Conn. May 28, 2013).

**E.**   *Baron v. Maxam N. Am., Inc.*, No. 3:11-CV-198-JCH, 2012 U.S. Dist. LEXIS 52315, 2012 WL 1247257 (D. Conn. Apr. 13, 2012).

**F.**   Termination Form for Daley Antoine dated March 16, 2013.

**G.**   Declaration of Kristin Dominguez.

**H.**   *Savage v. Envirotest Sys. Corp.*, No. 3:96-CV-1931, 1996 WL 732551 (D. Conn. Dec. 13, 1996).

**I.**   *Weaver v. Readco Mgmt., LLC*, No. CV-10-6005041, 2010 Conn. Super. LEXIS 3020, 2010 WL 5095347 (Conn. Sup. Nov. 24, 2010).

**J.**   *Mody v. Gen. Elec. Co.*, No. 04-CV-358, 2006 U.S. Dist. LEXIS 77929, 2006 WL 3050834 (D. Conn. Oct. 25, 2006).

**K.**   *Shorter v. Hartford Fin. Servs. Grp., Inc.*, No. 3:03-CV-0149, 2005 U.S. Dist. LEXIS 19902, 2005 WL 2234507 (D. Conn. May 31, 2005), *supplemented,* 2005 U.S. Dist. LEXIS 19903, 2005 WL 2231599 (D. Conn. July 15, 2005).

**L.**   *Kamat v. Kurtha*, No. 05-CV-10618-KMW-THK, 2007 U.S. Dist. LEXIS 4593, 2007 WL 188738 (S.D.N.Y. Jan. 22, 2007)

**M.**   *Patino v. Birken Mfg. Co.*, No. HHD-CV-05-40161205, 2009 Conn. Super. LEXIS 1331, 2009 WL 1624365 (Conn. Sup. May 15, 2009).

**N.**   *Wise v. Marriott Int'l, Inc.*, No. 06-CIV-11439, 2007 U.S. Dist. LEXIS 55611, 2007 WL 2200704 (S.D.N.Y. July 30, 2007).

**O.**   *Shorter Jr. v. Hartford Financial Service; Rhodes*, JVR No. 806258, 2005 WL 4256090, Conn. Jan. 2005.

**P.**   *Kimberly Bachiocchi v. Southern New England Telephone*, 2008 WL 6894517, D. Conn. July 8, 2008.

**Q.**   *Bjorlin v. Ira P. Hersh Inc., F/K/A Macarthur Equities Ltd.*, 2013 WL 6912802, Conn. Sup. Nov. 7, 2013.

**R.**   *Terri Tucker v. Journal Register East*, 2008 WL 4925070, D. Conn. July 24, 2008.

# EXHIBIT A

 State of Connecticut Judicial Branch
# Civil and Family E-Services


**Attorney/Firm:** SIEGEL O'CONNOR O'DONNELL & BECK PC (057730)**E-Mail:** gduhl@siegeloconnor.com  **Logout**

HHD-CV14-6049810-S DALEY, ANTOINE v. CHIPOTLE MEXICAN GRILL, LLC

**Prefix/Suffix:** [none] **Case Type:** M90   **File Date:** 03/26/2014      **Return Date:** 04/22/2014

| **Case Detail** | **Notices** | **History** | **Processing** ▶ | **Scheduled Court Dates** | **Help Manual** |

To receive an email when there is activity on this case, click here.

The logged in Juris Number is not appearing on this case. Select "Go" to e-file an appearance.

Select Case Activity: [E-File an Appearance ▾] [Go]

Information updated as of: 04/17/2014

| Case Information |
|---|
| **Case Type:** M90 - MISC - ALL OTHER |
| **Court Location:** HARTFORD |
| **List Type:** No List Type |
| **Trial List Claim:** |
| **Referral Judge or Magistrate:** |
| **Last Action Date:** 03/26/2014  (The "last action date" is the date the information was entered in the system) |

| Disposition Information |
|---|
| **Disposition Date:** |
| **Disposition:** |
| **Judge or Magistrate:** |

| Party & Appearance Information |
|---|

| Party | | No Fee Party |
|---|---|---|
| P-01 | ANTOINE DALEY | |
| | **Attorney:** CICCHIELLO & CICCHIELLO LLP (419987)  File Date: 03/26/2014 | |
| | 364 FRANKLIN AVENUE | |
| | HARTFORD, CT 06114 | |
| | | |
| D-01 | CHIPOTLE MEXICAN GRILL, LLC | |
| | Non-Appearing | |

**Viewing Documents on Civil Cases:** Attorneys who have an appearance on the case can view pleadings, orders and other documents that are *paperless* by selecting the document link below. Any attorney without an appearance on the case can look at court orders and judicial notices that are *electronic* on this case by choosing the link next to the order or selecting "Notices" from the tab at the top of this page and choosing the link to the notice on this website. Pleadings and other documents that are paperless can be viewed during normal business hours at any Judicial District courthouse and at many geographical area courthouses. Any pleadings or documents that are *not paperless* can be viewed during normal business hours at the Clerk's Office in the Judicial District where the case is. Some pleadings, orders and other documents are protected by court order and can be seen at the Clerk's Office in the Judicial District where the case is only by attorneys or parties on the case.

| Motions / Pleadings / Documents / Case Status | | | | |
|---|---|---|---|---|
| Entry No | File Date | Filed By | Description | Arguable |
| 100.30 | 03/26/2014 | C | SUMMONS | No |
| 100.31 | 03/26/2014 | C | COMPLAINT | No |
| 100.32 | 03/26/2014 | C | RETURN OF SERVICE | No |

| Individually Scheduled Court Dates as of 04/16/2014 | | | |
|---|---|---|---|
| HHD-CV14-6049810-S - DALEY, ANTOINE v. CHIPOTLE MEXICAN GRILL, LLC | | | |
| # | Date | Time | Event Description | Status |
| | | No Events Scheduled | | |

Judicial ADR events may be heard in a court location different from where the case was filed. Please see the JDNO/Notices tab on the Case Detail screen for scheduling location information.

Note: This listing of court activity may include motions or pleadings that were written onto the short calendar by the clerk. For items where the time is not displayed, please contact the clerk's office for further information.

Periodic changes to terminology may be made which do not affect the status of the case.

**Disclaimer:** For civil and family cases statewide, case information can be seen on this website for a period of time, from one year to a maximum period of ten years, after the disposition date. If the Connecticut Practice Book Sections 7-10 and 7-11 give a shorter period of time, the case information will be displayed for the shorter period. Under the Federal Violence Against Women Act of 2005, cases for relief from physical abuse, foreign protective orders, and motions that would be likely to publicly reveal the identity or location of a protected party may not be displayed and may be available only at the courts.

Copyright © 2014, State of Connecticut Judicial Branch

RETURN DATE: APRIL 22, 2014    :    SUPERIOR COURT

DALEY ANTOINE    :    J.D. OF HARTFORD

V.    :    AT HARTFORD

CHIPOTLE MEXICAN GRILL, INC.    :    MARCH 18, 2014

## COMPLAINT

### INTRODUCTION:

1.    This is an action to redress discrimination and wrongful termination based on the Plaintiff's sex/gender, sexual harassment and previous opposition to discriminatory employment practices pursuant to Conn. Gen. Stat § 46a-60, *et seq.*

### JURISDICTION:

2.    The Plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities alleging discrimination on the basis sex and sexual harassment in a timely manner, insofar as it was filed within 180 days of his date of termination on March 15, 2013.

3.    Plaintiff received a Release of Jurisdiction from the CHRO, dated January 8, 2014. Plaintiff has filed the instant complaint within 90 days of his receipt of the Release of Jurisdiction.

### PARTIES:

4.    The Plaintiff, Daley Antoine (hereinafter, "Plaintiff"), was at all times relevant to this Complaint a resident of the Town of East Haven, State of Connecticut.

5.    The Defendant, Chipotle Mexican Grill, Inc. (hereinafter, "Defendant"), is a corporation licensed to conduct business in the State of Connecticut, with a business address of 910 Chapel Street, New Haven, Connecticut.

## FACTS:

6.    Mr. Antoine performed well in this position, receiving positive quarterly performance reviews and feedback throughout her entire term of employment.

7.    Mr. Antoine began working for the Defendant in or around March 2012 as a Crew Member in Defendant Company's Greenwich location, 49 Greenwich Avenue, Greenwich, Connecticut.

8.    In or around October 2012, Plaintiff was promoted to Kitchen Manager and was transferred to Defendant Company's Milford location, 1319 Boston Post Road, Milford, Connecticut.

9.    Shortly thereafter, Plaintiff was promoted to Service Manager of Defendant Company's Milford location.

10.    While Plaintiff was employed at Defendant Company's Milford, CT location, his supervisor, Mayra Garcia, Restaurateur 4, would call Plaintiff after work hours, including very late at night, and ask him personal and intimate questions.

11.    When Ms. Garcia would call the Plaintiff she would make sexual and unwelcome advance towards the Plaintiff, including but not limited to:

    a.    Ms. Garcia telling the Plaintiff he has big legs and then stating, "I like guys with big legs."

    b.    Ms. Garcia asking "How are things in your personal life," "How is your wife," "How are things with you and your wife?"

    c.    Ms. Garcia stating "When are we getting together?" and "Come to my house and drink some wine."

12.    The conduct referenced above created a hostile work environment for Mr. Antoine.

13.    Mr. Antoine declined each of Ms. Garcia's advances and repeatedly told Ms. Garcia he was married.

14.    In or around January 2013, Plaintiff was transferred to Defendant Company's New Haven location, 910 Chapel Street, New Haven, Connecticut.

15.    While employed in Defendant Company's New Haven location, Plaintiff worked with Ms. Garcia on a daily basis, therefore the harassment and sexually charged comments escalated and increased in frequency.

16.    While working in Defendant Company's New Haven location, Ms. Garcia would tell the Plaintiff what she was physically attracted to in men by describing Plaintiff's physical characteristics.

17.    In response to Ms. Garcia's harassing comments, Plaintiff would tell her that those comments made him feel uncomfortable and were inappropriate.

18.    Following Plaintiff's refusal of Ms. Garcia's sexual advances, Ms. Garcia began to keep a written log of any perceived performance issues that Plaintiff had.

19.    Throughout Plaintiff's employment with Defendant Company he was never written up or given any formal discipline.

20.    On March 15, 2013, less than two months after being promoted to Service Manager, Mr. Antoine was fired by Ms. Garcia.

21.    Ms. Garcia stated that Plaintiff had poor performance, including multiple complaints against the Plaintiff, which, upon information and belief, are false.

22.    Ms. Garcia's reason for termination was a pretext to sexual harassment, sex/gender discrimination and discrimination for opposing discriminatory employment practice.

3

**COUNT ONE:**     Sex Discrimination in Violation of Conn. Gen. Stat. § 46a-60(1)

23.     Paragraphs 1-24 are hereby incorporated as paragraphs 1-24 of the First Count.

24.     The Defendant, acting through its agents, servant, and/or employees, discriminated against the Plaintiff and wrongfully terminated him on the basis of his sex.

25.     The Defendant's stated reason for termination was a pretext to sex discrimination.

26.     As a result of the Defendant Company's violation of Conn. Gen. Stat. § 46a-60(1), Plaintiff has suffered lost wages and employment benefits, severe emotional distress and has incurred attorney's fees and costs in order to receive the rights to which he is entitled.

**COUNT TWO:**     Hostile Work Environment – Sex Discrimination

27.     Paragraphs 1-26 are hereby incorporated as paragraphs 1-26 of the Second Count.

28.     The Defendant, acting through its agents, servant, and/or employees, subjected the Plaintiff, on the basis of her sex, to a continuing course of severe and pervasive conduct, creating a hostile work environment.

29.     As a result of the Defendant creating a hostile work environment on the basis of the Plaintiff's sex, Plaintiff has suffered lost wages and employment benefits, severe emotional distress and has incurred attorney's fees and costs in order to receive the rights to which he is entitled.

**COUNT THREE:**     Sexual Harassment in Violation of Conn. Gen. Stat. § 46a-60(8)

30.     Paragraphs 1-29 are hereby incorporated as paragraphs 1-29 of the Third Count.

31.     The Defendant, acting through its agents, servant, and/or employees, subjected the Plaintiff, on the basis of her sex, to a continuing course of severe and pervasive conduct, creating a hostile work environment.

4

32.    As a result of the Defendant creating a hostile work environment on the basis of the Plaintiff's sex, Plaintiff has suffered lost wages and employment benefits, severe emotional distress and has incurred attorney's fees and costs in order to receive the rights to which he is entitled.

**COUNT FOUR:**     **Discrimination in Violation of Conn. Gen. Stat. § 46a-60(4)**

33.    Paragraphs 1-32 are hereby incorporated as paragraphs 1-32 of the Fourth Count.

34.    The Defendant, acting through its agents, servant, and/or employees, discriminated against and terminated the Plaintiff's employment with Defendant Company for Plaintiff's previous opposition to discriminatory employment practice.

35.    As a result of the Defendant's discrimination and termination for Plaintiff's previous opposition to discriminatory employment practice, Plaintiff has suffered lost wages and employment benefits, severe emotional distress and has incurred attorney's fees and costs in order to receive the rights to which he is entitled.

WHEREFORE, the Plaintiff prays for the following relief:

1. Money damages;

2. Damages for lost wages, front pay and reinstatement;

3. Damage for emotional distress;

4. Punitive damages;

5. Reasonable attorneys fee and costs; and

6. Such other relief as the Court deems appropriate.


RESPECTFULLY SUBMITTED,
THE PLAINTIFF
DALEY ANTOINE

BY: _____
Amanda M. DeMatteis, Esq.
Cicchiello & Cicchiello, LLP
364 Franklin Avenue
Hartford, CT 06114
Tel: (860) 296-3457
Fax: (860) 296-0676
Juris No.: 419987
adematteis@cicchielloesq.com
His Attorneys

6

RETURN DATE: APRIL 22, 2014          :          SUPERIOR COURT
                                     :
DALEY ANTOINE                        :          J.D. OF HARTFORD
                                     :
V.                                   :          AT HARTFORD
                                     :
CHIPOTLE MEXICAN GRILL, INC.         :          MARCH 18, 2014

## STATEMENT OF AMOUNT IN DEMAND

The Plaintiff claims the amount in demand in excess of $15,000.00 exclusive of interest and costs.

RESPECTFULLY SUBMITTED,
THE PLAINTIFF
DALEY ANTOINE

BY: _____
Amanda M. DeMatteis, Esq.
Cicchiello & Cicchiello, LLP
364 Franklin Avenue
Hartford, CT 06114
Tel: (860) 296-3457
Fax: (860) 296-0676
Juris No.: 419987
adematteis@cicchielloesq.com
His Attorneys

7

# EXHIBIT B

**SUMMONS - CIVIL**
JD-CV-1   Rev. 2-13
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a,
52-48, 52-259, P.B. Secs. 3-1 through 3-21, 8-1

**STATE OF CONNECTICUT**
**SUPERIOR COURT**
*www.jud.ct.gov*

*See page 2 for instructions*

| | |
|---|---|
| ☐ "X" if amount, legal interest or property in demand, not including interest and costs is less than $2,500. | TO: Any proper officer; BY AUTHORITY OF THE STATE OF CONNECTICUT, you are hereby commanded to make due and legal service of this Summons and attached Complaint. |
| ☒ "X" if amount, legal interest or property in demand, not including interest and costs is $2,500 or more. | |
| ☐ "X" if claiming other relief in addition to or in lieu of money or damages. | |

| Address of court clerk where writ and other papers shall be filed *(Number, street, town and zip code)* *(C.G.S. §§ 51-346, 51-350)* | Telephone number of clerk *(with area code)* | Return Date *(Must be a Tuesday)* |
|---|---|---|
| 95 Washington Street, Hartford, Connecticut 06106 | ( 860 ) 548-2700 | April   Month    22  Day ,  2014 Year |

| ☒ Judicial District | ☐ G.A. | At *(Town in which writ is returnable) (C.G.S. §§ 51-346, 51-349)* | Case type code *(See list on page 2)* |
|---|---|---|---|
| ☐ Housing Session | Number: | Hartford | Major: T    Minor: 90 |

**For the Plaintiff(s) please enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented *(Number, street, town and zip code)* | Juris number *(to be entered by attorney only)* |
|---|---|
| Amanda DeMatteis, Esq., Cicchiello & Cicchiello, LLP, 364 Franklin Avenue, Hartford, CT 06114 | 419987 |

| Telephone number *(with area code)* | Signature of Plaintiff *(if self-represented)* |
|---|---|
| ( 860 ) 296-3457 | |

| Number of Plaintiffs: 1 | Number of Defendants: 1 | ☐ Form JD-CV-2 attached for additional parties |
|---|---|---|

| Parties | Name *(Last, First, Middle Initial)* and Address of Each party *(Number; Street; P.O. Box; Town; State; Zip; Country, if not USA)* | |
|---|---|---|
| First Plaintiff | Name:   Daley Antoine<br>Address: 612 George Street, Apt. 7<br>New Haven, CT 06511 | P-01 |
| Additional Plaintiff | Name:<br>Address: | P-02 |
| First Defendant | Name:   Chipotle Mexican Grill, LLC<br>Address: c/o National Registered Agents, Inc., One Corporate Center, Hartford, CT 06103 | D-01 |
| Additional Defendant | Name:<br>Address: | D-02 |
| Additional Defendant | Name:<br>Address: | D-03 |
| Additional Defendant | Name:<br>Address: | D-04 |

**Notice to Each Defendant**

1. YOU ARE BEING SUED. This paper is a Summons in a lawsuit. The complaint attached to these papers states the claims that each plaintiff is making against you in this lawsuit.
2. To be notified of further proceedings, you or your attorney must file a form called an "Appearance" with the clerk of the above-named Court at the above Court address on or before the second day after the above Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to come to court.
3. If you or your attorney do not file a written "Appearance" form on time, a judgment may be entered against you by default. The "Appearance" form may be obtained at the Court address above or at *www.jud.ct.gov* under "Court Forms."
4. If you believe that you have insurance that may cover the claim that is being made against you in this lawsuit, you should immediately contact your insurance representative. Other action you may have to take is described in the Connecticut Practice Book which may be found in a superior court law library or on-line at *www.jud.ct.gov* under "Court Rules."
5. If you have questions about the Summons and Complaint, you should talk to an attorney quickly. The Clerk of Court is not allowed to give advice on legal questions.

| Signed *(Sign and "X" proper box)* | ☒ Commissioner of the Superior Court<br>☐ Assistant Clerk | Name of Person Signing at Left<br>Amanda M. DeMatteis, Esq. | Date signed<br>03/18/2014 |
|---|---|---|---|

| If this Summons is signed by a Clerk: | For Court Use Only |
|---|---|
| a. The signing has been done so that the Plaintiff(s) will not be denied access to the courts.<br>b. It is the responsibility of the Plaintiff(s) to see that service is made in the manner provided by law.<br>c. The Clerk is not permitted to give any legal advice in connection with any lawsuit.<br>d. The Clerk signing this Summons at the request of the Plaintiff(s) is not responsible in any way for any errors or omissions in the Summons, any allegations contained in the Complaint, or the service of the Summons or Complaint. | File Date |

| I certify I have read and understand the above: | Signed *(Self-Represented Plaintiff)* | Date |
|---|---|---|

Name and address of person recognized to prosecute in the amount of $250

Amanda M. DeMatteis, Esq.

| Signed *(Official taking recognizance; "X" proper box)* | ☒ Commissioner of the Superior Court<br>☐ Assistant Clerk | Date<br>03/18/2014 | Docket Number |
|---|---|---|---|

STATE OF CONNECTICUT:
                 : ss: HARTFORD           MARCH 19, 2014

COUNTY OF HARTFORD   :

       Then and by virtue hereof, and by direction of the Plaintiff's Attorney, I left a

verified true and attested copy of the original WRIT, SUMMONS, COMPLAINT AND

STATEMENT OF AMOUNT IN DEMAND, with and in the hands of ANGIE GUAY,

FULFILLMENT SPECIALIST OF NATIONAL REGISTERED AGENTS, INC., ONE

CORPORATE CENTER, REGISTERED AGENT FOR SERVICE and duly authorized

to accept service for the within named defendant **CHIPOTLE MEXICAN GRILL,**

**LLC,** in the said town of HARTFORD, County of Hartford.



**Connecticut**
of Hartford
Judicial Department

**State of**
County

The within is the original WRIT, SUMMONS, COMPLAINT AND

STATEMENT OF AMOUNT IN DEMAND, with my doings thereon endorsed.

| | | ATTEST |
|---|---|---|
| Verified pages | $ 8.00 | |
| Endorsements | 1.60 | |
| Service | 30.00 | KEITH NIZIANKIEWICZ |
| Travel | 12.00 | CT STATE MARSHAL |
| | ----------- | HARTFORD COUNTY |
| Total | $51.60 | |

**KEITH D. NIZIANKIEWICZ**
*CONNECTICUT STATE MARSHAL*
P.O. BOX 280054 • EAST HARTFORD, CONNECTICUT 06128-0054 • OFFICE: (860) 610-0295

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

### CASE NO.: _____

DALEY ANTOINE,

     Plaintiff,

vs.

CHIPOTLE MEXICAN GRILL, INC.,

     Defendant.

_____/

## **DECLARATION OF DAVID GOTTLIEB**

I, David Gottlieb, declare and state as follows:

1.     I am employed as the Director, Compliance and Field People Support of the Chipotle Mexican Grill group of companies (collectively, "Chipotle"), which includes Chipotle Mexican Grill, Inc.  I am providing this declaration in support of the Notice of Removal filed by Chipotle Mexican Grill, Inc.

2.     I have been employed by Chipotle since April 2010 and have served as its Director, Compliance and Projects and Director, Compliance and Field People Support from that date to the present.  Through my experience in that position, I have acquired personal knowledge of the corporate structure of Chipotle and its affiliated entities.  I have also become personally familiar with each of Chipotle's officers, executive directors, board members, executive team directors and regional directors and am knowledgeable about the respective duties and responsibilities of each. I am also generally familiar with the locations of Chipotle restaurants and with the number of employees employed by Chipotle and its affiliated entities.  I have

personal knowledge of the facts set forth below, and if called upon to testify to them, I could and would do so competently and truthfully.

3.      Chipotle develops and operates fast-casual, fresh Mexican food restaurants.

4.      Chipotle Mexican Grill, Inc. is a corporation incorporated under the laws of the State of Delaware.

5.      Chipotle's corporate headquarters is located at 1401 Wynkoop Street, Suite 500, Denver, Colorado 80202.

6.      Chipotle employs approximately 150 administrative and executive employees at its Denver headquarters.  True and correct copies of excerpts from Chipotle's Form 10-K for the period ending December 31, 2013 – identifying 1401 Wynkoop Street, Suite 500, Denver, Colorado 80202, as the address of Chipotle's "Principal Executive Offices" – are attached hereto as **Exhibit 1**.

7.      Chipotle also operates a small executive office at 126 Fifth Avenue, New York, New York 10011.  One of Chipotle's two co-Chief Executive Officers and its Chief Marketing and Development Officer split their time working between the New York and Chipotle's Denver headquarters.

8.      Chipotle also maintains a small office in Columbus, Ohio, where it employs approximately 45 people who perform accounting functions.  There are no high level officers who direct, control or coordinate the corporation's activities from this small administrative office in Ohio.

9.      Chipotle also maintains a small administrative office in several of the seven regions into which its restaurants are divided: Rocky Mountain, Pacific, Central, Southeast, Southwest, Mid-Atlantic and Northeast.  The Rocky Mountain regional office is located within

{01266394 / 1}

Chipotle's Denver headquarters, at 1401 Wynkoop Street, Suite 500, Denver, Colorado 80202. The Pacific regional office is located in Sacramento, California. The Central regional office is located in Oak Brook, Illinois. The Mid-Atlantic regional office is located in Washington, D.C. The Northeast regional office is located in New York, New York. Chipotle does not maintain regional offices for either its Southeast or Southwest regions.

10.     The foregoing regional offices serve primarily as a base of operations for each Executive Team Director or Regional Director, a small regional People Support staff and a small regional staff of Local Marketing Strategists. The only people who regularly work out of each regional office are People Support Specialists who report to the People Support Managers. Although some of the Executive Team Directors, Regional Directors, and regional Local Marketing Strategists have dedicated office space in some of these regional offices, each of them spends the significant majority of his or her time working at, and traveling between, the restaurants in his or her respective region, rather than at the regional office. Each of these regional offices also serves as a base of operations for a small regional facilities maintenance staff, which spends most of its time working at the restaurants in the region, and which reports directly to Chipotle's Denver headquarters.

11.     Other than the offices described in paragraphs 5-10, above, Chipotle does not maintain any other executive or administrative offices.

12.     Chipotle's principal decision makers are its executive officers, executive directors, board of directors and executive team directors/regional directors.

13.     Chipotle's executive officers consist of two co-Chief Executive Officers, a Chief Financial Officer, a Chief Marketing and Development Officer, and two Restaurant Support Officers.

14.    Chipotle's two co-Chief Executive Officers are the principal executive officers of the corporation and are responsible for the total management of the corporation by facilitating the operation of its business while guiding its officers and employees in furtherance of the company's objectives.   One of the two co-Chief Executive Officers works from offices in Chipotle's corporate headquarters, located at 1401 Wynkoop Street, Suite 500, Denver, Colorado 80202.  The other co-Chief Executive Officer splits his time between Chipotle's executive office in New York City and its headquarters in Denver.

15.    Chipotle's Chief Financial Officer is the corporation's principal financial and accounting officer and is responsible for all financial, accounting and reporting functions of the corporation, as well as for overseeing information technology, training, safety, security and risk for the entire corporation.   The Chief Financial Officer works from an office in Chipotle's corporate headquarters, located at 1401 Wynkoop Street, Suite 500, Denver, Colorado 80202 and from Chipotle's Central Regional Office.

16.    Chipotle's Chief Marketing and Development Officer is responsible for the physical expansion of the corporation by overseeing the identification of new markets for Chipotle restaurants and the construction of new restaurants in appropriate markets, throughout the United States and internationally. The Chief Marketing and Development Officer is also responsible for improving the corporation's marketing direction and message, deepening its relationship with customers and continuing to attract new customers.   As such the Chief Marketing and Development Officer oversees all advertising and promotional programs (including print, outdoor, transit and radio advertisements), in-store communications and design elements (such as menus and signs).  The Chief Marketing and Development Officer splits his time between Chipotle's office in New York City and its headquarters in Denver.

18.     Chipotle also employs two Restaurant Support Officers who are responsible for the overall restaurant operations in their respective regions of the country.   Both Restaurant Support Officers report directly to the co-Chief Executive Officer in Denver, who, along with the other co-Chief Executive Officer, is ultimately responsible for all business operations. The two Restaurant Support Officers are based out of Denver, Colorado.

19.     Chipotle's executive directors consist of:   an Executive Director of IT; an Executive Director of Purchasing; an Executive Director of Facilities Construction and Design; and an Executive Director of Safety, Security and Risk.

20.     Chipotle's Executive Director of IT is responsible for maintaining and improving the corporation's integrated information system, which manages the flow of information within each of Chipotle's restaurants and between the restaurants and the corporate offices in Denver. The Executive Director of IT works from an office in Chipotle's corporate headquarters, located at 1401 Wynkoop Street Suite 500, Denver, Colorado 80202.

21.     Chipotle's Executive Director of Purchasing is responsible for overseeing the procurement of food ingredients, equipment and supplies for all of Chipotle's restaurants, throughout the United States and internationally.  The Executive Director of Purchasing works from an office in Chipotle's corporate headquarters, located at 1401 Wynkoop Street, Suite 500, Denver, Colorado 80202.

22.     Chipotle's Executive Director of Facilities and Construction is responsible for overseeing the development, construction and maintenance of new and existing Chipotle restaurants.   The Executive Director of Facilities and Construction works from an office in Chipotle's corporate headquarters, located at 1401 Wynkoop Street, Suite 500, Denver, Colorado 80202.

{01266394 / 1}

23.     Chipotle's Executive Director of Safety, Security and Risk, is responsible for overseeing Chipotle's efforts to minimize its exposure to a variety of potential sources of liability.  The Executive Director of Safety, Security and Risk works from an office in Chipotle's corporate headquarters, located at 1401 Wynkoop Street, Suite 500, Denver, Colorado 80202. Chipotle's Customer Service department reports to Chipotle's Executive Director of Safety, Security and Risk and is also located in the corporation's headquarters, at 1401 Wynkoop Street, Suite 500, Denver, Colorado 80202.

24.     Chipotle's board of directors consists of nine members, including the two co-CEOs.  The members of the board of directors are responsible for adopting policies to support the corporation's values and to provide good corporate governance for the entire corporation. Chipotle's board of directors typically meets three or four times per year in Denver, Colorado, and one time per year in some other, varying location.

25.     Chipotle's Executive Team Directors and Regional Directors work in one of the seven regions into which Chipotle's restaurants are divided:  Rocky Mountain, Pacific, Central, Southeast, Southwest, Mid-Atlantic and Northeast. Each region includes multiple states. For example, the Pacific region currently encompasses Washington, Oregon, Nevada, Arizona and California.  Each Executive Team Director or Regional Director is responsible for business operations in his or her region and reports to one of the two Restaurant Support Officers. Although some of these Executive Team Directors or Regional Directors have dedicated office space in some of the regional offices described in paragraphs 9-10, above, each of them spends most of his or her time working at, and traveling between, the restaurants in his or her respective region, rather than at the regional office.

26. Thus, Chipotle, directly or through its affiliates, currently employs over 45,000 people and operates over 1,500 restaurants throughout the United States, as well as in Canada, England, Germany and France (see Exhibit 1).

27. Almost all of the high level officers who direct, control and coordinate the activities of Chipotle work from the corporate headquarters, located at 1401 Wynkoop Street, Suite 500, Denver, Colorado 80202. As such, virtually all of the core executive and operational functions of Chipotle are carried out from the corporation's Denver headquarters, and, to a much lesser extent, from its small executive office in New York City.  With the exception of some accounting functions that are performed by employees in Columbus, Ohio, Chipotle's major administrative functions are conducted in its Denver headquarters as well.

28.    Chipotle's Denver corporate headquarters is not simply an office where the company holds its board meetings or where its principal decision makers can work when they happen to be in Colorado.  Rather, the Denver corporate headquarters is where, among other things, Chipotle's real estate design, development, construction and administration is conducted; its purchasing research, analysis, standards and orders are generated; its training materials are developed; its information technology systems are identified, implemented and improved upon; its legal decisions are vetted; its financial models are developed, refined and communicated; its customer service matters are addressed; its compensation and benefits decisions are made; its workers' compensation, customer and employee incidents are addressed; and its lease matters are resolved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this __16th__ day of April, 2014.

_____
DAVID GOTTLIEB

# EXHIBIT 1

(Declaration of David Gottlieb)

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2013**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from            to**
**Commission File Number: 1-32731**

# CHIPOTLE MEXICAN GRILL, INC.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **84-1219301** |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |

| | |
|---|---|
| **1401 Wynkoop Street, Suite 500 Denver, CO** | **80202** |
| (Address of Principal Executive Offices) | (Zip Code) |

**Registrant's telephone number, including area code: (303) 595-4000**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common stock, par value $0.01 per share | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   ☒ Yes   ☐ No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act (check one):

☒ Large accelerated filer ☐ Accelerated filer ☐ Non-accelerated filer (do not check if a smaller reporting company) ☐ Smaller reporting company

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☒

As of June 28, 2013, the aggregate market value of the registrant's outstanding common equity held by non-affiliates was $7.10 billion, based on the closing price of the registrant's common stock on such date, the last trading day of the registrant's most recently completed second fiscal quarter. For purposes of this calculation, shares of common stock held by each executive officer and director and by holders of more than 5% of the outstanding common stock have been excluded since those persons may under certain circumstances be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

As of January 30, 2014, there were 31,024,168 shares of the registrant's common stock, par value of $0.01 per share outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

Part III incorporates certain information by reference from the registrant's definitive proxy statement for the 2014 annual meeting of shareholders, which will be filed no later than 120 days after the close of the registrant's fiscal year ended December 31, 2013.

Annual Report

## Information Systems

We use an integrated information system to manage the flow of information within each restaurant and between the restaurants and our corporate offices and which is accessible remotely by our field staff. This system includes a point-of-sales local area network that helps facilitate the operations of the restaurant by recording sales transactions and printing orders in the appropriate locations within the restaurant. Additionally, the point-of-sales system is used to authorize, batch and transmit credit card transactions, to record employee time clock information, and to produce a variety of management reports. Select information that is captured from this system is transmitted to our corporate offices on a daily basis, which enables management to continually monitor operating results. We believe that our current point-of-sales systems will be an adequate platform to support our continued expansion. See "Risk Factors—General Business Risks—*We may incur costs resulting from security risks we face in connection with our electronic processing and transmission of confidential customer and employee information*" below for a discussion of certain risks associated with our point-of-sales systems.

## Employees

As of December 31, 2013, we had about 45,340 employees, including about 3,740 salaried employees and about 41,600 hourly employees. None of our employees are unionized or covered by a collective bargaining agreement.

## Available Information

We maintain a website at www.chipotle.com, including an investor relations section at ir.chipotle.com in which we routinely post important information, such as webcasts of quarterly earnings calls and other investor events in which we participate or host, and any related materials. Our Code of Conduct is also available in this section of our website. You may access our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports, as well as other reports relating to us that are filed with or furnished to the SEC, free of charge in the investor relations section of our website as soon as reasonably practicable after such material is electronically filed with or furnished to the SEC. The public may also read and copy materials we file with the SEC at the SEC's Public Reference Room, which is located at 100 F Street, NE, Room 1580, Washington, DC 20549. You can obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC also maintains a website that contains reports, proxy and information statements and other information regarding issuers that file electronically with the SEC at www.sec.gov.

The contents of the websites mentioned above are not incorporated into and should not be considered a part of this report. The references to the URLs for these websites are intended to be inactive textual references only.

## ITEM 1A.   RISK FACTORS

### Cautionary Note Regarding Forward-Looking Statements

This report includes statements of our expectations, intentions, plans and beliefs that constitute "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934 and are intended to come within the safe harbor protection provided by those sections. These statements, which involve risks and uncertainties, relate to the discussion of our business strategies and our expectations concerning future operations, margins, profitability, liquidity and capital resources and to analyses and other information that are based on forecasts of future results and estimates of amounts not yet determinable. Forward-looking statements include our projections of the number of restaurants we expect to open in 2014, our expected comparable restaurant sales results during 2014, our expectations for food cost inflation and food costs as a percentage of revenue in 2014, statements about potential menu price increases in 2014, projections of restaurant development costs and other expenses, statements of our intention to open restaurants in one or more specified locations, statements regarding the potential impact of ongoing economic uncertainty on our business, statements about possible repurchases of our common stock, forecasts of

9

Our progress in opening new restaurants from quarter to quarter may also occur at an uneven rate, which may result in quarterly sales and profit growth falling short of market expectations in some periods. Similarly, our growth strategy and the substantial investment associated with the development of each new restaurant (as well as the impact of our new restaurants on the sales of our existing restaurants) may cause our operating results to fluctuate and be unpredictable or adversely affect our profits.

### *Our new restaurants, once opened, may not be profitable, and may adversely impact the sales of our existing restaurants.*

Historically, many of our new restaurants have opened with an initial ramp-up period typically lasting 24 months or more, during which they generated sales and income below the levels at which we expect them to normalize. This is in part due to the time it takes to build a customer base in a new area, higher fixed costs relating to increased labor and other start-up inefficiencies that are typical of new restaurants, and a larger proportion of our recent openings being in higher rent sites than we have historically targeted. It may also be difficult for us to attract a customer base if we are not able to staff our restaurants with employees who perform to our high standards. If we are unable to build the customer base that we expect for new restaurant locations or overcome the higher fixed costs associated with new restaurant locations, new restaurants may not have similar results as our existing restaurants and may not be profitable. We also have lowered the average development cost, net of landlord reimbursements, for new Chipotle restaurants in the U.S. significantly in recent years, from about $916,000 in 2008 to about $800,000 in 2013. In 2014, we expect average development costs to increase about 5%. In the event we are not able to achieve the average development costs we expect for 2014 or sustain the benefits achieved in prior years, which could result from inflation, project mismanagement or other reasons, our new restaurant locations could also result in decreased profitability. Additionally, our new restaurant development activity has broadened recently to incorporate trade areas or restaurant sites in which we have little or no prior experience, including smaller or more economically mixed communities, highway sites, outlet centers, and restaurants in airports, food courts, or on military sites. The risks relating to building a customer base and managing development and operating costs may be more significant in some or all of these types of trade areas or restaurant sites.

In addition, we have now opened restaurants in nearly all major metropolitan areas across the U.S. New restaurants opened in existing markets may adversely impact sales in previously-opened restaurants in the same market as customers who frequent our established restaurants begin to visit a newly-opened restaurant instead. This impact could worsen as we open additional restaurants, and could make it more difficult for us to increase comparable restaurant sales and profitability. Existing restaurants could also make it more difficult to build the customer base for newly-opened restaurants in the same market.

### *Our expansion into international markets may present increased risks due to lower customer awareness of our brand, our unfamiliarity with those markets and other factors.*

In 2008, we opened our first restaurant outside the U.S., in Toronto, Canada. In 2010 we opened our first restaurant in the United Kingdom in London, in 2012 we opened our first restaurant in France in Paris, and in 2013 we opened our first restaurant in Germany in Frankfurt. As of December 31, 2013, 16 of our restaurants were located outside of the U.S. As a result of our small number of restaurants outside the U.S. and the relatively short time we have been operating those restaurants, we have lower brand awareness, lower sales and/or transaction counts, and less operating experience in these markets. The markets in which we've opened restaurants outside the U.S., and any additional new markets we enter outside the U.S. in the future, have different competitive conditions, consumer tastes and discretionary spending patterns than our U.S. markets. As a result, new restaurants outside the U.S. may be less successful than restaurants in our existing markets. Specifically, due to lower consumer familiarity with the Chipotle brand, differences in customer tastes and spending patterns, or for other reasons, sales at restaurants opened outside the U.S. may take longer to ramp up and reach expected sales and profit levels, and may never do so, thereby affecting our overall profitability. To build brand awareness in international markets, we may need to make greater investments in advertising and promotional activity than we originally planned, which could negatively impact the profitability of our operations in those markets.

12

Our main office is located at 1401 Wynkoop Street, Suite 500, Denver, Colorado, 80202 and our telephone number is (303) 595-4000. We lease our main office and substantially all of the properties on which we operate restaurants. For additional information regarding the lease terms and provisions, see Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations—*Contractual Obligations*," as well as Note 7 "Leases" in our consolidated financial statements included in Item 8. "Financial Statements and Supplementary Data."

We own sixteen properties and operate restaurants on all of them.

**ITEM 3.   LEGAL PROCEEDINGS**

For information regarding legal proceedings, see Note 9 "Commitments and Contingencies" in our consolidated financial statements included in Item 8. "Financial Statements and Supplementary Data."

**ITEM 4.   MINE SAFETY DISCLOSURES**

Not applicable.

Annual Report

# EXHIBIT D



Neutral
As of: April 17, 2014 1:00 PM EDT

# Chien v. Commonwealth Biotechnologies, Inc.

United States District Court for the District of Connecticut
May 28, 2013, Decided; May 28, 2013, Filed
Civil No. 3:12CV1378(AWT)

**Reporter:** 2013 U.S. Dist. LEXIS 74458; 2013 WL 2319331

ANDREW CHIEN, Plaintiff, v. COMMONWEALTH BIOTECHNOLOGIES, INC., RICHARD FREER AND LECLAIRRYAN, A PROFESSIONAL CORPORATION, Defendants.

**Subsequent History:** Dismissed by, Judgment entered by Chien v. Commonwealth Biotechnologies, Inc., 2013 U.S. Dist. LEXIS 118853 (D. Conn., Aug. 21, 2013)

| Core Terms |
| --- |

diversity, domesticate

**Counsel:** [*1] Andrew Chien, Plaintiff, Pro se, New Haven, CT.

For Richard J. Freer, LeClairRyan, a Professional Corporation, Defendants: Joaquin L. Madry, LEAD ATTORNEY, LeClairRyan, Hartford, CT.

**Judges:** Alvin W. Thompson, United States District Judge.

**Opinion by:** Alvin W. Thompson

| Opinion |
| --- |

## RULING ON MOTIONS TO REMAND

The pro se plaintiff, Andrew Chien ("Chien"), brought this action in Connecticut Superior Court against defendants Commonwealth Biotechnologies, Inc. ("CBI") [1], Dr. Richard J. Freer ("Dr. Freer") and LeClairRyan, a Professional Corporation ("LeClairRyan"). The defendants removed this case to federal court, and the plaintiff has filed two motions to remand the case to Connecticut Superior Court. For the reasons set forth below, the motions to remand are being denied.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This action arises from a case tried in Chesterfield County Circuit Court in the Commonwealth of Virginia, where Chien was found liable to Dr. Freer for $1.6 million in damages caused by Chien's tortious conduct, which included acts of defamation and conspiracy. Final judgment was entered against Chien and the other [*2] defendant in the Virginia action on August 9, 2012.

### A. The Instant Action

On September 12, 2012, Chien filed a complaint in Connecticut Superior Court in New Haven asserting seven claims: 1) malicious prosecution against Dr. Freer and LeClairRyan, 2) abuse of process against Dr. Freer and LeClairRyan, 3) "bad faith and submitted falsified or perjury information" against Dr. Freer and LeClairRyan, 4) unjust enrichment against Dr. Freer, 5) "securities fraud and fiduciary duty violation" against CBI, 6) "fiduciary duty violation" against CBI, and 7) "manipulation operation" against Dr. Freer. On October 5, 2012, the defendants removed the case to this court pursuant to 28 U.S.C. § 1441(b) based on diversity jurisdiction. Chien is a resident of Connecticut; Dr. Freer is a resident of Virginia; and LeClairRyan is organized and incorporated under Virginia law and has its headquarters in Richmond, Virginia.

The plaintiff filed a "Motion to Remand this Case to State Court due to Defendant Freer's Violation of 28 U.S.C. § 1446(b)(2)(A)" ("First Motion to Remand") on October 31, 2012, and a "Motion to Remand this Case to State Court due to the Lack of Subject-Matter Over this Case and to Require [*3] Sanction over Defendant LeClairRyan due to 28 U.S.C. § 1447(c)" ("Second Motion to Remand") on November 2, 2012.

### B. Connecticut Judgment Domestication Proceeding

On September 26, 2012, Dr. Freer filed a Certification Concerning Foreign Judgment (the "Certification") in Connecticut Superior Court in New Haven. The Certification requested that the judgment obtained by Dr. Freer in the Commonwealth of Virginia against Chien be treated in the same manner as a Connecticut judgment (the "Connecticut Judgment Domestication Proceeding").

---

[1]   The court has entered an order dismissing the case as to CBI only without prejudice. See Doc. No. 11.

On October 10, 2012, Chien filed a pleading in the Connecticut Judgment Domestication Proceeding styled as "Response/Complaint" and attempted to assert counterclaims and third party claims against the defendants.

Dr. Freer successfully domesticated his Virginia judgment in Connecticut.

## II. DISCUSSION

Chien contends, inter alia, that complete diversity does not exist and that the removal of this case by Dr. Freer and LeClairRyan, counsel for Dr. Freer, was in violation of 28 U.S.C. § 1446(b)(2)(A) and was fraudulent. Defendants Freer and LeClairRyan argue that removal was proper pursuant to 28 U.S.C. § 1441(b) because the requirements of federal diversity jurisdiction [*4] have been met. The court agrees.

"The federal removal statute allows a defendant to remove an action to the United States District Court in any civil action brought in a State court of which the district courts of the United States have original jurisdiction....The district courts...have original jurisdiction of all civil actions where the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between...[inter alia] citizens of different States." Bounds v. Pine Belt Mental Health Care Resources, 593 F.3d 209, 215 (2d Cir. 2010) (internal quotation marks omitted; citations omitted). "To remove a case based on diversity jurisdiction, it is incumbent upon the diverse defendant to aver that all the requirements of diversity jurisdiction have been met....Complete diversity of citizenship of the parties is required, since an action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought....In other words: When a plaintiff sues more than one defendant in a diversity action, the plaintiff must meet the requirements of the diversity statute for each defendant [*5] or face dismissal." Id. (internal quotation marks omitted).

"An individual's citizenship, within the meaning of the diversity statute, is determined by his domicile." Palazzo v. Corio, 232 F.3d 38, 42 (2d Cir. 2000). An individual's domicile is the place where he has "his true fixed home and principal establishment, and to which, whenever he is absent, has the intention of returning." Linardos v. Fortuna, 157 F.3d 945, 948 (2d Cir. 1998) (quoting 13B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3612, at 526 (2d ed. 1984)). "[A] corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." 28 U.S.C. § 1332(c)(1). A corporation's principal place of

business is its "nerve center" or its main headquarters and "not simply an office where the corporation holds its board meetings." Hertz Corp. v. Friend, 559 U.S. 77, 130 S.Ct. 1181, 1192, 175 L. Ed. 2d 1029 (2010) ("We conclude that 'principal place of business' is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities. It is the place that Courts [*6] of Appeals have called the corporation's 'nerve center.'").

The party opposing a motion to remand bears the burden of showing that the requirements for removal have been met. See California Pub. Emps.' Ret. Sys. v. WorldCom, Inc., 368 F.3d 86, 100 (2d Cir. 2004) (citing Grimo v. Blue Cross/Blue Shield of Vermont, 34 F.3d 148, 151 (2d Cir. 1994)); 14C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3739 (3d ed. 1998) (collecting cases). "In light of the congressional intent to restrict federal court jurisdiction, as well as the importance of preserving the independence of state governments, federal courts construe the removal statute narrowly, resolving any doubts against removability." Lupo v. Human Affairs Intern., Inc., 28 F.3d 269, 274 (2d Cir.1994) (citing Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 108, 61 S. Ct. 868, 85 L. Ed. 1214 (1941); 1A J. Moore and B. Ringle, Moore's Federal Practice ¶ 0.157, at 38 (2d ed. 1989)).

Removal is appropriate in this action under 28 U.S.C. § 1441(b) because the complete diversity of citizenship and the amount in controversy requirements are satisfied. Complete diversity exists in this case because Chien is a citizen of Connecticut [*7] and the defendants are citizens of Virginia. Moreover, the amount in controversy is $2,003,100, which exceeds the $75,000 required in federal diversity cases.

As to the First Motion to Remand, Chien argues that Dr. Freer violated 28 U.S.C. § 1446(b)(2)(A) because he had filed the Connecticut Judgment Domestication Proceeding on September 26, 2012 with respect to the Virginia judgment and removing this case was contrary to the doctrines of res judicata and/or collateral estoppel in that Dr. Freer had an identical dispute with Chien being litigated in Connecticut Superior Court. However, the doctrines of res judicata and collateral estoppel have no applicability here. The instant action brought by the plaintiff involves the seven claims described above. On the other hand, the Connecticut Judgment Domestication Proceeding filed by Dr. Freer is a statutory, post-judgment procedure that allows a creditor like Dr. Freer to expedite the recognition and domestication of a foreign judgment in Connecticut pursuant to the Uniform Enforcement of Foreign Judgments Act, Conn. Gen. Stat. § 52-604 et seq.

As to the Second Motion to Remand, Chien argues that this court should remand the case to the Connecticut

2013 U.S. Dist. LEXIS 74458, *8

[*8] Superior Court because this court lacks subject matter jurisdiction and because LeClairRyan, counsel for Dr. Freer, violated 28 U.S.C. § 1446(b)(2)(A) by removing the case. First, Chien argues that complete diversity does not exist because all of the parties are citizens of Connecticut. In particular, he argues that LeClairRyan is a citizen of Connecticut based on the fact that it has offices in New Haven and Hartford and is licensed and doing business in Connecticut. However, the court concludes that LeClairRyan is a citizen of Virginia because its place of incorporation is Virginia; its headquarters is located in Richmond, Virginia; its principal place of business is Richmond, Virginia; and its executive officers direct, control and coordinate its activities in Richmond, Virginia. See Hertz Corp., 130 S.Ct. at 1192.

Second, he reasserts his argument that LeClairRyan violated 28 U.S.C. § 1446(b)(2)(A) because Dr. Freer had an identical dispute with Chien being litigated in Connecticut Superior Court. As discussed above, this argument is without merit.

The plaintiff includes a request for sanctions in the Second Motion to Remand. That request is being denied as lacking merit, as reflected [*9] in the discussion above, because the defendants did not act improperly in removing this case to federal court.

Therefore, the motions to remand are being denied.

**III. CONCLUSION**

For the reasons set forth above, the plaintiff's Motions to Remand (Doc. Nos. 15 and 17) are hereby DENIED.

It is so ordered.

Signed this 28th day of May 2013 at Hartford, Connecticut.

/s/ Alvin W. Thompson

United States District Judge

# EXHIBIT E



Neutral
As of: April 17, 2014 1:01 PM EDT

# Baron v. Maxam North Am., Inc.

United States District Court for the District of Connecticut
April 13, 2012, Decided; April 13, 2012, Filed
CIVIL ACTION NO. 3:11-CV-198 (JCH)

**Reporter:** 2012 U.S. Dist. LEXIS 52315; 2012 WL 1247257

CHRISTINA BARON, Plaintiff, v. MAXAM NORTH AMERICA, INC. and MAXAM INITIATION SYSTEMS, LLC, Defendants.

**Prior History:** Baron v. Maxam Initiation Sys., LLC, 2011 Conn. Super. LEXIS 2327 (Conn. Super. Ct., June 20, 2011)

---

**Core Terms**

---

baron, terminate, discipline, bias, summary judgment motion, summary judgment, state court, pregnancy, employment action, disciplinary, cat's, paw, set forth, detonators, glass

**Counsel:** [*1] For Christina Baron, Plaintiff: James F. Sullivan, LEAD ATTORNEY, Howard, Kohn, Sprague & Fitzgerald, Hartford, CT.

For Maxam North America, Inc., Maxam Initiation Systems, LLC, Defendants: Angel Ya-Chi Feng, Lawrence Peikes, LEAD ATTORNEYS, Wiggin & Dana LLP-Stfd, Stamford, CT.

**Judges:** Janet C. Hall, United States District Judge.

**Opinion by:** Janet C. Hall

---

**Opinion**

---

RULING RE: PLAINTIFF'S MOTION TO REMAND (DOC. NO. 39) AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 21)

## I. INTRODUCTION

Plaintiff, Christina Baron, brings this case against her former employer, Maxam Initiation Systems, LLC, and its parent company, Maxam North America, Inc. (collectively, "Maxam"), alleging that she was discriminated against on the basis of her pregnancy, in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(a)(7). Baron originally brought her claim in Connecticut state court, but Maxam removed the case to federal court. Maxam then

moved for summary judgment as to Baron's claim. Subsequent to Maxam's Motion for Summary Judgment, Baron filed a Motion to Remand to State Court.

## II. FACTUAL BACKGROUND

In or around November 2007, Maxam hired Baron on a temporary basis to serve as an assembly line [*2] worker at its manufacturing facility in Sterling, CT. L.R. 56(a)(1) Stmt. ¶ 1; L.R. 56(a)(2) Stmt. ¶ 1. In or around May 2008, Maxam hired Baron as a regular full-time employee. L.R. 56(a)(1) Stmt. ¶ 2; L.R. 56(a)(2) Stmt. ¶ 2. Around that time, the Plant Manager, Anthony Tremblay, assigned Baron to the position of shift line supervisor, or line lead, on the third shift. See L.R. 56(a)(1) Stmt. ¶ 2; L.R. 56(a)(2) Stmt. ¶ 2. In this position, Baron was responsible for assembly duties, overseeing production, reviewing orders and assigning work, ensuring work was performed in a safe, proper, and timely manner, and generally supervising team members. L.R. 56(a)(1) Stmt. ¶ 3; L.R. 56(a)(2) Stmt. ¶ 3.

In or around June or July 2008, Maxam began running a "swing shift" between the normally scheduled first and third shifts, and Tremblay assigned Baron to be line lead on the newly scheduled second shift. See L.R. 56(a)(1) Stmt. ¶ 4; L.R. 56(a)(2) Stmt. ¶ 4. Approximately a month later, Maxam eliminated the second shift, and reassigned Baron back to her position in the third shift as a line lead, which she shared with the incumbent third shift line lead going forward. L.R. 56(a)(1) Stmt. ¶ 5; [*3] L.R. 56(a)(2) Stmt. ¶ 5.

In or around May 2008, Tremblay counseled Baron regarding her use of a company computer for personal matters during working hours. L.R. 56(a)(1) Stmt. ¶ 6; L.R. 56(a)(2) Stmt. ¶ 6. On or about July 16, 2008, Tremblay issued an "Employee Warning Notice" to Baron for her failure to wear her safety glasses on consecutive days. L.R. 56(a)(1) Stmt. ¶ 8; L.R. 56(a)(2) Stmt. ¶ 8. The parties dispute whether Tremblay was aware Baron was pregnant when he issued that Notice. See L.R. 56(a)(1) Stmt. ¶ 9; L.R. 56(a)(2) Stmt. ¶ 9. Baron asserts that she notified Tremblay of her pregnancy "around the middle of

2012 U.S. Dist. LEXIS 52315, *3

July 2008." Baron Aff. ¶ 3. Maxam asserts that Tremblay became aware of Baron's pregnancy shortly after he issued the Notice on July 16, 2008. L.R. 56(a)(1) Stmt. ¶ 9.

On or about September 2, 2008, Maxam's General Manager, Dan Francelj, counseled Baron for submitting an inaccurate time card. L.R. 56(a)(1) Stmt. ¶ 10; Francelj Aff. ¶ 3. [1] On September 17, 2008, Tremblay issued Baron a "Disciplinary Action/Warning" for failing to sign out detonators. L.R. 56(a)(1) Stmt. ¶ 11; [2] Baron Dep. 138-45; Tremblay Dep. 20-21.

On October 3, 2008, an incident occurred where a live detonator ended up in a scrap box with inert detonators that were to be crushed, creating a safety hazard ("October 2008 incident"). See L.R. 56(a)(1) Stmt. ¶ 12; L.R. 56(a)(2) Stmt. ¶ 12. At Francelj's directive, Tremblay obtained written statements from several assembly workers who were familiar with the incident. See L.R. 56(a)(1) Stmt. ¶ 12; L.R. 56(a)(2) Stmt. ¶ 12. According to those statements, Baron was primarily responsible for the safety hazard. L.R. 56(a)(1) Stmt. ¶ 12; L.R. 56(a)(2) Stmt. ¶ 12.

As line lead, Baron had overall responsibility for ensuring all safety guidelines were followed during her shift. L.R. 56(a)(1) Stmt. ¶ 13; L.R. 56(a)(2) Stmt. ¶ 13. [*5] After reviewing the witness statements and speaking with Tremblay, Francelj determined that Baron was at fault for creating, or failing to prevent, a safety hazard as a result of the October 2008 incident. L.R. 56(a)(1) Stmt. ¶ 15; [3] Francelj Aff. ¶ 8.

In early October 2008, Francelj decided to eliminate the third shift, in response to a management directive to cut costs. L.R. 56(a)(1) Stmt. ¶ 16; [4] Tremblay Dep. 31-33; Francelj Aff. ¶ 4-5. Francelj determined that capacity could be met by adding only three of the five third shift employees to the first shift. L.R. 56(a)(1) Stmt. ¶ 17; [5] Francelj Aff. ¶ 5. Francelj selected Jessica Espita, a non-pregnant third shift employee, and Baron to be laid

off. L.R. 56(a)(1) Stmt. ¶ 17; [6] Francelj Aff. ¶¶ 5-6. Maxam then discharged Baron, effective October 17, 2008. L.R. 56(a)(1) Stmt. ¶ 20; L.R. 56(a)(2) Stmt. ¶ 20.

Baron originally filed this action in Connecticut Superior Court on January 10, 2011. See Doc. No. 1. On February 7, 2011, defendants removed the case to this court, asserting that removal was proper pursuant to *28 U.S.C. §§ 1332, 1441*, and *1446*. See id. On February 9, [*6] 2012, the court ordered defendants to come forward with some basis to support their assertion that the court has jurisdiction over this case. See Doc. No. 36. Defendants filed a response on February 17, 2012. See Doc. Nos. 37-38. On February 29, 2012, Baron filed a Motion to Remand to State Court. See Doc. No. 39. Defendants subsequently opposed Baron's Motion to Remand. See Doc. No. 43.

## II. MOTION TO REMAND

Prior to addressing Maxam's Motion for Summary Judgment, the court must first determine whether it has subject matter jurisdiction over this claim. As defendants removed the case to federal court, they have the burden of establishing that diversity jurisdiction exists. See Mehlenbacher v. Akzo Nobel Salt, Inc., 216 F.3d 291, 296 (2d Cir. 2000).

Pursuant to *28 U.S.C. § 1332*, diversity jurisdiction exists "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." [7] The existence of federal subject matter jurisdiction over an action removed from state court is normally determined as of the time of removal. See Hallingby v. Hallingby, 574 F.3d 51, 56 (2d Cir. 2009). Maxam must demonstrate that [*7] "it appears to a reasonable probability that the claim is in excess of the statutory jurisdictional amount." See Mehlenbacher, 216 F.3d at 296 (internal quotations omitted). Baron argues that the jurisdictional amount is not met because, at the time Maxam removed the case in February 2011, there was a pending action in state court to enforce an

---

[1]   Baron denies this fact in her Local Rule 56(a)(2) Statement;  **[*4]** however, she does not cite to any evidence to support his denial. See L.R. 56(a)(2) Stmt. ¶ 10. In accordance with L.R. 56(a)(3), where a party fails to provide a specific citation to evidence in the record, the court may deem such facts to be admitted. Because Maxam's asserted fact is supported by evidence in the record and Baron has failed to provide specific citations to support her denial, the court will deem the fact to be admitted.

[2]   See supra n. 1.

[3]   See supra n. 1.

[4]   See supra n. 1.

[5]   See supra n. 1.

[6]   See supra n. 1.

[7]   It appears undisputed that complete diversity exists in this case.

agreement between the parties to settle these claims for $10,000. [8] See Doc. No. 39 at 2. In addition, on March 1, 2012, Baron filed a post-removal clarifying stipulation stating:

> The plaintiff, Christina Baron, will neither seek nor accept damages against the defendants Maxam North America, Inc. and Maxam Initiation Systems, LLC for claims asserted in her state court complaint - that was removed to this Court - in excess of the amount that falls below the minimum for diversity jurisdiction under *28 U.S.C. § 1332*.

Maxam argues that such a stipulation is insufficient to deprive the court of jurisdiction, and that a reasonable estimate of Baron's potential recovery is well in excess of the jurisdictional amount. See Doc. Nos. 37, 43.

In accordance with Connecticut practice, Baron's "Demand for Relief" requests damages "in excess of $15,000." See Doc. No. 1. Where the pleadings are inconclusive as to the amount in controversy, courts may look outside the pleadings to other evidence in the record. See Vermande v. Hyundai Motor Am., Inc., 352 F. Supp. 2d 195, 199 (D. Conn. 2004). While the court may consider a settlement offer as a factor to consider in assessing the amount in controversy, the court must "be alert to the fact that settlement offers can often be wildly unrealistic and constitute mere puffery or posturing rather than a fair or realistic appraisal of a party's damages." See id. at 202- 03. Further, "a settlement demand or even an offer of judgment is not necessarily a fixed ceiling on a plaintiff's damages." See id. at 203.

Pursuant to the CFEPA, a plaintiff may recover back pay, emotional distress damages, and reasonable attorneys' fees. See C.G.S. § 46a-104; Thames Talent, Ltd. v. Comm'n on Human Rights, 265 Conn. 127, 141, 827 A.2d 659 (2003); [*9] Patino v. Birken Mfg. Co., 2009 Conn. Super. LEXIS 1331, at *44 (May 15, 2009). Maxam asserts that Baron's back pay may equal approximately $25,000. See Doc. No. 37 at 4-5. In addition, emotional

distress damages awards vary widely. See Patino, 2009 Conn. Super. LEXIS 1331 at *46 (noting that emotional distress damages of $5,000 to $65,000 may be appropriate for "less severe discrimination cases," and awards of $100,000 to $400,000 may be appropriate for severe discrimination cases). Finally, should Baron prevail, she would be entitled to reasonable attorneys' fees, which Maxam estimates could equal $50,000 or higher. See Patino v. Birken Mfg. Co., 2009 Conn. Super. LEXIS 2166, at *9, *16 (Aug. 6, 2009) (noting that Connecticut courts have adopted twelve factors to consider in determining reasonable attorney fees and awarding $42,800 in attorneys' fees for a hostile work environment claim). [9] Taken together, there is a reasonable probability that Baron's claim may amount to an award greater than $75,000. Consequently, defendants have met their burden of establishing that the amount in controversy meets the jurisdictional amount, and the court has subject matter jurisdiction over this action.  [*10] [10]

## III. MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009). Thus, the role  [*11] of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Id. In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts'

---

[8]   On June 20, 2011, a Superior Court judge determined  [*8] that the agreement was not enforceable because defendants decided not to sign the agreement. See Baron v. Maxam Initiation Sys., LLC, et al, WWM-CV-09-5005218-S, 2011 Conn. Super. LEXIS 2327, Entry No. 129.00.

[9]   Attorneys' fees may be used to satisfy the amount in controversy where they are recoverable as a matter of right pursuant to statute. See Kimm v. KCC Trading, Inc., 449 Fed. Appx. 85, 2012 WL 171503, at *1 (2d Cir. 2012).

[10]   Though Baron attempts to strip the court of jurisdiction by filing a "Post-Removal Clarifying Stipulation" asserting that she will not accept damages in excess of the jurisdictional amount, the Stipulation is not sufficient to do so for two reasons. First, the Stipulation does not address the damages Baron was seeking at the time of removal, when the court's jurisdiction attached. Second, it is well-established that "a plaintiff cannot seek to deprive a federal court of jurisdiction by reducing her demand to $75,000 or less once the jurisdictional threshold has been satisfied." See Luo v. Mikel, 625 F.3d 772, 776 (2d Cir. 2010).

demonstrating that there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir.2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)); see also [*12] Havey v. Homebound Mortg., Inc., 547 F.3d 158, 163 (2d Cir. 2008) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)) (stating that a non-moving party must point to more than a mere "scintilla" of evidence in order to defeat a motion for summary judgment).

B. Discussion

A pregnancy discrimination claim under the CFEPA is analyzed similarly to a federal claim under Title VII, as amended by the Pregnancy Discrimination Act. See Canales v. Schick Mfg., Inc., 2011 U.S. Dist. LEXIS 104568, 2011 WL 4345006, at *1 (D. Conn. Sept. 15, 2011). Typically, such claims are subject to the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See id. Plaintiff must first meet a "de minimis" burden by setting forth a prima facie case of pregnancy discrimination, by demonstrating that "(1) she is a member of a protected class; (2) she satisfactorily performed the duties required by the position; (3) she was discharged; and (4) [either] her position remained open and was ultimately filled by a non-pregnant employee . . . [or] the discharge occurred in circumstances giving rise to an inference of unlawful discrimination." See 2011 U.S. Dist. LEXIS 104568, [WL] at *1-2 (quoting Kerzer v. Kingly Mfg., 156 F.3d 396, 401 (2d Cir. 1998)). [*13] If the plaintiff meets this requirement, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employee's dismissal. See Adamczyk v. New York State Dep't of Corr. Svcs., 2012 U.S. App. LEXIS 6781, 2012 WL 1130637, at *2 (2d Cir. Apr. 5, 2012). If the employer sufficiently carries this burden of production, "the pattern of presumptions and burden shifts . . . drops away, and the question in adjudicating the defendants' motion for summary judgment becomes simply whether the evidence in plaintiff's favor, when viewed in the light most favorable to the plaintiff, is sufficient to sustain a reasonable finding that her dismissal was motivated at least in part by . . . discrimination." See Tomassi v. Insignia Fin. Grp., 478 F.3d 111, 114 (2d Cir. 2007).

Maxam does not appear to challenge Baron's ability to set forth a prima facie case. See Mem. Supp. Mot. at 9 (arguing that no evidence exists to demonstrate pretext). As the court must view the facts in the light most favorable to the plaintiff, the court will assume arguendo that Baron has set forth a prima facie case of discrimination. [11]

The burden of production then shifts to Maxam to set forth a legitimate, non-discriminatory reason for terminating Baron's employment. Here, Francelj asserts that, in response to a cost-cutting effort by the parent company's management which demanded significant reductions in operating expenses, he decided to discontinue the third shift, which Baron worked on, and eliminate two assembly line jobs. See Francelj Aff. ¶¶ 4-5. Francelj asserts that he selected Baron to be laid off because he understood her to be the least senior employee on the third shift, he had recently disciplined her for irregularities with her time card and was aware Tremblay had disciplined her for a safety violation, and because he had determined that she was primarily responsible for the October 2008 incident. See id. ¶ 7. On the basis of these assertions, Maxam has met its burden [*15] of production.

Next, the court considers whether the evidence, when taken in the light most favorable to the plaintiff, is sufficient to allow a reasonable jury to conclude that the defendants' asserted reason was merely a pretext for discrimination, and that the defendants' decision to terminate her employment was motivated, at least in part, by discrimination. See Tomassi, 478 F.3d at 114; Quaratino v. Tiffany & Co., 71 F.3d 58, 64 (2d Cir. 1995). Maxam argues that Baron cannot demonstrate that its decision was motived by anti-pregnancy bias because the individual Baron asserts was biased against her, her supervisor, Anthony Tremblay, was not involved in the decision to terminate her employment. See Reply at 2-3. In response, Baron asserts that Francelj considered Tremblay's input in determining which employees to terminate, that input was tainted by discriminatory animus, and consequently, Tremblay's bias played a causal role in her termination. See Pl.'s Sur-Reply at 3.

Baron's theory stems from the Supreme Court's decision regarding "cat's paw liability" in Staub v. Proctor Hospital, 131 S. Ct. 1186, 179 L. Ed. 2d 144 (2011). In Staub, the Court analyzed a claim pursuant to the Uniformed Services [*16] Employment and Reemployment Rights Act ("USERRA"), and determined that "if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse

[11]  It is undisputed that Baron was pregnant when she was terminated, and that Tremblay was [*14] aware of her pregnancy. L.R. 56(a)(1) Stmt. ¶¶ 9, 20; L.R. 56(a)(2) Stmt. ¶¶ 9, 20. Baron's affidavit asserts sufficient facts which, if believed, would allow a jury to find that the circumstances of her termination give rise to an inference of discrimination, especially in light of her minimal burden at this stage. See Baron Aff. ¶¶ 4-11.

employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." See Staub v. Proctor Hosp., 131 S. Ct. 1186, 1194, 179 L. Ed. 2d 144 (2011). In analyzing the plaintiff's claim, the Court noted that USERRA "is very similar to Title VII," and relied on the background of general tort law. See id. at 1191. In addition, the Second Circuit has previously acknowledged that, so long as the biased individual played a meaningful role in the termination process, a Title VII plaintiff may succeed on her claim even absent evidence of bias by the ultimate decisionmaker. See Holcomb v. Iona Coll., 521 F.3d 130, 143 (2d Cir. 2008). Consequently, plaintiff may rely on a cat's paw liability theory in asserting her CFEPA claim. See Herbert v. Nat'l Amusements, Inc., 2012 U.S. Dist. LEXIS 7392, 2012 WL 201758, at *3 (D. Conn. Jan. 23, 2012) (allowing plaintiff to advance a cat's paw theory of liability in a CFEPA claim).

To establish Maxam's liability on a cat's paw basis, Baron must first demonstrate [*17] that Tremblay's actions were motivated by anti-pregnancy bias. See Staub, 131 S. Ct. 1194. Next, Baron must demonstrate that those actions were intended by Tremblay to cause an adverse employment action. See id. Finally, Baron must demonstrate that Tremblay's actions were the proximate cause of her termination. See id.; see also Rajaravivarma v. Bd. of Trs. for the Connecticut State Univ. Sys., 2012 U.S. Dist. LEXIS 40848, 2012 WL 1019877, at *20 (D. Conn. Mar. 26, 2012).

In support of her assertion that Tremblay acted with anti-pregnancy bias, Baron points to several disciplinary incidents which, she asserts, were motivated by Tremblay's negative attitude toward her after she disclosed her pregnancy. First, Baron asserts that Tremblay disciplined her for failing to wear safety glasses, even though she had informed him that the glasses provided to her did not fit, and even though Tremblay himself failed to wear safety glasses when performing the same tasks. See Baron Aff. ¶¶ 4-5. [12] Next, Baron states that Tremblay disciplined her for failing to sign out detonators that another individual had failed to sign in, even though this was a common practice, in which Tremblay himself had engaged. See id. ¶¶ 9-10. Finally, [*18] Baron contends that, while disciplining her for her role in the October 2008 incident, Tremblay called her derogatory names and departed from ordinary conduct by leaving his office door open while disciplining her. See id. ¶ 11. If a jury were to believe Baron's testimony that Tremblay's attitude towards her changed after she notified

him of her pregnancy, it would be reasonable for a jury to find that Tremblay's actions subsequent to that notification were motivated by anti-pregnancy bias. See Quaratino, 71 F.3d at 65 (noting a supervisor's "change in attitude toward plaintiff" as a material disputed fact).

Next, Baron must demonstrate that Tremblay's actions were "intended by [Tremblay] to cause an adverse employment [*19] action." See Staub, 131 S. Ct. 1194 (emphasis in original). In Staub, the Supreme Court indicated that a jury could reasonably infer intent where a supervisor notified the personnel officer responsible for terminating employees of the plaintiff's non-compliance with a disciplinary directive and the personnel officer fired the plaintiff immediately thereafter, and there was evidence that the supervisor had specific intent to cause the plaintiff to be terminated. See id. Here, however, Baron has not introduced any evidence that Tremblay had any specific intent to cause Baron's termination. Though it is undisputed that Tremblay issued discipline to Baron for failing to wear safety glasses and failing to sign out detonators, Baron does not cite any evidence to support the assertion that Tremblay intended that discipline to cause Baron's termination, or that he took any steps to ensure the discipline he issued contributed to Baron's termination. Further, unlike in Staub, where the plaintiff was terminated immediately following the disciplinary incident, the disciplinary incidents here occurred one to three months before Baron was fired. See L.R. 56(a)(1) Stmt. ¶¶ 8, 11, 20; L.R. 56(a)(2) [*20] Stmt. ¶¶ 8, 11, 20.

Further, plaintiff has not introduced any evidence to contradict Francelj's assertion that he did not consult Tremblay in his decision to discontinue the third shift or to lay off two employees. See Francelj Supp. Aff. ¶ 2. Although Baron points out that Tremblay was responsible for most of Baron's disciplinary history—including compiling witness statements regarding the October 2008 incident, which Francelj relied on in determining which employees to lay off—this reliance is not enough for cat's paw liability unless Tremblay intended for that history and information to cause Baron's termination. Based on the undisputed evidence in the record, Francelj made the decision to discontinue the third shift and terminate two employees independently. There is no evidence that he consulted with Tremblay or that Tremblay knew Francelj was considering this action. Consequently, it would not be reasonable for a jury to find that Tremblay had the intent to cause Baron's termination by layoff due to a reduction in the work force when Tremblay was not aware of that upcoming action. See Adamczyk, 2012 U.S. App. LEXIS

---

[12]   Defendants assert that this incident occurred prior to Baron's disclosure to Tremblay that she was pregnant. See L.R. 56(a)(1) Stmt. ¶ 9. At this stage, however, the court must view the evidence in the light most favorable to the plaintiff. As neither party has produced evidence to demonstrate conclusively whether Baron told Tremblay of her pregnancy before or after July 16, 2008, the date of the discipline, the court will accept plaintiff's assertion at this stage.

2012 U.S. Dist. LEXIS 52315, *20

6781, 2012 WL 1130637, at *3 (holding that a reasonable juror could not conclude that a supervisor [*21] intended to cause an adverse employment action where there was no evidence the supervisor instigated the disciplinary inquiry which led to plaintiff's termination). Consequently, plaintiff fails set forth sufficient evidence to demonstrate pretext under a cat's paw liability theory, and summary judgment is appropriate.

## IV. CONCLUSION

For the foregoing reasons, defendants' Motion for Summary Judgment (Doc. No. 21) is **granted.** In addition, plaintiff's Motion to Remand to State Court (Doc. No. 39) is **denied**, plaintiff's Motion for Leave to file Sur-Reply (Doc. No. 34) is **granted**, and defendants' Consent Motion for Leave to file Response (Doc. No. 35) is **granted. SO ORDERED.**

Dated at Bridgeport, Connecticut this 13th day of April, 2012.

/s/ Janet C. Hall

Janet C. Hall

United States District Judge

# EXHIBIT F



2011

# Termination Form

**Employee Information**

Employee name: **Daley Antoine**

Employee # (required): **218784**

Current job title: **Service Manager**

Restaurant/Department #: **1981**

Department name:

---

**Termination Information**

Date of Termination: **3/16/2013**

| Salaried Employees: | Hourly Employees: |
|---|---|
| Number of days to be paid: | Regular hours worked: **8.98** |
| Actual number of days worked: | Overtime hours worked: |
| Vacation eligibility*: | Vacation eligibility*: |
| Vacation days used: | Vacation days used: |
| Vacation days to be paid: | Vacation days to be paid: |
| Overtime hours worked: | |

Payout Instructions:

Is the final payout needed before scheduled pay date?  No

If termination check is needed, please send termination form to your regional Payroll Coordinator.

If yes, when needed?

Mailing instructions:

Paycard Number: _____

* Please refer to benefits guide for days eligible at termination.

---

**Termination Reason**

Reason:  Involuntary-Unacceptable Work Performance
All involuntary terms need to be sent to your regional People Support Specialist for processing.

Eligible for rehire?  No

---

**Manager Responsibilities**

Retrieve from salaried employees the following items, as applicable:
☐ Keys          ☐ Meal Card/Burrito Bucks          ☐ Proprietary Manuals
☐ Parking Pass  ☐ Company Car - Fuel & Maint. Card
☐ Credit Card/Review Expense Reports/Cancel travel, conferences, etc.

Contact IT before termination/separation to:
☐ Cancel computer access and discuss computer equipment (if applicable) to include:
   Computer, Docking Station, Linksys or Hub, Wireless Card, Monitor, Printer, Phone.
☐ Cancel voicemail

You need to: ☐ Change/delete restaurant/building codes (building, safe, alarm)

---

**Approval**

Manager's name (print): **Mayra Garcia**                    Date: **3/16/2013**

Manager's signature: _____

Manager's manager's name (print):                          Date:

Manager's manager's signature: _____

# EXHIBIT G

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

CASE NO.: _____

DALEY ANTOINE,

     Plaintiff,

vs.

CHIPOTLE MEXICAN GRILL, INC.,

     Defendant.

_____ /

## DECLARATION OF KRISTEN DOMINGUEZ

I, Kristen Dominguez, declare and state as follows:

1.     I am employed by Chipotle Mexican Grill, Inc. ("Chipotle") as its Compensation Manager.  I am providing this declaration in support of the Notice of Removal filed by Chipotle.

2.     At all times relevant to the allegations contained in the Complaint for damages filed by plaintiff Daley Antoine, I have held my current position.

3.     As Chipotle's Compensation Manager, I am familiar with Chipotle's records reflecting the employment of, the wages paid to and the benefits of, Chipotle employees. I have reviewed Chipotle's payroll, benefit and personnel records concerning plaintiff.

4.     Chipotle hired plaintiff as a crew member in April 2012.  He was promoted to a Service Manager effective January 1, 2013. Plaintiff's date of termination was March 16, 2013.

5.     As of March 16, 2013 - plaintiff's date of termination - he was earning an hourly wage of $13.00.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ___17___ day of April, 2014.

_____
KRISTEN DOMINGUEZ

# EXHIBIT H

Savage v. Envirotest Systems Corp., Not Reported in F.Supp. (1996)

Case 3:14-cv-00515-JAM Document 11 Filed 04/17/14 Page 47 of 117

1996 WL 732551
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Tammy SAVAGE

v.

ENVIROTEST SYSTEMS CORPORATION

Civ. No. 3:96cv1931 (AHN). | Dec. 13, 1996.

**Opinion**

### RULING ON MOTION TO REMAND

NEVAS, District Judge:

**\*1** Plaintiff, Tammy Savage ("Savage") sued her former employer, Envirotest Systems Corporation ("Envirotest") in state court alleging that her termination violated Connecticut statutory and common laws. Envirotest subsequently removed her action to federal court.

Savage now moves to remand to state court, arguing that the court has neither diversity nor federal question jurisdiction over this controversy. Because the court concludes that it has diversity jurisdiction, Savage's motion [doc. # 5] is DENIED.

### BACKGROUND

On August 23, 1996, Savage filed suit against Envirotest in Connecticut Superior Court, Judicial District of Hartford/ New Britain at Hartford.

Savage's Complaint alleges that she began working at Envirotest as a part-time emissions tester in October 1993 and was later promoted to various management positions. (*See* Compl. ¶¶ 3-4, 7.) In March 1995, certain Envirotest employees began organizing themselves for collective bargaining and subsequently elected to participate in a membership election sponsored by Local 371 of the United Food and Commercial Workers International Union. (*See id.* ¶¶ 5-6.)

As part of her management training, Savage received documentation regarding Envirotest's "just cause" and progressive discipline policies. (*See id.* ¶¶ 9-10, Ex. A.) After her promotion, Envirotest told Savage not to promote the formation of a union and to dissuade employees from voting in the union election, but Savage refused to follow these instructions. (*See id.* ¶¶ 11-12, 14.)

On November 6, 1995, Envirotest accused Savage of stealing ten dollars and gave her the option of resigning or being terminated. (*See id.* ¶¶ 16-18.) Savage initially resigned in protest, but later retracted her resignation. However, Envirotest did not allow her to return to work. (*See id.* ¶ 19.)

Count One of the Complaint alleges that Envirotest breached Savage's implied employment contract by discharging her without regard to its "just cause" and progressive discipline policies. (*See id.* ¶¶ 22-24.) Count Two alleges that, by failing to follow these policies, Envirotest also breached the covenant of good faith and fair dealing arising out of Savage's implied contract. (*See id.* ¶¶ 25-28.)

Count Three alleges that Envirotest violated Conn. Gen. Stat. § 31-51q by discharging Savage in retaliation for her support of union organization efforts. (*See id.* ¶¶ 25-27.) Count Four alleges that Envirotest wrongfully discharged Savage in violation of the public policies embodied in Conn. Gen. Stat. §§ 31-51q, 31-104, 31-105, and 29 U.S.C. §§ 157, 158. (*See id.* ¶ 28.)

Count Five alleges that, because Savage did not receive her final paycheck until November 17, 1995, Envirotest violated Conn. Gen. Stat. § 31-71c. (*See id.* ¶¶ 20, 25.)

Finally, Count Six alleges that, by wrongly accusing her of theft and discharging her under false pretenses, Envirotest intentionally inflicted emotional distress on Savage. (*See id.* ¶¶ 29-32.)

**\*2** On September 19, 1996, Envirotest removed this action to federal court, pursuant to 28 U.S.C. §§ 1441(a) & (b) and 1443, based on federal question and diversity jurisdiction. (*See* Notice of Removal ¶¶ 7-12.)

### DISCUSSION

The removal statute authorizes a defendant to remove to federal court "any civil action brought in State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a). Thus, "[o]nly [[[those] state court actions that originally could have been filed in federal court may be removed to federal court by the

defendant." *Williams v. Caterpillar Tractor Co.,* 482 U.S. 386, 392 (1987).

"The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $50,000, exclusive of interest and costs, and is between [*inter alia*] citizens of different States...." 28 U.S.C. § 1332. Here, because the dispute regarding diversity jurisdiction is limited to the amount in controversy,[1] Envirotest need only demonstrate by competent proof "that is appears to a 'reasonable probability' that the claim is in excess of the statutory jurisdictional amount." *United Food & Commercial Workers' Union, Local 919, AFL-CIO v. Centermark Properties Meriden Square, Inc.,* 30 F.3d 298, 301 (2d Cir. 1994) (quoting *Tongkook Am., Inc. v. Shipton Sportswear Co.,* 14 F.3d 781, 784 (2d Cir. 1994)).

Here, Savage seeks 1) restoration of her employment, 2) back pay from the date of discharge, 3) restoration of all employment benefits, 4) punitive damages pursuant to Conn. Gen. Stat. § 31-51q, 5) double damages pursuant to Conn. Gen. Stat. § 31-72, 6) attorney's fees and costs pursuant to sections 31-51q and 31-72, 7) future economic and non-economic damages, and 8) general punitive damages, (*see* Compl., Prayer for Relief), but claims no specific amount other than a demand "in excess of $15,000 exclusive of costs and interests." (*See id.,* Statement of Amount in Demand.)

"Where the pleadings themselves are inconclusive as to the amount in controversy, federal courts may look outside those pleadings to other evidence in the record." *United Food,* 30 F.3d at 305. Envirotest has submitted evidence that provides the court with a benchmark from which to estimate the amount in controversy. Through the uncontested affidavit of its Human Resources Manager, Envirotest has established that, had Savage remained employed, she would have earned approximately $16,640 during a fiscal year and received a twenty-four cent raise in February of 1996. (*See* Aff. Dianah Cox [hereinafter "Cox Aff."] ¶¶ 5-6.)

Furthermore, punitive damages, *see Bell v. Preferred Life Assurance Soc'y,* 320 U.S. 238, 240 (1943), and attorneys fees where authorized by statute or contract, *see Missouri State Life Ins. Co. v. Jones,* 290 U.S. 199, 200 (1933); *Givens v. W.T. Grant Co.,* 457 F.2d 612, 614 (2d Cir.), *vacated on other grounds,* 409 U.S. 56 (1972), may be included in assessing the amount in controversy. *See also* 1 James Moore, *Moore's Federal Practice* ¶¶ 0.93[4], 0.99[2] (2d ed. 1996). While the court is mindful that the use of punitive or exemplary damages

to satisfy the amount in controversy warrants "special judicial scrutiny," *Snyder v. Pleasant Valley Finishing Co., Inc.,* 756 F. Supp. 725, 732 (S.D.N.Y. 1990) (court must ascertain whether substantive law permits such damages), section 31-51q, upon which Savage relies, expressly provides that employers who discipline or discharge employees for exercising their free speech rights "shall be liable" for punitive damages and reasonable attorney's fees. Conn. Gen. Stat. Ann. § 31-51q (West 1987).[2] In addition, Savage's intentional infliction of emotional distress claim permits the award of punitive damages upon proof that Envirotest acted with reckless indifference toward, or intentionally violated, her rights. *See Berry v. Loiseau,* 223 Conn. 786, 811-12 (1992).[3]

**\*3** Savage alleges that Envirotest constructively discharged her on November 6, 1995. It is reasonable to assume that this action, allowing for discovery and dispositive motions, will not be tried for another year. Thus, if Savage ultimately prevails, her accrued backpay and employment benefits alone will likely exceed $35,000. When reasonable attorney's fees incurred over this period and punitive damages are aggregated to these compensatory damages, it appears to a "reasonable probability" that the amount in controversy is in excess of $50,000. *See, e.g., Kahle v. Houghton Mifflin Co.,* No. 94 C 2803, 1994 WL 374242, at *2-3 (N.D. Ill. July 14, 1994) (amount in controversy satisfied when employees entitled to at least $30,000 in accrued back pay and lost benefits and state law permitted punitive damages for unlawful and wilful conduct).

Because the court concludes that it has diversity jurisdiction over this controversy, it need not determine whether federal question jurisdiction exists. However, it is concerned that Counts Three, Four, and Six of Savage's Complaint, which are based on Envirotest's alleged retaliation against union organization efforts, may be preempted by sections 7 and 8 of the National Labor Relations Act ("NLRA"), 29 U.S.C. 157, 158, requiring their dismissal. *See, e.g., San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 245 (1959) ("[w]hen activity is arguably subject to § 7 or § 8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board...."); *Shane v. Greyhound Lines, Inc.,* 868 F.2d 1057 (9th Cir. 1989) (wrongful discharge claim based on participation in union activities preempted by §§ 7 & 8 of NLRA); *Viestenz v. Fleming Co., Inc.,* 681 F.2d 699 (10th Cir.) (same), *cert denied,* 459 U.S. 972 (1982); *Williams v. Herman Goelitz Candy Co.,* No. Civ. S-94-1226, 1995 WL

**Savage v. Envirotest Systems Corp., Not Reported in F.Supp. (1996)**

Case 3:14-cv-00515-JAM  Document 1-1  Filed 04/17/14  Page 49 of 117

840766 (E.D. Cal. Nov. 17, 1995) (same); *Veal v. Kerr-McGee Coal Corp.,* 682 F. Supp. 957 (S.D. Ill. 1988) (NLRA preempted First Amendment claim based on association with union but not intentional infliction of emotional distress claim), *aff'd,* 885 F.2d 873 (7th Cir. 1989); *Clayton v. Gold Bond Bldg. Prods.,* 679 F. Supp. 637 (E.D. Mich. 1987) (wrongful discharge claim preempted). Accordingly, the parties shall file, within 30 days of this ruling, appropriate motions and memoranda of law addressing this issue.

*CONCLUSION*

For the foregoing reasons, Savage's Motion to Remand [doc. # 5] is DENIED.

SO ORDERED.

---

Footnotes

1    Savage is a citizen of Connecticut and Envirotest is a Delaware Corporation. (*See* Compl. ¶¶ 1-2.)

2    Attorney's fees under § 31-51q may be included in the jurisdictional sum even though the statute awards them as costs. *Compare* 28 U.S.C. § 1332 *with Jones,* 290 U.S. at 200; *Moore's Federal Practice* ¶ 0.99[2].

3    Savage also claims double damages and attorney's fees under section 31-72 for Envirotest's alleged violation of 31-71c ("Whenever an employer discharges an employee, the employer shall pay the employee's wages in full not later than the business day next succeeding the date of such discharge."). However, section 31-72 concerns only unpaid wages for services previously rendered, not backpay. *See Sansone v. Clifford,* 219 Conn. 217, 228-29 (1991). Here, Savage invokes section 31-71c and 31-72 for Envirotest's tardy payment of her last paycheck. Assuming bi-weekly payment at a rate of eight dollars per hour, (*see* Cox Aff. ¶ 3), this claim amounts to roughly $1,300 when doubled. Any attorney's fees award regarding this recovery would be correspondingly small. Thus, this claim, although not insignificant, contributes only marginally to the amount in controversy.

---

# EXHIBIT I

No *Shepard's Signal™*
As of: April 17, 2014 1:02 PM EDT

# Weaver v. Readco Mgmt., LLC

Superior Court of Connecticut, Judicial District of New London at New London
November 24, 2010, Decided; November 24, 2010, Filed
CV106005041

**Reporter:** 2010 Conn. Super. LEXIS 3020; 2010 WL 5095347

Petricia Weaver v. Readco Management, LLC

**Notice:** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**Judges:** [*1] Emmet L. Cosgrove, J.

**Opinion by:** Emmet L. Cosgrove

---

| Opinion |
|---|

MEMORANDUM OF DECISION RE MOTION TO STRIKE # 101

FACTS

On July 16, 2010, the defendant, Readco Management, LLC, filed a motion to strike and a memorandum in support. On July 28, 2010, the plaintiff, Petricia Weaver, filed an objection to the motion to strike. On August 2, 2010, the defendant filed a reply to the plaintiff's objection.

The plaintiff filed her original complaint on July 6, 2010, which alleged causes of action for disability discrimination and age discrimination in violation of the Connecticut Fair Employment Practices Act (CFEPA). The plaintiff sought compensatory and punitive damages, attorneys fees, costs of litigation and interest. The defendant moved to strike the age discrimination count of the plaintiff's complaint as well as the plaintiff's request for punitive damages. Subsequently, on July 28, 2010, the plaintiff filed an amended complaint as of right, which withdrew her age discrimination claim. Accordingly, the only remaining issue is whether the plaintiff's request for punitive damages should be stricken.

The plaintiff alleges that the defendant discriminated against her on the basis of a disability in violation of General Statutes § 46a-60. [1] [*2] The plaintiff claims that she filed a timely complaint of age and disability discrimination with the Connecticut Commission on Human Rights & Opportunities (CHRO) and was issued a release of jurisdiction from the CHRO on or about May 14, 2010. In this action, the plaintiff seeks compensatory damages as well as attorneys fees, costs, punitive damages and "legal and equitable relief" as provided for by General Statutes § 46a-104 and interest pursuant to General Statutes § 37-3a. [2] There is no dispute that the plaintiff's request for punitive damages is based on her claim pursuant to the CFEPA.

DISCUSSION

"The purpose of a motion to strike is to contest . . . the legal sufficiency of the allegations of any complaint . . . to state a claim upon which relief can be granted." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC v. Alves*, 262 Conn. 480, 498, 815 A.2d 1188 (2003). In ruling on a motion to strike, "[t]he role of the trial court [is] to examine the [complaint], construed in favor of the [plaintiff], to determine whether the [plaintiff has] stated a legally sufficient cause of action." (Internal quotation marks omitted.) *Dodd v. Middlesex Mutual Assurance Co.*, 242 Conn. 375, 378, 698 A.2d 859 (1997). [*3] "Practice Book . . . § 10-39, allows for a claim for relief to be stricken only if the relief sought could not be legally awarded." *Pamela B. v. Ment*, 244 Conn. 296, 325, 709 A.2d 1089 (1998).

The defendant argues that the plaintiff's request for punitive damages should be stricken because punitive damages are not available under § 46a-104 as a matter of fact or law. The defendant argues that the statute does not explicitly provide for an award of punitive damages.

---

[1]  Section 46a-60(a)(1) provides, in relevant part: "It shall be a discriminatory practice in violation of this section . . . [f]or an employer, by the employer or the employer's agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual . . . because of the individual's . . . present or past history of mental disability . . ."

[2]  Section 37-3a(a) provides, in relevant part: "[I]nterest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions or arbitration proceedings under chapter 909 . . ."

2010 Conn. Super. LEXIS 3020, *3

Further, the defendant argues that an award of attorneys fees is regarded as punitive in nature and that allowing an award of punitive damages under § 46a-104 would amount to an award of double attorneys fees.

The plaintiff notes that there is a split of authority with respect to the issue of whether punitive damages are allowed under § 46a-104, but argues that the language of the statute is inclusive and that there is no prohibition against an award of punitive damages contained within the statute. Additionally, the plaintiff argues that the rules of statutory construction support the interpretation that punitive damages are permitted under § 46a-104.

A plaintiff who successfully brings a claim under the CFEPA is entitled  [*4] to relief pursuant to § 46a-104, which provides: "The court may grant a complainant in an action brought in accordance with Section 46a-100 such legal and equitable relief which it deems appropriate including, but not limited to, temporary or permanent injunctive relief, attorneys fees and court costs." This court recently addressed all of the parties' arguments in *Tomick v. United Parcel Service, Inc.*, Superior Court, judicial district of New London, Docket No. CV 06 4008944 (October 28, 2010, Cosgrove, J.). [3] This court engaged in an analysis of the case law surrounding the issue of punitive damages as well as the statutory language and legislative history with respect to § 46a-104. Thereafter, this court concluded that "reviewing the legislative history, the policy that the legislation was designed to address and this section's language as compared to other statutory sections, the court holds that punitive damages are not authorized in this case to be imposed by either the jury or the court." *Id*. Based on the reasoning set forth in the *Tomick* decision, the court concludes that punitive damages may not be awarded under § 46a-104.  [*5] Accordingly, the defendant's motion to strike is granted.

Cosgrove, J.

---

[3]   The relevant portion of that opinion are annexed hereto for the convenience of the parties as Appendix A.

# EXHIBIT J



Caution
As of: April 17, 2014 1:03 PM EDT

# Mody v. GE

United States District Court for the District of Connecticut
October 25, 2006, Decided ; October 26, 2006, Filed
04cv358

**Reporter:** 2006 U.S. Dist. LEXIS 77929; 2006 WL 3050834

HEMANT K. MODY v. GENERAL ELECTRIC COMPANY

**Subsequent History:** Motion denied by, Motion for new trial granted by, in part, Motion for new trial denied by, in part, Motion granted by Mody v. GE, 2007 U.S. Dist. LEXIS 76654 (D. Conn., Oct. 15, 2007)

**Prior History:** Mody v. GE, Co., 2006 U.S. Dist. LEXIS 24439 (D. Conn., Apr. 26, 2006)

## Core Terms

liquidated damages, front pay, backpay, pre-judgment, calculate, suitable employment, stock option, compensatory, willful violation, punitive, age discrimination, prejudgment

## Case Summary

### Procedural Posture

Plaintiff former employee filed a motion for judgment with adjustment on back pay, pre- and post-judgment interest, and liquidated damages in connection with a jury verdict in his favor on his claims for retaliation based on race, national origin, and age in violation of, among other things, the Age Discrimination in Employment Act (ADEA), 29 U.S.C.S. § 626(b), against defendant former employer. Plaintiff also requested front pay.

### Overview

The jury awarded plaintiff back pay, compensatory damages, and punitive damages, and determined that he was entitled to liquidated damages due to a willful violation of the ADEA. The court held that plaintiff was entitled to back pay from the date of discharge until judgment, and that he was entitled to pre-judgment interest on the back pay award. The court declined to include pre-judgment interest in plaintiff's liquidated damages award. The court held that, although the evidence did not suggest that plaintiff was totally disabled from work and therefore ineligible for front pay, his prospects of securing suitable employment were severely diminished by his age, health condition, and dialysis needs. Defendant did not

show that plaintiff would have been able to find work commensurate with his skills at a salary equal to what he received before his demotion. It was not unreasonable to conclude that plaintiff would have been employed at least eight years beyond his discharge. The court rejected plaintiff's request, as part of the front pay award, for compensation for the value of his lost life insurance proceeds and for the value of stock options that he would have received.

### Outcome

The court granted in part and denied in part plaintiff's post-trial motion for court-awarded statutory liquidated damages, front pay, pre- and post-judgment interest, supplemental back pay, lost life insurance, and stock options. The court awarded compensatory damages, back pay, pre- and post-judgment interest, liquidated damages, and front pay.

## LexisNexis® Headnotes

Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest

*HN1* In a suit to enforce a federal right, whether to award prejudgment interest is left to the discretion of the district court, which must consider 1) the need to fully compensate the wronged party for actual damages suffered, 2) fairness and the relative equities of the award, 3) the remedial purpose of the statute involved, and/or 4) such other principles deemed relevant by the court.

Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest

Labor & Employment Law > Discrimination > General Overview

*HN2* It is ordinarily an abuse of discretion not to include pre-judgment interest on an award of back pay in an employment discrimination case.

Labor & Employment Law > ... > Remedies > Damages > Liquidated Damages

*HN3* The Age Discrimination in Employment Act, 29 U.S.C.S. § 626(b), provides for liquidated damages in the event of a willful violation of the statute.

2006 U.S. Dist. LEXIS 77929, *77929

Labor & Employment Law > ... > Remedies > Damages > Liquidated Damages

Labor & Employment Law > ... > Remedies > Damages > Liquidated Damages

**HN4** Liquidated damages under the Age Discrimination in Employment Act (ADEA), *29 U.S.C.S. § 626(b)*, are tied to the amount of pecuniary loss or harm suffered by the plaintiff. *Section 626(b)* directs that the amounts owing resulting from a violation of the ADEA shall be determined in accordance with the Fair Labor Standards Act (FLSA) § 216, which provides for damages in the amount of unpaid minimum wages, or unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. While the FLSA provides for mandatory awards of liquidated damages, an award of liquidated damages under the ADEA is allowed only in cases of willful violations. Thus, the FLSA's liquidated damages are considered to be compensatory, and the ADEA's liquidated damages are punitive in nature.

Labor & Employment Law > ... > Remedies > Damages > Liquidated Damages

**HN5** Generally, district courts have determined liquidated damages in accordance with plaintiff's actual damages or back pay award absent pre-judgment interest. Some courts have reasoned that a pre-judgment interest award should not be awarded on liquidated damages since pre-judgment interest and liquidated damages serve differing compensatory and punitive functions, respectively.

Labor & Employment Law > ... > Remedies > Damages > Backpay & Frontpay

**HN6** To compensate a plaintiff for future damages after a wrongful discharge pursuant to the Age Discrimination in Employment Act, *29 U.S.C.S. § 626(b)*, a court may exercise its discretion by ordering reinstatement or an award of front pay as equitable relief. An award of front pay is appropriate where reinstatement is not possible due to hostility or antagonism between the parties. Front pay serves to make a wronged plaintiff whole where the factfinder can predict that plaintiff has no reasonable prospect of obtaining comparable alternative employment. A request for front pay may be denied if the court finds that the back pay award is sufficient to make the plaintiff whole.

Evidence > Burdens of Proof > Allocation

Labor & Employment Law > ... > Remedies > Damages > Backpay & Frontpay

**HN7** In considering a front pay award, the court must take into account plaintiff's ability to mitigate his damages in the future, his age, education, training, work experience, skills, job market and reasonable prospects of obtaining comparable employment. Employees who have been terminated have a duty to use reasonable diligence in finding other suitable employment. However, that duty is not onerous. Plaintiff must have acted reasonably in attempting to gain other employment or in rejecting proffered employment. Suitable employment is a substantially equivalent job to that of plaintiff's former position. A plaintiff must demonstrate reasonable effort in seeking such suitable employment, yet it is the employer who bears the ultimate burden of proving that suitable work existed and that the employee failed to avail himself of such opportunities. The court may tailor the period for which front pay is calculated to the extent of plaintiff's efforts to find comparable employment.

Civil Procedure > Preliminary Considerations > Equity > Relief

**HN8** The court retains jurisdiction to grant such equitable relief to ensure that plaintiff be made whole.

**Counsel:** [*1]  For Hemant K. Mody, Ph.D, Plaintiff: Scott R. Lucas, LEAD ATTORNEY, Martin, Lucas & Chioffi, Stamford, CT; Claire E. Ryan, Martin, Lucas & Chioffi - Stamford, Stamford, CT.

For General Elec Co, Defendant: Grace Han, LEAD ATTORNEY, GE Consumer & Industrial, Plainville, CT; Richard Voigt, LEAD ATTORNEY, McCarter & English-Htfd, Hartford, CT; Robert J. Gallo, II., LEAD ATTORNEY, McCarter & English, Hartford, CT; Jenny L. Stewart, Paul, Hastings, Janofsky & Walker - CT, Stamford, CT; Patrick W. Shea, Paul, Hastings, Janofsky & Walker, Stamford, CT.

**Judges:** Warren W. Eginton, Senior United States District Judge.

**Opinion by:** Warren W. Eginton

---

**Opinion**

---

*Ruling on Plaintiff's Post-Trial MotionFor Court-Awarded StatutoryLiquidated Damages, Front Pay,Pre- And Post-Judgment Interest,Supplemental Back Pay, Lost Life InsuranceAnd Stock Options*

In this action, plaintiff Hemant Mody alleged retaliation based on race, national origin, and age discrimination in violation of Title VII, *42 U.S.C. § 1983*, the Age Discrimination in Employment Act ("ADEA"), and the Connecticut Fair Employment Practices Act ("CFEPA"); and retaliation [*2]  based on taking leave under the Family Medical Leave Act ("FMLA").

This case was tried to a jury on July 10 through 14, and July 17 and 18, 2006. On July 18, 2006, the jury rendered its answers to the special verdict form in favor of the

plaintiff on his claims of retaliation based on race, national origin, and age, and against plaintiff on his claim of retaliation based on FMLA. The jury found that plaintiff should be awarded $ 591,423 in back pay, $ 500,000 in compensatory damages, and $ 10 million in punitive damages. Additionally, the jury determined that plaintiff was entitled to an award of liquidated damages due to a willful violation of the ADEA.

Plaintiff now moves for judgment to enter consistent with the jury's special verdict findings with adjustment on the back pay, pre- and post-judgment interest, and the appropriate amount of liquidated damages. Plaintiff also requests relief in the form of front pay. For the following reasons, the Court will grant plaintiff's motion in part.

### DISCUSSION

#### Back Pay Award

On the special verdict form, the jury indicated that plaintiff was entitled to $ 591,423 in back pay. [1] Plaintiff requests the Court to enter judgment [*3] on the back pay award with an additional *pro rata* increase including pre-judgment interest to compensate for the time between the rendering of the special verdict and the entry of judgment.

Plaintiff is entitled to back pay from the date of discharge until the date of judgment. *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 167 (2d Cir. 1998). Further, plaintiff is entitled to an award of pre-judgment interest on the back pay award. An award of pre-judgment interest serves to "compensate the plaintiff for loss of the use of money wrongfully withheld." *Reichman v. Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278, 281 (2d Cir. 1987). *HN1* In a suit to enforce a federal right, whether to award prejudgment interest is left to the discretion of the district court, which must consider 1) the need [*4] to fully compensate the wronged party for actual damages suffered, 2) fairness and the relative equities of the award, 3) the remedial purpose of the statute involved, and/or 4) such other principles deemed relevant by the court. *Gierlinger v. Gleason*, 160 F.3d 858, 873 (2d Cir. 1998). *HN2* "[I]t is ordinarily an abuse of discretion not to include pre-judgment interest..." on an award of back pay in an employment discrimination case. *Saulpaugh v. Monroe Community Hospital*, 4 F.3d 134, 145 (2d Cir. 1993), *cert. denied*, 510 U.S. 1164, 127 L. Ed. 2d 539, 114 S. Ct. 1189 (1994).

Plaintiff has submitted a revised expert report calculating back pay and prejudgment interest at an amount of $

639,303, which is adjusted to October 8, 2006. Since almost a month has passed since that date, the Court will allow plaintiff an opportunity to submit another revised expert calculation adjusting the back pay to November 6, 2006. Accordingly, judgment will enter on the back pay award and prejudgment interest after plaintiff submits the revised calculation of back pay and prejudgment interest.

#### Liquidated Damages

*HN3* The ADEA provides for liquidated damages in the event [*5] of a willful violation of the statute. *29 U.S.C. § 626(b)*. The Court must now determine the appropriate amount to award on liquidated damages since the jury determined that plaintiff should be awarded liquidated damages due to a willful violation of the ADEA. Plaintiff submits that the Court should reach the liquidated damages award by doubling the amount of the back pay award including the pre-judgment interest and tax adjustment. [2] Defendant counters that the award of liquidated damages should not include pre-judgment interest or the tax adjustment factored into the back pay calculation by plaintiff's expert.

*HN4* Liquidated damages under the ADEA are tied to the amount of pecuniary loss or harm suffered by the plaintiff. See *Paolitto v. John Brown E. & C., Inc.*, 151 F.3d 60, 67 (2d Cir. 1998). [*6] *Section 626(b)* directs that the "amounts owing" resulting from a violation of the ADEA shall be determined in accordance with the Fair Labor Standards Act ("FLSA") § 216, which provides for damages "in the amount of . . . unpaid minimum wages, or . . . unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." While the FLSA provides for mandatory awards of liquidated damages, an award of liquidated damages under the ADEA is allowed "only in cases of willful violations." Thus, the FLSA's liquidated damages are considered to be compensatory, *Reich v. Southern New England Telecommunications Corp.*, 121 F.3d 58, 71 (2d Cir. 1997), and the ADEA's liquidated damages are punitive in nature. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 125, 105 S. Ct. 613, 83 L. Ed. 2d 523 (1985). This distinction bears upon the parties' competing calculations of the proper amount of liquidated damages.

The Court first addresses defendant's position that the liquidated damages award should not include the pre-judgment interest awarded on the back pay. *HN5* Generally, district courts have determined liquidated damages in accordance with [*7] plaintiff's actual

---

[1]   The Court had instructed the jury that back pay "may include salary, salary increases that you find he would have received, and any fringe benefits to which he would have been entitled."

[2]   The parties agree that the award on back pay appears to have adopted the expert report which included interest compounded annually at the rate enumerated pursuant to 28 U.S.C. § 1961(a) and the tax adjustment.

2006 U.S. Dist. LEXIS 77929, *7

damages or back pay award absent pre-judgment interest. *See Altman v. Port Authority of New York and New Jersey*, 879 F.Supp. 345, 352 (S.D.N.Y. 1995). Some courts have reasoned that a pre-judgment interest award should not be awarded on liquidated damages since pre-judgment interest and liquidated damages serve differing compensatory and punitive functions, respectively. *See Criswell v. Western Airlines, Inc.*, 709 F.2d 544, 557 (9th Cir. 1983); *Rosasa v. Hudson River Club Restaurant*, 1998 U.S. Dist. LEXIS 2665, 1998 WL 106141 (S.D.N.Y.); *cf. Fink v. City of New York*, 129 F.Supp.2d 511, 526 (E.D.N.Y. 2001) (noting that pre-judgment interest is not appropriate on an award of liquidated damages under analogous provision of Uniformed Services Employment and Reemployment Rights Act). In exercise of its discretion and in accordance with the purposes of the ADEA, the Court declines to include pre-judgment interest in plaintiff's liquidated damages award.

However, the Court rejects defendant's invitation to deduct the tax adjustment, which amount is integral to the amount of plaintiff's actual pecuniary harm.

Accordingly, the Court [*8] will enter judgment on the liquidated damages on an amount adjusted to consistent with the foregoing discussion.

*Front Pay*

Plaintiff requests $ 1,920,368, the value of plaintiff's income for approximately thirteen years until he becomes 65 years old. Defendant argues that plaintiff's request for front pay should be denied in its entirety because 1) plaintiff has not made reasonable efforts to avail himself of comparable employment opportunities, and 2) plaintiff's position may have been eliminated prior to 2019.

*HN6* To compensate a plaintiff for future damages after a wrongful discharge pursuant to the ADEA, a court may exercise its discretion by ordering reinstatement or an award of front pay as equitable relief. [3] *See Dominic v. Consolidated Edison Co. Of N.Y., Inc.*, 822 F.2d 1249, 1258 (2d Cir. 1987). An award of front pay is appropriate where reinstatement is not possible due to hostility or antagonism between the parties. *Pollard v. EI du Pont de Nemours & Co.*, 532 U.S. 843, 846, 121 S. Ct. 1946, 150 L. Ed. 2d 62 (2001). Front pay serves to make a wronged plaintiff whole where the factfinder can predict that plaintiff has no reasonable prospect of obtaining [*9] comparable alternative employment. *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 728 (2d Cir. 1984). A request for front pay may be denied if the court finds that the back pay award is sufficient to make the plaintiff whole. *Saulpaugh*, 4 F.3d at 145.

The Court first addresses whether plaintiff is entitled to front pay regardless of whether defendant would have eliminated his position even absent retaliatory animus. *HN7* In considering a front pay award, the Court must take into account plaintiff's ability to mitigate his damages in the future, his age, education, training, work experience, skills, job market and reasonable prospects of obtaining comparable employment. *Shorter v. Hartford Financial Services Group, Inc.*, 2005 U.S. Dist. LEXIS 19903, 2005 WL 2234507*3 (D. Conn.).

Employees who have been terminated have a duty to "use reasonable diligence in finding other suitable employment." *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 231, 102 S. Ct. 3057, 73 L. Ed. 2d 721 (1982). [*10] However, that duty is not onerous. *Dailey v. Societe Generale*, 108 F.3d 451, 456 (2d Cir. 1997). Plaintiff must have acted reasonably "in attempting to gain other employment or in rejecting proffered employment." *Hawkins v. 1115 Legal Service Care*, 163 F.3d 684, 695 (2d Cir. 1998). Suitable employment is a "substantially equivalent" job to that of plaintiff's former position. *See Ford Motor Co.*, 458 U.S. at 232. A plaintiff must demonstrate reasonable effort in seeking such suitable employment, yet it is the employer who bears the ultimate burden of proving that suitable work existed and that the employee failed to avail himself of such opportunities. *N.L.R.B. v. Thalbo Corp.*, 171 F.3d 102, 112 (2d Cir. 1999). The court may tailor the period for which front pay is calculated to the extent of plaintiff's efforts to find comparable employment. *Brenlla v. Lasorsa Buick Pontiac Chevrolet*, 2002 U.S. Dist. LEXIS 9358, 2002 WL 1059117*10 n.7 (S.D.N.Y.)

In this instance, plaintiff is a 52-year old male with serious health conditions, including severe chronic renal disease requiring 12 hours of daily dialysis treatment and a heart condition [*11] that has resulted in two heart attacks during the past three years. At present, plaintiff awaits a kidney replacement operation.

Plaintiff explained at trial that he has made efforts to find a suitable position through inquiries with his friends and other contacts, posting his resume with employment services, and reviewing job advertisements. He testified that he was not purposely remaining unemployed. During the past three years, he applied without success for positions related to the stock market and engineering. Although the evidence does not suggest that plaintiff is totally disabled from work and therefore ineligible for front pay, *see Saulpaugh*, 4 F.3d at 145, his prospects of securing "suitable" employment are severely diminished by his age, health condition and dialysis needs. Further,

---

[3]   In this instance, neither party argues that reinstatement is a viable remedy.

2006 U.S. Dist. LEXIS 77929, *11

defendant has not persuaded the Court that plaintiff would be able "to find work commensurate with his skills at a salary equal to what he received" before his demotion. *Padilla v. Metro-North Commuter Railroad*, 92 F.3d 117, 126 (2d Cir. 1995). Thus, the Court will not deny plaintiff's request for front pay on the ground of failure to mitigate his damages.

[*12] However, defendant presented evidence concerning the financial challenges facing plaintiff's department, in particular funding positions that were not related to product implementation. Nevertheless, defendant provided no actual evidence that it had planned an implementation of a reduction-in-force, and as plaintiff points out, transfers had been allowed within the corporation in order to retain qualified individuals. While the Court is not persuaded that plaintiff's position was secure until 2019, defendant has not fully demonstrated that plaintiff's position would have been eliminated prior to September 2006. In light of plaintiff's on-going work on the magic panel project and his positive performance ratings prior to his discrimination complaint, it is not unreasonable to conclude that plaintiff would have been employed at least eight years beyond his April 2003 discharge. The Court will award front pay until April 2011. The Court requests plaintiff to provide an amount for the front pay award reflecting his income and benefits, consistent with the discussion below, from November 2006 through April 2011.

*Life Insurance*

Plaintiff requests, as part of the front pay award, [*13] compensation for the value of his lost life insurance proceeds in the amount of $ 570,000, since plaintiff is unable to secure life insurance due to his deteriorating health condition. Defendant objects on the basis that the proper measure of damages is either the amount paid in premiums on employee's behalf, or the amount paid to obtain comparable insurance. *Shkolnik v. Combustion Eng'g, Inc.*, 856 F.Supp. 82, 88 (D.Conn. 1994).

*HN8* The Court retains jurisdiction to grant such equitable relief to ensure that plaintiff be made whole. *See* 29 U.S.C. § 626(b); *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 727-28 (2d Cir. 1984). However, the Court finds it inappropriate to saddle defendant with the full value of plaintiff's insurance proceeds payable upon plaintiff's death. *See Fariss v. Lynchburg Foundry*, 769 F.2d 958, 965 (4th Cir. 1985) (discussing obvious disincentive to employers for providing life insurance benefits if faced with enormous potential liability for insurance proceeds).

The life insurance premiums have already been incorporated into plaintiff's expert report on future lost benefits, which the [*14] Court will award for the period between November 2006 through April 2011.

*Stock Options*

Plaintiff also seeks, as part of the front pay award, the value of stock options that he would have received in appreciation for his skills and work. Defendant asserts that plaintiff has failed to prove such damages with a reasonable degree of certainty.

The Court cannot afford plaintiff this compensation without entering into undue speculation. Plaintiff, whose employment commenced with defendant in 1998, testified that he received stock options in appreciation for his work in 2001 and 2002. Thus, plaintiff's proof of his entitlement to stock options is grounded on only a two year history. Further, it is not possible to arrive at the amount of discretionary stock options that plaintiff would have received even assuming continuation of this benefit. Accordingly, the Court will deny the request for stock options.

*Post-Judgment Interest*

Defendant does not dispute that plaintiff is entitled to post-judgment interest on the entire award comprising back pay, front pay, and punitive and compensatory damages pursuant to 28 U.S.C. § 1961(a).

**Conclusion**

[*15] For the foregoing reasons, plaintiff's post-trial motion for court-awarded statutory liquidated damages, front pay, pre- and post-judgment interest, supplemental back pay, lost life insurance and stock options [doc. # 127] is GRANTED in part and DENIED in part. The Court will enter judgment awarding compensatory damages, back pay, pre-judgment interest, liquidated damages, and front pay after plaintiff submits calculations of the back-pay, liquidated damages and front pay adjusted to and consistent with this Ruling. The plaintiff is instructed to submit these adjusted calculations within 10 days of this Ruling's filing date.

Dated this 25th day of October 2006, at Bridgeport, Connecticut.

Warren W. Eginton

Senior United States District Judge

# EXHIBIT K



Neutral
As of: April 17, 2014 1:03 PM EDT

# Shorter v. Hartford Fin. Servs. Group, Inc.

United States District Court for the District of Connecticut
May 31, 2005, Decided
No. 3:03cv0149 (WIG)

**Reporter:** 2005 U.S. Dist. LEXIS 19902; 2005 WL 2234507

FERRON SHORTER, JR., Plaintiff, vs. HARTFORD FINANCIAL SERVICES GROUP, INC., Defendant.

**Subsequent History:** Costs and fees proceeding at Shorter v. Hartford Fin. Servs. Group, Inc., 2005 U.S. Dist. LEXIS 19903 (D. Conn., July 15, 2005)

---

### Core Terms

calculate, prejudgment interest, backpay, front pay, terminate, reinstatement, lodestar, prevail, attorney's fees, skill, interest rate, pension benefits, expend, salary, employment discrimination case, equitable relief, fee award, date of judgment, district court, civil rights, multiplier, compound, post-judgment, unsuccessful, reputation, billion, technology, pension

---

### Case Summary

#### Procedural Posture

A jury awarded plaintiff former employee back pay, benefits, and general compensatory damages on his claims against defendant former employer of race and gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e seq., and state law negligent infliction of emotional distress. The employee moved for reinstatement or front pay, benefits, interest, attorney's fees, and costs. The employer contested the motion.

#### Overview

As the employee had moved out of state and the employer opposed his reinstatement request, the court granted the employee front pay for six years following the date of judgment, which would enable him to obtain a college degree and find comparable work. The court also awarded back pay from the date of the jury's verdict until the date of judgment. However, the court declined to award additional relief for lost pension benefits, which were included in the jury's award. Prejudgment interest was awarded to compensate the employee for not having had access to the wages that he would have received had he not been wrongfully terminated. The employee was directed to submit an appropriate calculation. Postjudgment interest was awarded on the entire money judgment. Further, the employee was entitled to attorney's fees and costs. The claim for hours billed was reduced by an amount reflecting time spent on another party plaintiff who was dropped from the case. The rate requested was granted as reasonable based on fees generally charged by attorneys in the district with similar levels of experience. The court denied the parties' requests for both an upward and downward departure.

#### Outcome

The court denied the employee's request for reinstatement, but awarded $ 117,000 as front pay. The court also awarded the employee $ 4,722 per month as back pay from the date of the jury's verdict until the date judgment was entered. The court granted the employee's motions for interest, but directed the employee to submit a calculation for prejudgment interest. The court awarded the employee $ 108,768 in attorney's fees, and $ 2,813 in costs.

---

### LexisNexis® Headnotes

Civil Procedure > Judicial Officers > Judges > Discretionary Powers

Civil Rights Law > Protection of Rights > Federally Assisted Programs > Civil Rights Act of 1964

Labor & Employment Law > ... > Age Discrimination > Remedies > General Overview

Labor & Employment Law > ... > Remedies > Damages > Backpay & Frontpay

Labor & Employment Law > ... > Age Discrimination > Remedies > Compelled Employment

Labor & Employment Law > ... > Gender & Sex Discrimination > Remedies > General Overview

Labor & Employment Law > ... > Racial Discrimination > Remedies > General Overview

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

Labor & Employment Law > ... > Title VII Discrimination > Remedies > General Overview

Labor & Employment Law > ... > Title VII Discrimination > Remedies > Affirmative & Equitable Relief

Labor & Employment Law > Wrongful Termination > Remedies > Reinstatement

*HN1* To compensate a victim of discrimination for future damages, a court, in the exercise of its sound discretion,

2005 U.S. Dist. LEXIS 19902, *19902

may order reinstatement or an award of front pay as further equitable relief. *42 U.S.C.S. § 2000e-5(g)(1)*. Although reinstatement is the preferred remedy, front pay may be awarded when it would be inappropriate to order reinstatement due to excessive hostility or antagonism between the parties. A plaintiff must first seek reinstatement and have that remedy denied before he or she can seek front pay. To hold otherwise would allow a plaintiff to deny an employer the opportunity to obtain his or her services in exchange for compensation, as opposed to the employer's having to compensate a plaintiff without receiving any services in return.

Civil Rights Law > Protection of Rights > Federally Assisted Programs > Civil Rights Act of 1964

Commercial Law (UCC) > Sales (Article 2) > Remedies > General Overview

Labor & Employment Law > ... > Remedies > Damages > Backpay & Frontpay

Labor & Employment Law > ... > Age Discrimination > Remedies > Compelled Employment

Labor & Employment Law > ... > Age Discrimination > Remedies > Injunctions

Labor & Employment Law > ... > Gender & Sex Discrimination > Remedies > General Overview

Labor & Employment Law > ... > Racial Discrimination > Remedies > General Overview

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

Labor & Employment Law > Wrongful Termination > Remedies > Reinstatement

*HN2* The United States Court of Appeals for the Second Circuit has held that in cases where the employer-employee relationship has been irreparably damaged by animosity associated with the litigation, reinstatement may not be possible, and a reasonable monetary award of front pay is necessary as equitable relief appropriate to effectuate the purposes of the law. A front pay award serves a necessary role in making victims of discrimination whole in cases where the factfinder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment.

Civil Procedure > Judicial Officers > Judges > Discretionary Powers

Civil Rights Law > Protection of Rights > Federally Assisted Programs > Civil Rights Act of 1964

Labor & Employment Law > ... > Remedies > Damages > Backpay & Frontpay

Labor & Employment Law > ... > Gender & Sex Discrimination > Remedies > General Overview

Labor & Employment Law > ... > Racial Discrimination > Remedies > General Overview

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

*HN3* The amount of front pay to be awarded is a matter committed to a court's discretion. In calculating the size of

a front-pay award, a court must estimate a plaintiff's ability to mitigate his damages in the future. Additionally, a court must take into consideration plaintiff's age, his education and training, his work experience, his skills, the job market, and his reasonable prospects of obtaining comparable employment.

Civil Rights Law > Protection of Rights > Federally Assisted Programs > Civil Rights Act of 1964

Evidence > Burdens of Proof > General Overview

Evidence > Burdens of Proof > Ultimate Burden of Persuasion

Labor & Employment Law > ... > Gender & Sex Discrimination > Remedies > General Overview

Labor & Employment Law > ... > Racial Discrimination > Remedies > General Overview

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

*HN4* It is defendant's burden to prove that comparable positions were available to plaintiff, and that he did not make reasonable efforts to avail himself of employment opportunities. While employees who have been terminated have a duty to "use reasonable diligence in finding other suitable employment, the duty is "not onerous." The United States Court of Appeals for the Second Circuit has held that the ultimate question is whether plaintiff acted reasonably in attempting to gain other employment or in rejecting proffered employment. Suitable employment means a job that is "substantially equivalent" to plaintiff's former job. While a plaintiff must demonstrate reasonable diligence in seeking suitable employment, an employer has the ultimate burden of proving that the discriminatee failed to mitigate damages.

Civil Procedure > Judicial Officers > Judges > Discretionary Powers

Civil Rights Law > Protection of Rights > Federally Assisted Programs > Civil Rights Act of 1964

Labor & Employment Law > ... > Gender & Sex Discrimination > Remedies > General Overview

Labor & Employment Law > ... > Racial Discrimination > Remedies > General Overview

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

*HN5* The United States Court of Appeals for the Second Circuit has encouraged district courts to fashion remedies designed to ensure that victims of discrimination are made whole. The amount of time for which front pay will be awarded is committed to a district court's discretion.

Civil Rights Law > Protection of Rights > Federally Assisted Programs > Civil Rights Act of 1964

Labor & Employment Law > ... > Age Discrimination > Remedies > General Overview

Labor & Employment Law > ... > Remedies > Damages > Backpay & Frontpay

Labor & Employment Law > ... > Gender & Sex Discrimination > Remedies > General Overview

2005 U.S. Dist. LEXIS 19902, *19902

Labor & Employment Law > ... > Racial Discrimination > Remedies > General Overview

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

Labor & Employment Law > ... > Remedies > Damages > Backpay

*HN6* The United States Court of Appeals for the Second Circuit has held that, because a jury cannot anticipate the date on which judgment will enter in calculating a back pay award, any lag time between a jury's verdict and a district court's ultimate judgment ordinarily should be remedied by a court, in the form of a pro rata increase of the back pay award. A back pay award runs from the date of termination until the date of judgment.

Civil Procedure > ... > Jury Trials > Right to Jury Trial > Actions in Equity

Civil Procedure > Remedies > Damages > Monetary Damages

Civil Rights Law > Protection of Rights > Federally Assisted Programs > Civil Rights Act of 1964

Labor & Employment Law > ... > Gender & Sex Discrimination > Remedies > General Overview

Labor & Employment Law > ... > Racial Discrimination > Remedies > General Overview

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

Labor & Employment Law > ... > Remedies > Damages > Compensatory Damages

Pensions & Benefits Law > General Overview

*HN7* The United States Court of Appeals for the Second Circuit has held that compensation for lost pension benefits is an essential component of the relief to which victims of discrimination are entitled. Relief for lost pension benefits may take one of two forms, legal or equitable. Legal relief, which is properly awarded by a jury, involves the payment of money damages directly to plaintiff as compensation for the value of the pension benefits that were lost. Equitable relief, which is committed to the sound discretion of a court, entails the restoration of lost service and salary credits to plaintiff's pension plan to put him in the same place he would have been had he not been unlawfully terminated. Unlike damage awards, which are payable to plaintiff, pension benefits are paid into pension annuity funds. They merely replace the benefits that would have accrued during the period of employment wrongfully denied to plaintiff.

Civil Procedure > Remedies > Judgment Interest > General Overview

Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest

Civil Rights Law > Protection of Rights > Federally Assisted Programs > Civil Rights Act of 1964

Labor & Employment Law > ... > Gender & Sex Discrimination > Remedies > General Overview

Labor & Employment Law > ... > Racial Discrimination > Remedies > General Overview

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

Labor & Employment Law > ... > Title VII Discrimination > Remedies > General Overview

Labor & Employment Law > ... > Title VII Discrimination > Remedies > Affirmative & Equitable Relief

*HN8* The United States Supreme Court has held that consistent with the "make-whole" remedial scheme of § 706(g), Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e-5*, authorizes prejudgment interest as part of the backpay remedy in suits against private employers. The fact that prejudgment interest may be awarded does not mean that it must be awarded. It is within the sound discretion of a trial court whether or not to award prejudgment interest at all, and the same considerations that inform that decision should also inform the choice of interest rate. In cases involving the award of compensation for lost wages, the United States Court of Appeals for the Second Circuit has held that it is ordinarily an abuse of discretion not to include prejudgment interest. The rationale for awarding prejudgment interest in such cases is to prevent a defendant-employer from attempting to enjoy an interest-free loan for as long as it can delay paying out back wages, and to help ensure that plaintiff is made whole. Prejudgment interest is an element of compensation.

Civil Procedure > Remedies > Judgment Interest > General Overview

Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest

*HN9* Regardless of the interest rate used as a starting point by a court evaluating a motion for prejudgment interest, the United States Court of Appeals for the Second Circuit has made clear that a court need not limit an award of prejudgment interest to the rate at which the injured party would have lent money to the government. The Second Circuit has emphasized that circumstances must be reviewed individually to determine the fairness of an award of prejudgment interest in a particular case, taking into consideration: (i) the need to fully compensate a wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of an award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by a court.

Civil Procedure > Remedies > Judgment Interest > General Overview

Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest

Civil Rights Law > Protection of Rights > Federally Assisted Programs > Civil Rights Act of 1964

Labor & Employment Law > ... > Gender & Sex Discrimination > Remedies > General Overview

Labor & Employment Law > ... > Racial Discrimination > Remedies > General Overview

2005 U.S. Dist. LEXIS 19902, *19902

Labor & Employment Law > Discrimination > Title VII
Discrimination > General Overview

Labor & Employment Law > ... > Title VII Discrimination >
Remedies > General Overview

Labor & Employment Law > ... > Title VII Discrimination >
Remedies > Affirmative & Equitable Relief

*HN10* The remedial scheme of Title VII of the Civil
Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., clearly
contemplates that victims of discrimination should be
made whole and, in keeping with this philosophy, the
United States Court of Appeals for the Second Circuit has
encouraged an award of prejudgment interest on back pay
awards in employment discrimination cases. Although
courts have applied different interest rates in employment
discrimination cases, the majority of courts appear to favor
the postjudgment statutory rate of 28 U.S.C.S. § 1961
because it takes into account the effects of inflation, but
does not overly compensate a plaintiff.

Civil Procedure > Remedies > Judgment Interest > General Overview

Civil Procedure > Remedies > Judgment Interest > Prejudgment
Interest

Civil Rights Law > Protection of Rights > Federally Assisted
Programs > Civil Rights Act of 1964

Labor & Employment Law > ... > Gender & Sex Discrimination >
Remedies > General Overview

Labor & Employment Law > ... > Racial Discrimination >
Remedies > General Overview

Labor & Employment Law > Discrimination > Title VII
Discrimination > General Overview

Labor & Employment Law > ... > Title VII Discrimination >
Remedies > General Overview

Labor & Employment Law > ... > Title VII Discrimination >
Remedies > Affirmative & Equitable Relief

Labor & Employment Law > ... > Remedies > Damages > Backpay

*HN11* The United States Court of Appeals for the Second
Circuit held that a court must calculate prejudgment
interest in a Title VII of the Civil Rights Act of 1964, 42
U.S.C.S. § 2000e et seq., case based upon a compound rate
of interest. Given that the purpose of back pay is to make
a plaintiff whole, it can only be achieved if interest is
compounded. The Second Circuit has held that it is error
for a district court to award prejudgment interest as of the
date of discharge on the entire amount of the back pay
award, rather than calculating the interest separately for
each lost salary payment. Interest should have run from the
date of the missed payments, rather than from the date of
termination. Because interest must be compounded, and
should only be based upon the back pay due as of a
particular point in time, the interest rate will change pay
period to pay period.

Civil Procedure > Remedies > Judgment Interest > General Overview

Civil Procedure > Remedies > Judgment Interest > Postjudgment
Interest

*HN12* After an award of back pay, postjudgment interest is
allowed in all cases. Postjudgment interest is designed to
compensate a plaintiff for the delay it suffers from the time
damages are reduced to an enforceable judgment to the
time defendant pays the judgment. Under 28 U.S.C.S. §
1961(a), postjudgment interest is calculated from the date
of entry of the judgment, at a rate equal to the weekly
average one-year constant maturity Treasury yield, as
published by the Board of Governors of the Federal
Reserve System, for the calendar week preceding the date
of the judgment. 28 U.S.C.S. § 1961(a).

Civil Procedure > Remedies > Costs & Attorney Fees > General
Overview

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees &
Expenses > General Overview

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees &
Expenses > Reasonable Fees

Civil Procedure > ... > Attorney Fees & Expenses > Basis of
Recovery > Statutory Awards

Civil Rights Law > Protection of Rights > Federally Assisted
Programs > Civil Rights Act of 1964

Civil Rights Law > ... > Procedural Matters > Costs & Attorney
Fees > Award Calculations

Civil Rights Law > ... > Procedural Matters > Costs & Attorney
Fees > Prevailing Parties

Civil Rights Law > ... > Procedural Matters > Costs & Attorney
Fees > Reasonable Fees

Civil Rights Law > ... > Procedural Matters > Costs & Attorney
Fees > Statutory Attorney Fee Awards

Evidence > Inferences & Presumptions > General Overview

Labor & Employment Law > Discrimination > Title VII
Discrimination > General Overview

Labor & Employment Law > ... > Title VII Discrimination >
Remedies > Costs & Attorney Fees

*HN13* In Title VII cases, a court may, in its discretion,
allow the prevailing party a reasonable attorney's fee. *42
U.S.C.S. § 2000e-5(k)*. A district court is afforded broad
discretion in determining a reasonable fee award based on
the circumstances in a case. The normal starting point for
calculating reasonable attorneys' fees to be awarded to a
prevailing civil rights plaintiff is the calculation of a
so-called "lodestar" figure, which is arrived at by
multiplying the number of hours reasonably expended in
the litigation by a reasonable hourly rate. The rates to be
used in calculating the lodestar are the market rates
prevailing in the community for similar services by
lawyers of reasonably comparable skill, experience, and
reputation. There is a strong presumption that the lodestar
figure represents a reasonable rate.

Civil Procedure > ... > Privileged Communications > Work Product
Doctrine > General Overview

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees &
Expenses > Reasonable Fees

Evidence > Burdens of Proof > General Overview

*HN14* An attorney fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates. Applications for fee awards should generally be documented by contemporaneously created time records that specify, for each attorney, the date, the hours expended, and the nature of the work done. A court should exclude from the fee calculation hours that were not reasonably expended. Hours that are excessive, redundant, or otherwise unnecessary should be excluded from the lodestar calculation. The task of determining a fair fee requires a conscientious and detailed inquiry into the validity of the representations that a certain number of hours were usefully and reasonably expended A court must examine the hours expended by counsel and the value of the work product of the particular expenditures to the client's case. In making this examination, a district court does not play the role of an uninformed arbiter but may look to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties.

Civil Procedure > Remedies > Costs & Attorney Fees > General Overview

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

*HN15* The United States Court of Appeals for the Second Circuit has directed that, in an application for attorneys fees, if a court determines that certain hours are not deserving of compensation, it must state the reasons for excluding those hours "as specifically as possible."

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

*HN16* The product of reasonable hours times a reasonable rate does not end an attorneys fee inquiry. There are other considerations that may lead a court to adjust the fee upward or downward. The lodestar figure may be adjusted on the basis of the "results obtained." The most critical factor in determining the reasonableness of a fee award is the degree of success obtained. This factor is particularly crucial where a plaintiff is deemed "prevailing" even though he succeeded on only some of his claims for relief. A plaintiff who prevails on some but not all of his claims is not entitled to a fee award for unsuccessful claims that were based on different facts and different legal theories.

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

*HN17* A plaintiff's lack of success on some of his claims does not require a court to reduce the lodestar amount where the successful and unsuccessful claims were interrelated and required essentially the same proof. The following factors also may be considered: (1) the time and

labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

Evidence > Burdens of Proof > General Overview

*HN18* The United States Supreme Court has noted the inherent difficulty in determining an appropriate "market rate" for a lawyer's services but explained that the burden is on the fee applicant to produce satisfactory evidence--in addition to the attorney's own affidavits--that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation. A rate determined in this way is normally deemed to be reasonable, and is referred to-- for convenience--as the prevailing market rate.

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

*HN19* The actual billing arrangement between an attorney and his client does not necessarily establish a ceiling on the rates that can be awarded, although it is a significant factor. Should a fee agreement provide less than a reasonable fee calculated according to the lodestar method, defendant should nevertheless be required to pay the higher amount.

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

Evidence > Inferences & Presumptions > General Overview

Evidence > Burdens of Proof > General Overview

*HN20* There is a strong presumption that the lodestar is reasonable. The party asking a court to depart from the lodestar amount bears the burden of proving that such a departure is necessary to the calculation of a reasonable fee. An upward adjustment is warranted only in rare instances.

Civil Procedure > Judicial Officers > Judges > Discretionary Powers

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

*HN21* Whether to reduce an attorney's fee award based on unsuccessful claims is a matter left to the sound discretion of a court. The United States Court of Appeals for the

2005 U.S. Dist. LEXIS 19902, *19902

Second Circuit has held that where a court determines that the successful and unsuccessful claims are "inextricably intertwined" and involve a common core of facts or are based on related legal theories, it is not an abuse of discretion for a court to award the entire fee.

Civil Procedure > ... > Costs & Attorney Fees > Costs > General Overview

Civil Rights Law > Protection of Rights > Federally Assisted Programs > Civil Rights Act of 1964

Civil Rights Law > ... > Procedural Matters > Costs & Attorney Fees > Reasonable Fees

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

*HN22* The United States Court of Appeals for the Second Circuit has held that an award of fees in a civil rights suit includes reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients.

**Counsel:** [*1] For Ferron Shorter, Jr., Plaintiff: Rachel M. Baird, Law Office of Rachel M. Baird, Torrington, CT.

For Hartford Financial Svcs Group Inc, Defendant: James F. Shea, Margaret J. Strange, Jackson Lewis - Htfd, CT, Hartford, CT.

**Judges:** WILLIAM I. GARFINKEL, United States Magistrate Judge.

**Opinion by:** WILLIAM I. GARFINKEL

| Opinion |
| --- |

## RULING ON PLAINTIFF'S POST-TRIAL MOTIONS

Following a five-day trial, the jury returned a verdict in favor of Plaintiff, Ferron Shorter, Jr., on his claims of race and gender discrimination under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e, et seq., and his state-law claim of negligent infliction of emotional distress. [1] The jury awarded Plaintiff $ 170,000.00 in back pay and benefits and $ 85,000.00 in general compensatory damages. Plaintiff now moves for equitable relief in the form of reinstatement or, alternatively, an award of front pay and benefits **[Doc. # # 125, 133]**. Additionally, Plaintiff has asked the Court to award prejudgment interest, post-judgment interest, and attorney's fees and costs **[Doc. # # 27, 133]**. Plaintiff's motions will be granted [*2] to the extent set forth below.

## DISCUSSION

### A. Front Pay

#### 1. Reinstatement vs. Front Pay

*HN1* To compensate a victim of discrimination for future damages, a court, in the exercise of its sound discretion, may order reinstatement or an award of front pay as further equitable relief. See *42 U.S.C. § 2000e-5(g)(1)*; Saulpaugh v. Monroe Community Hospital, 4 F.3d 134, 145 (2d Cir. 1993), cert. denied, *510 U.S. 1164, 127 L. Ed. 2d 539, 114 S. Ct. 1189 (1994)*; see also Dominic v. Consolidated Edison Co., 822 F.2d 1249, 1258 (2d Cir. 1987) (ADEA claim). Although reinstatement is the preferred remedy, front pay may be awarded when it would be inappropriate to order reinstatement due to excessive hostility or antagonism between the parties. Shaw v. Greenwich Anesthesiology Assocs., P.C., 200 F. Supp. 2d 110, 114 (D. Conn. 2002). [*3]

In *Shaw*, this Court held that a plaintiff must first seek reinstatement and have that remedy denied before he or she can seek front pay. Id. at 114-15. To hold otherwise, the Court explained, would allow a plaintiff to deny an employer the opportunity to obtain his or her services in exchange for compensation, as opposed to the employer's having to compensate a plaintiff without receiving any services in return. Id. at 114.

In keeping with the holding of *Shaw*, Plaintiff has first moved for reinstatement. He notes that following his termination by The Hartford, he sought reinstatement. [2] See Pl.'s Reply Br. Ex. 1 containing Letters between Plaintiff's counsel and The Hartford regarding reinstatement, dated Jan. 29, 2002, Mar. 11, 2002, May 7, 2002, and June 14, 2002. Plaintiff continues to remain interested in returning to The Hartford, despite this litigation since, in his view, reinstatement is the only way he will ever regain the position, status, seniority, and benefits that he had achieved through more than twelve years with The Hartford.

[*4] The Hartford, on the other hand, vehemently opposes reinstatement. It relies largely on the Plaintiff's arrest, evidence of which the Court excluded, as well as Plaintiff's violation of The Hartford's Electronic Communications Policy. The Hartford argues that, although the jury found in favor of Plaintiff on his discrimination claims, it did not conclude that his termination was unjust or unwarranted, but rather that his

---

[1]   The jury returned a verdict in favor of Defendant on Plaintiff's claims of intentional infliction of emotional distress and hostile work environment.

[2]   During the trial, the Court instructed the jury that The Hartford's failure to reinstate Plaintiff was not part of the case. (Tr. 130.) However, the fact that Plaintiff sought reinstatement is relevant to his claim that he is willing to be reinstated.

2005 U.S. Dist. LEXIS 19902, *4

former girlfriend and co-worker, Maryanne Rhodes, should also have been terminated. Additionally, The Hartford maintains that reinstatement would not be practical because over three years have passed since Plaintiff's termination, during which time he has not worked in the information technology field nor updated his skill level to stay current in the field. Thus, it argues, the Court has no basis for concluding that Plaintiff retains the skills and knowledge to perform his former job. (Def.'s Mem. at 8-9.)

The Court is not persuaded by the arguments advanced by The Hartford for not reinstating Plaintiff. The Court is not convinced that a company as large as The Hartford could not find a position for which Plaintiff would be qualified, given the variety of positions [*5] that Plaintiff competently filled over the twelve years he was with the company. Additionally, the Court disagrees with The Hartford's assessment of the jury's verdict. The jury found that Plaintiff's race and gender were motivating factors in The Hartford's decision to terminate him. The Court fails to understand how The Hartford could construe the jury's verdict as anything other than a finding that Plaintiff's termination was unjust. The Hartford further ignores the jury's verdict in arguing that an award of any further equitable relief is inappropriate because Plaintiff would have been terminated in any event for violating the company's Electronic Communications Policy. This evidence was presented to the jury and the jury disagreed, finding that Plaintiff's termination was unlawful, for which it awarded him back pay. [3] As to Defendant's argument that reinstatement is not appropriate in light of Plaintiff's alleged criminal conviction, twelve days after Plaintiff was terminated, The Hartford received evidence that Plaintiff did not, in fact, have a record of a criminal conviction. See Def.'s Mem. in Opp'n to Pl.'s Mot. for Equitable Relief, Ex. 2. Although The Hartford argues [*6] that these records were unclear, the Court is not willing to deny reinstatement on the basis of these records,

particularly when Plaintiff established that he did not have a criminal conviction. [4]

[*7] Nevertheless, the Court reluctantly concludes that reinstatement is not a viable alternative and that the more appropriate remedy is an award of front pay based upon the animosity between the parties that was exhibited throughout the course of this litigation, as well as the fact that Plaintiff now resides in Georgia. HN2 The Second Circuit has held that in cases where the employer-employee relationship has been irreparably damaged by animosity associated with the litigation, reinstatement may not be possible, and "a reasonable monetary award of front pay is necessary as equitable relief … appropriate to effectuate the purposes of [the Act]." Whittlesey v. Union Carbide Corp., 742 F.2d 724, 728 (2d Cir. 1984) (decided under the ADEA) (internal citations and quotation marks omitted); see also Banks v. Travelers Companies, 180 F.3d 358, 365 (2d Cir. 1999); Padilla v. Metro-North Commuter R.R., 92 F.3d 117, 125-26 (2d Cir. 1996), cert. denied, 520 U.S. 1274, 138 L. Ed. 2d 211, 117 S. Ct. 2453 (1997). It is clear to the Court that, though Plaintiff was liked and respected in his unit, corporate management's negative feelings about Plaintiff [*8] and this case would create an untenable relationship were he to return to The Hartford.

"A front pay award 'serves a necessary role in making victims of discrimination whole in cases where the factfinder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment.'" Padilla, 92 F.3d at 126 (quoting Whittlesey, 742 F.2d at 729). Under the facts of this case, the Court finds an award of front pay is appropriate.

## 2. Calculation of the Front Pay Award

As an alternative equitable remedy, Plaintiff has sought front-pay in the amount of $ 869,828. [5]HN3 The amount of front pay to be awarded is a matter committed to the

---

[3]   The Hartford could have sought a mixed-motive instruction but did not. The Court will not speculate how the jury would have responded to mixed-motive interrogatories.

[4]   Defendant argues that the Court should not consider the issue of reinstatement because it was precluded from introducing evidence at trial to rebut Plaintiff's claim for reinstatement. This evidence was excluded because, inter alia, the matter of reinstatement was not for the jury but for the Court. See Banks v. Travelers Companies, 180 F.3d 358, 364 (2d Cir. 1999) (holding that if there is a lacuna in the record evidence concerning the issue of reinstatement versus front pay, the court on remand should afford the parties an opportunity to supplement the record); United States E.E.O.C. v. W & O, Inc., 213 F.3d 600, 618 (11th Cir. 2000) (rejecting defendant's claim that the EEOC waived the claim of front pay due to the alleged paucity of references to front pay in the pretrial order and its failure to submit evidence of or to argue front pay during the jury trial, since this was an issue for the court, rather than the jury). The Court has reviewed the cases cited by Defendant in support of this argument, Excel Corp. v. Bosley, 165 F.3d 635, 639-40 (8th Cir. 1999), and Sequa Corp. v. GBJ Corp., 156 F.3d 136, 143-44 (2d Cir. 1998), and finds them to be inapposite.

[5]   Plaintiff has prepared a chart in which he has calculated two alternative front pay figures. The first is based upon a minimum annual salary of $ 45,000, which he projects will remain constant from 2005 to 2032, at which time Plaintiff would reach retirement age of 65. From this figure, he has subtracted his current earnings of $ 25,000, increasing each year at the rate of 1%.

2005 U.S. Dist. LEXIS 19902, *8

Court's discretion. In calculating the size of a front-pay award, the Court must estimate Plaintiff's ability to mitigate his damages in the future. See Dominic, 822 F.2d 1249 at 1257 (ADEA case). Additionally, the Court must take into consideration Plaintiff's age, his education and training, his work experience, his skills, the job market, and his reasonable prospects of obtaining comparable employment. See Fernandez v. North Shore Orthopedic Surgery & Sports Medicine, P.C., 79 F. Supp. 2d 197, 204 (E.D.N.Y. 2000). [*9]

[*10] In this case, Plaintiff has produced a detailed affidavit setting forth his efforts to find comparable employment. [6] During his twelve years with The Hartford, Plaintiff worked as an insurance rater, an assistant to the underwriter, an actuarial pricing specialist, a specialty actuarial programmer, a technician in the information management department, and last as a developer with an annual salary of $ 44,500. Following the termination of his employment on January 23, 2002, Plaintiff placed his resume on various internet job search web sites. He regularly checked the employment section of the local newspapers, and applied for jobs at numerous temporary work and staffing agencies and with several other insurance companies. He attended a career expo. Plaintiff was repeatedly advised that either he was over-qualified, that he did not have enough experience for a particular job, that he was not a good match for a position, or that it had been too long since he had used particular skills. Finally, in April of 2003, Plaintiff relocated to Georgia to live with his family while he continued his search for employment.

[*11] Plaintiff submitted his resume to more than fifteen companies and recruiters in Georgia, and met with at least five others. One recruiting firm told him that he would have difficulty finding a job because his salary at The Hartford had been so high and that he should look for a job with a substantially lower salary, between $ 20,000 and $ 30,000.

Finally, in October of 2003, having found no comparable employment, Plaintiff began work as a courier for $ 12.00/hour (or approximately $ 25,000/year) and has continued in that capacity for several different companies until December 2004, when his employer could no longer afford to pay him due to the loss of a major customer.

Following the trial in January, 2005, Plaintiff met with a counselor at DeVry University in Alpharetta, Georgia, who advised him that to find a position in information technology he needed to acquire computer networking skills. Plaintiff states that he plans to attend a university [7] to acquire a degree and the skills he needs to obtain a job comparable to the position he held with The Hartford. Because he needs to work, he will have to attend school on a part-time basis. The university guidance counselor has advised [*12] him that it will take him six years to obtain his degree, after which he hopes to obtain a position in the field of Computer Programming/Information Technology. Plaintiff believes that after obtaining his degree, he will be able to find employment at a starting annual salary of $ 30,000 to $ 40,000.

The Court finds that Plaintiff has made reasonable and diligent efforts to find other comparable employment. [8] Although The Hartford argues that Plaintiff's efforts at mitigation were insufficient, *HN4* it is Defendant's burden to prove that comparable positions were available to

---

After six years, when he hopes to have completed his college degree, he has used an earnings figure of $ 35,000, which increases at the rate of 1% per year. This yields a total front pay figure of $ 268,156 over 27 years. Alternatively, he has computed front pay using the jury's back pay award, which included lost benefits, for a three-year period. Dividing the award of $ 170,000 by three produces an annual back pay award of approximately $ 57,000, including benefits, which he has increased at the rate of 1% per year. After subtracting the same projected future earnings, the total front pay is $ 869,828 for 27 years. In neither scenario has he included any benefits from future employers.

[6] Defendant has challenged this evidence on the ground that it was not produced during the trial. Defendant argues that it is improper for the Court to consider evidence outside the record. The "record" however before the Court on these posttrial motions is not limited to the trial transcript and exhibits. Plaintiff's affidavit was properly submitted in support of a post-trial motion on a matter to be decided by the Court, not the jury, just as his attorney's affidavit was properly submitted in support of the motion for attorney's fees. See Note 4, supra. Additionally, the Court notes that the affidavit is largely a recap in narrative form of Plaintiff's Exhibit No. 29, consisting of Plaintiff's resume and over thirty letters and e-mails detailing Plaintiff's efforts to find other employment. Plaintiff also testified during his deposition and at trial as to his efforts to find other employment. See Def.'s Mem. in Opp'n to Mot. for Equitable Relief Ex. 1 & 4.

[7] Plaintiff has looked into several universities. The cost to obtain his degree ranges from $ 58,000 to nearly $ 70,000.

[8] While employees who have been terminated have a duty to "use reasonable diligence in finding other suitable employment," Ford Motor Co. v. E.E.O.C., 458 U.S. 219, 231, 73 L. Ed. 2d 721, 102 S. Ct. 3057 (1982), the duty is "not onerous." Dailey v. Societe Generale, 108 F.3d 451, 456 (2d Cir. 1997). The Second Circuit has held that the ultimate question "is whether the plaintiff acted reasonably in attempting to gain other employment or in rejecting proffered employment." Hawkins v. 1115 Legal Service Care, 163 F.3d 684, 695 (2d Cir. 1998) (internal quotations and citations omitted). Suitable employment means a job that is "substantially equivalent" to the plaintiff's former job. Ford Motor Co., 458 U.S. at 232. While a plaintiff must demonstrate

Plaintiff, and that he did not make reasonable efforts to avail himself of employment opportunities. Clarke v. Frank, 960 F.2d 1146, 1152 (2d Cir. 1992); Palma v. Pharmedica Communs., Inc., 2003 U.S. Dist. LEXIS 21160 , No. 3:00CV1128, 2003 WL 22750600, at *3 (D. Conn. Sept. 30, 2003); Epstein v. Kalvin-Miller Int'l, Inc., 139 F. Supp. 2d 469, 482 n.4 (S.D.N.Y. 2001). [*13] The Hartford has failed to provide any evidence that comparable employment existed for Plaintiff, who had only a high school education and had worked for The Hartford for over twelve years. [9]

 [*14]

The Court finds that under the circumstances of this case, a front pay award is particularly appropriate. Plaintiff had received raises over a twelve-year period from a starting annual salary of $ 13,300 to $ 44,500, based on his seniority, in-house promotions, and merit assessment reviews. Without further training or a college degree, it will be extremely difficult for him to match the salary that he was earning at the time of his termination. The Hartford itself states that it would not be practical to rehire Plaintiff because he had been away from the [*15] information technology field for over three years. (Def.'s Mem. at 9) ("The IT field is constantly changing and there is no evidence in the record that Plaintiff has updated his skill level to stay current in the field."). Defendant also states that there were few positions in the information technology field available in Connecticut. (Def.'s Mem. at 3.)

HN5 The Second Circuit has encouraged the district courts to "fashion remedies designed to ensure that victims of [] discrimination are made whole." Whittlesey, 742 F.2d at 728. The amount of time for which front pay will be awarded is committed to the district court's discretion. See Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1182

(2d Cir. 1996). The Court finds an award of front pay to be an appropriate equitable remedy in this case and awards front pay for a period of six years following the date of judgment, which will provide Plaintiff with the opportunity to obtain his college degree and to find comparable employment. [10] Plaintiff was making $ 44,500 with The Hartford at the time of his termination. He has been earning approximately $ 25,000 since October 2003 and intends to continue working [*16] while attending college. [11] The Court awards Plaintiff front pay in the amount of $ 117,000, representing the difference between his former salary and what Plaintiff was earning as a courier for a period of six years.

[*17] **3. Back Pay Until the Date of Judgment**

Additionally, *HN6* the Second Circuit has held that, because the jury cannot anticipate the date on which judgment will enter in calculating a back pay award, "any lag time between the jury's verdict and the district court's ultimate judgment ordinarily should be remedied by the court, in the form of a pro rata increase of the back pay award." Banks, 180 F.3d at 364; see also Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 167 (2d Cir. 1998) (holding that a "plaintiff who has proven a discharge in violation of the ADEA is, as a general matter, entitled to back pay from the date of discharge until the date of judgment"); Dunlap-McCuller v. Riese Organization, 980 F.2d 153, 159 (2d Cir. 1992) (holding that back pay award runs from the date of termination until the date of judgment), cert. denied, 510 U.S. 908, 126 L. Ed. 2d 239, 114 S. Ct. 290 (1993); Nord v. United States Steel Corp., 758 F.2d 1462, 1472-73 (11th Cir. 1985) (back pay award should extend to date of judgment, rather than to earlier date on which court announced findings of fact following bench trial).

Based [*18] on the Court's instructions, the jury's back pay award of $ 170,000 was calculated from the date of

---

reasonable diligence in seeking suitable employment, "the employer has the ultimate burden of proving that the discriminatee failed to mitigate damages." N.L.R.B. v. Thalbo Corp., 171 F.3d 102, 112 (2d Cir. 1999).

[9]  Plaintiff's situation is significantly different than that of the plaintiff in Palma cited by Defendant. In Palma, the plaintiff had obtained another job, where she was very happy. Since obtaining this job, plaintiff had not made any effort to find employment comparable to her former position. The court declined to hold the defendant responsible for maintaining the plaintiff's income level into the future without regard to any continuing efforts on her part to mitigate her damages. Palma, 2003 U.S. Dist. LEXIS 21160, 2003 WL 22750600, at *4.

[10]   The Court agrees with Defendant that an award of front pay for twenty-seven years, as sought by Plaintiff, is not warranted. Given Plaintiff's relatively young age and the fact that he will begin attending a college degree, it is far too speculative to assume that Plaintiff will never be able to find a job at a salary level or with benefits comparable to what he would have made with The Hartford. See Dominic, 822 F.2d at 1258 (holding that it was not an abuse of discretion to limit the front pay award to two years); but see Padilla, 92 F.3d at 126 (affirming a front pay award for a period of 20 years); Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1189 (2d Cir.) (affirming a front pay award for a period of 17 years), cert. denied, 506 U.S. 826, 121 L. Ed. 2d 46, 113 S. Ct. 82 (1992).

[11]   The Court has not factored future salary increases into these calculations and, therefore, it is not necessary to reduce these figures to present value. See Stratton v. Department for the Aging for City of New York, 132 F.3d 869, 882 (2d Cir. 1997) (affirming front pay award not discounted to present value); Dominic, 822 F.2d at 1257-58 (same); Gusman v. Unisys Corp., 986 F.2d 1146, 1147-48 (7th Cir. 1993) (same).

2005 U.S. Dist. LEXIS 19902, *18

Plaintiff's termination, January 23, 2002, to the date of the verdict, January 28, 2005, a period of three years. This back pay award should continue until the date of judgment at the rate of $ 4,722 per month.

### 4. Lost Benefits

In addition to his lost wages, Plaintiff seeks compensation for the pension benefits that he has lost because of his termination and his loss of seniority and earnings. Plaintiff states that, under The Hartford's retirement plan, he would have been eligible for retirement with full medical benefits as of October 29, 2018. [12] He has produced some calculations by an actuary, which show the difference between the pension benefits Plaintiff will receive given his termination in 2002 and the pension benefits he would have received had he retired from The Hartford in 2032, at the age of 65, to be $ 11,383 per year. This evidence, however, is not properly before the Court. As Defendant points out, this "expert" witness was not disclosed in Plaintiff's Trial Memorandum or elsewhere. Further, this individual has not been properly qualified as an expert witness. [*19] Indeed, Plaintiff has not even disclosed his name. Additionally, his calculations are offered to prove the truth of the matters asserted therein and are, therefore, inadmissible hearsay. _Fed. R. Evid. 801(c)_. Therefore, the Court will not consider this evidence in ruling on this motion.

_HN7_ The Second Circuit has held that compensation for lost pension benefits is an essential component of the relief to which victims of discrimination are entitled. See Sharkey v. Lasmo (AUL Ltd.), 214 F.3d 371, 374 (2d Cir. 2000). Relief for lost pension benefits may take one of two forms, legal or equitable. Id. (citing Banks v. Travelers Cos., 180 F.3d 358, 365 (2d Cir. 1999)). Legal relief, which is properly awarded by the jury, involves the payment of money damages directly to the plaintiff as compensation for [*20] the value of the pension benefits that were lost. See Id. Equitable relief, which is committed to the sound discretion of the Court, entails the restoration of lost service and salary credits to the plaintiff's pension plan to put him in the same place he would have had he not been unlawfully terminated. See Id. (citing Banks, 180 F.3d at 365, and Geller v. Markham, 635 F.2d 1027, 1036 (2d Cir. 1980)). "Unlike damage awards, 'which are payable to the plaintiff, pension benefits are paid into pension annuity funds. They merely replace the benefits that would have accrued during the [period] of employment wrongfully denied to [the plaintiff].'" Banks, 180 F.3d at 365 (quoting Geller, 635 F.2d at 1036).

The jury was instructed to take into consideration lost benefits, including pension benefits, in its calculation of damages for back pay. Based on the amount of the jury's award, it appears that they included compensation for lost benefits. To award additional relief for lost pension benefits would be speculative given the record before the Court and possibly duplicative of the benefits already awarded [*21] by the jury. Moreover, Plaintiff may later qualify for a pension with another employer. Thus, the Court declines to award additional relief for lost pension benefits. See EEOC v. Yellow Freight Sys., Inc., 2002 U.S. Dist. LEXIS 16826, No. 98 Civ. 2270, 2002 WL 31011859, at *31 (S.D.N.Y. Sept. 9, 2002).

### B. Prejudgment Interest

Plaintiff has also sought an award of prejudgment interest. In Loeffler v. Frank, 486 U.S. 549, 100 L. Ed. 2d 549, 108 S. Ct. 1965 (1988), _HN8_ the Supreme Court held that consistent with the "make-whole" remedial scheme of § 706(g), "Title VII authorizes prejudgment interest as part of the backpay remedy in suits against private employers." Id. at 557-58. However, the fact that prejudgment interest may be awarded does not mean that it must be awarded. See II Barbara Lindemann & Paul Grossman, Employment Discrimination Law 1785 (3d ed. 1997). "As the Second Circuit has noted, it is within the sound discretion of the trial court whether or not to award prejudgment interest at all, and the same considerations that inform that decision should also inform the choice of interest rate." Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 314 F. Supp. 2d 201, 202 (S.D.N.Y. 2003). [*22] Nevertheless, in cases involving the award of compensation for lost wages, the Second Circuit has held that "it is ordinarily an abuse of discretion not to include pre-judgment interest." Saulpaugh, 4 F.3d at 145 (backpay award under Title VII); see also Clarke, 960 F.2d at 1154 (same); Sands v. Runyon, 28 F.3d 1323, 1327 (2d Cir. 1994) (same under Rehabilitation Act); Miner v. City of Glens Falls, 999 F.2d 655, 661 (2d Cir. 1993) (upholding prejudgment interest award in a § 1983 case); Equal Employment Opportunity Commission v. County of Erie, 751 F.2d 79, 81 (2d Cir. 1984) (same under Equal Pay Act); Donovan v. Sovereign Security, Ltd., 726 F.2d 55, 58 (2d Cir. 1984) (same under Fair Labor Standards Act). The rationale for awarding prejudgment interest in such cases is to prevent the defendant-employer from attempting to "enjoy an interest-free loan for as long as it can delay paying out back wages," Saulpaugh, 4 F.3d at 145, and to help ensure that the plaintiff is made whole. Loeffler, 486 U.S. at 558 (holding that prejudgment interest is an element [*23] of compensation).

The Court finds that prejudgment interest should be awarded in this case to compensate Plaintiff for not having

---

[12]   This is based on the "Rule of 80." On October 29, 2018, Plaintiff will be 51 years old and would have had 29 years of service with The Hartford.

2005 U.S. Dist. LEXIS 19902, *23

had access to the wages that he would have received had he not been wrongfully terminated. See Chandler v. Bombardier Capital, Inc., 44 F.3d 80, 83 (2d Cir. 1994); Reichman v. Bonsignore, Brignati & Mazzotta, P.C., 818 F.2d 278, 281-82 (2d Cir. 1987). The more difficult questions are what rate should apply and the how prejudgment interest should be calculated.

Since no federal statute controls the rate of prejudgment interest, see Jones v UNUM Life Ins. Co. of America, 223 F.3d 130, 139 (2d Cir. 2000), and since the Second Circuit has not expressly endorsed a particular interest rate, see Worthington v. City of New Haven, 1999 U.S. Dist. LEXIS 16104, No. 3:94cv00609, 1999 WL 958627, at *17 (D. Conn. Oct. 5, 1999), the courts in the Second Circuit have adopted a variety of approaches, including the post-judgment interest rate provided in 28 U.S.C. § 1961, state statutory interest rates, or market rates. See, e.g, Chandler, 44 F.3d at 84 (approving the trial court's use of the [*24] federal post-judgment rate of interest, 28 U.S.C. § 1961); E.E.O.C. v. County of Erie, 751 F.2d at 82 (applying the adjusted prime rate of interest as established by the Secretary of the Treasury in an employment discrimination case; Shaw, 200 F. Supp. 2d at 119 (applying a prejudgment interest rate of 7.5%, compounded semi-monthly, in an employment discrimination case); Malarkey v. Texaco, Inc., 794 F. Supp. 1237, 1243 (S.D.N.Y. 1992) (applying the New York statutory rate to an employment discrimination case), aff'd, 983 F.2d 1204 (2d Cir. 1993). *HN9* "Regardless of the interest rate used as a starting point by a court evaluating a motion for prejudgment interest, the Second Circuit has made clear that a court 'need not limit the award of prejudgment interest to the rate at which the injured party would have lent money to the government.'" In re Livent, Inc., 360 F. Supp. 2d 568, 572 (S.D.N.Y. 2005) (quoting Jones, 223 F.3d at 139). In Jones, the Second Circuit emphasized that circumstances must be reviewed individually to determine the fairness of an award [*25] of prejudgment interest in a particular case, taking into consideration: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." Jones, 223 F.3d at 139 (quoting SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1476 (2d Cir. 1996), cert. denied, 522 U.S. 812, 139 L. Ed. 2d 21, 118 S. Ct. 57 (1997)).

*HN10* The remedial scheme of Title VII clearly contemplates that victims of discrimination should be made whole and, in keeping with this philosophy, the Second Circuit has encouraged the award of prejudgment interest on back pay awards in employment discrimination cases. Although the courts have applied different interest rates in employment discrimination cases, the majority of courts appear to favor the post-judgment statutory rate of 28 U.S.C. § 1961, "because it takes into account the effects of inflation, but does not overly compensate the plaintiff." Worthington, 1999 U.S. Dist. LEXIS 16104, 1999 WL 958627, at *17 [*26] (citing cases); Fisher v. Town of Windsor, 1997 U.S. Dist. LEXIS 23542, No. 3:94CV02050, 1997 WL 76669, at *6 (D. Conn. Feb. 7, 1997) (using the rates set forth in § 1961(a), compounded monthly, to calculate prejudgment interest in an employment discrimination case); Association against Discrimination in Employment, Inc. v. Bridgeport, 572 F. Supp. 494, 495 (D. Conn. 1983) (same). This Court will follow the approach taken in Worthington, Fisher, and the City of Bridgeport cases, supra, and award Plaintiff prejudgment interest at the § 1961(a) rate, which is the "rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System." See also Norville v. Staten Island Univ. Hosp., 112 Fed. Appx. 92, 94, 2004 WL 2291388 (2nd Cir. 2004) (applying the rate of interest found in § 1961(a) in an employment discrimination case); EEOC v. Yellow Freight Sys., Inc., 2002 U.S. Dist. LEXIS 16826, 2002 WL 31011859, at *33 (same). That still leaves the question of how prejudgment interest is to be calculated.

In Saulpaugh, *HN11* the Second Circuit held that the court must calculate prejudgment [*27] interest in a Title VII case based upon a compound rate of interest. "Given that the purpose of back pay is to make the plaintiff whole, it can only be achieved if interest is compounded." Saulpaugh, 4 F.3d at 145. In Chandler, the Second Circuit held that it was error for the district court to award prejudgment interest as of the date of discharge on the entire amount of the back pay award, rather than calculating the interest separately for each lost salary payment. "Interest should have run from the date of the missed payments, rather than from the date of termination." Chandler, 44 F.3d at 84.

Because interest must be compounded, and should only be based upon the back pay due as of a particular point in time, the interest rate will change pay period to pay period. (The interest rates range from 2.18% on January 25, 2002, to a low of 0.95% on June 20, 2003, to over 3.0% in April 2005). [13] The Court instructs Plaintiff's counsel to submit a calculation of the amount of prejudgment interest from January 23, 2002, to the date of this ruling, compounded either monthly or biweekly (depending on how Plaintiff

---

[13]   The most recent rates, i.e., those not appearing in 28 U.S.C. § 1961, can be found at www.federalreserve.gov.

2005 U.S. Dist. LEXIS 19902, *27

was paid by The Hartford), using the [*28] weekly rate of interest under § 1961(a) as of the Friday on or immediately preceding the date on which Plaintiff would have been paid. See EEOC v. Yellow Freight Sys., Inc., 2002 U.S. Dist. LEXIS 16826, 2002 WL 31011859, at *33. This calculation should be submitted within twenty (20) days of the date of this ruling, to which defense counsel will have ten (10) days to object and, if so, to offer an alternative calculation. Either side may enlist the help of an expert not previously disclosed in the trial memorandum.

### C. Post-Judgment Interest

Plaintiff is also entitled to an award of post-judgment interest under 28 U.S.C. § 1961(a) on the entire money judgment. See Employment Discrimination Law at 1787 (*HN12* "After an award of back pay, *postjudgment* interest is allowed in all cases." (original emphasis)). "Post-judgment interest is designed [*29] to compensate the plaintiff for the delay it suffers from the time damages are reduced to an enforceable judgment to the time the defendant pays the judgment." Andrulonis v. United States, 26 F.3d 1224, 1230 (2d Cir. 1994). Under § 1961(a), post-judgment interest is calculated "from the date of entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a). The judgment entered by the Court shall include an award of post-judgment interest in accordance with this section.

### D. Attorney's Fees and Costs

Last, Plaintiff seeks an award of attorney's fees and costs. In support of this request, his attorney Rachel M. Baird has submitted an affidavit, twenty-six billing invoices, a table summarizing these invoices, a list of costs, and an affidavit of Attorney Peter B. Prestley, a Connecticut attorney who handles employment discrimination cases. Based on these affidavits and records, Plaintiff seeks an award of attorney's fees in the amount of $ 110,718.00, [*30] to which Plaintiff asks the Court to apply a multiplier of two, plus costs of $ 2813.41.

### 1. The Standard for Awarding Fees

*HN13* In Title VII cases, "the court may, in its discretion, allow the prevailing party . . . a reasonable attorney's fee." 42 U.S.C. § 2000e-5(k); see Cowan v. Prudential Ins. Co. of America, 935 F.2d 522, 524 (2d Cir. 1991). The district court is afforded broad discretion in determining a reasonable fee award based on the circumstances in the case. Hensley v. Eckerhart, 461 U.S. 424, 437, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983). The "normal starting point for calculating reasonable attorneys' fees to be awarded to

a prevailing civil rights plaintiff is the calculation of a so-called 'lodestar' figure, which is arrived at by multiplying 'the number of hours reasonably expended in the litigation … by a reasonable hourly rate.'" Kirsch, 148 F.3d at 172 (quoting Hensley, 461 U.S. at 433). The rates to be used in calculating the lodestar are the market rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." [*31] Blum v. Stenson, 465 U.S. 886, 896, 79 L. Ed. 2d 891, 104 S. Ct. 1541 & n.11 (1984); see also Gierlinger v. Gleason, 160 F.3d 858, 882 (2d Cir. 1998). There is a strong presumption that the lodestar figure represents a reasonable rate. Quaratino v. Tiffany & Co., 166 F.3d 422, 425 (2d Cir. 1997).

*HN14* "The fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." Hensley, 461 U.S. at 437. "Applications for fee awards should generally be documented by contemporaneously created time records that specify, for each attorney, the hours expended, and the nature of the work done." Kirsch, 148 F.3d at 173. The Court should exclude from the fee calculation hours that were not reasonably expended. Hensley, 461 U.S. at 434. Hours that are excessive, redundant, or otherwise unnecessary should be excluded from the lodestar calculation. Kirsch, 148 F.3d at 173. "The task of determining a fair fee requires a conscientious and detailed inquiry into the validity of the representations that a certain number of hours [*32] were usefully and reasonably expended." Lunday v. City of Albany, 42 F.3d 131, 134 (2d Cir. 1994) (remanding award of attorneys' fees and directing the magistrate judge to review critically counsel's time records). The Court must

> examine the hours expended by counsel and the value of the work product of the particular expenditures to the client's case…. In making this examination, the district court does not play the role of an uninformed arbiter but may look to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties.

Gierlinger, 160 F.3d at 876 (quoting DiFilippo v. Morizio, 759 F.2d 231, 235-36 (2d Cir. 1985)).*HN15* The Second Circuit has further directed that if the Court determines that certain hours are not deserving of compensation, it must state the reasons for excluding those hours "as specifically as possible." LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 764 (2d Cir. 1998) (internal quotations omitted); Orchano v. Advanced Recovery, Inc., 107 F.3d 94, 99 (2d Cir. 1997).

*HN16* "The product of reasonable [*33] hours times a reasonable rate does not end the inquiry." Hensley, 461 U.S. at 434. There are other considerations that may lead a court to adjust the fee upward or downward. Id. The lodestar figure may be adjusted on the basis of the "results obtained." Id. "Indeed, 'the most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained.'" Farrar v. Hobby, 506 U.S. 103, 114, 121 L. Ed. 2d 494, 113 S. Ct. 566 (1992) (quoting Hensley, 461 U.S. at 436). "This factor is particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief." Hensley, 461 U.S. at 434. A plaintiff who prevails on some but not all of his claims is not entitled to a fee award for unsuccessful claims that were based on different facts and different legal theories. Id. However, *HN17* a plaintiff's lack of success on some of his claims does not require the court to reduce the lodestar amount where the successful and unsuccessful claims were interrelated and required essentially the same proof. Murphy v. Lynn, 118 F.3d 938, 951 (2d Cir. 1997), [*34] cert. denied, *522 U.S. 1115, 140 L. Ed. 2d 114, 118 S. Ct. 1051 (1998)*; DeLeon v. Little, 2000 U.S. Dist. LEXIS 18378, No. 3:94CV902, 2000 WL 435494, at *4 (D. Conn. Mar. 2, 2000). The following factors also may be considered: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. Hensley, 461 U.S. at 430 n.3.

## 2. Plaintiff's Fee Request

### a. Reasonableness of the Hours Claimed

Plaintiff bases his fee request on 369.06 hours of time billed by Attorney Baird for services rendered over a three-year period.

Attorney Baird's representation of Plaintiff began on or about January 26, 2002. She was the only attorney who [*35] represented Plaintiff in connection with this matter and she alone provided all of the legal services for which Plaintiff now seeks fees. Attorney Baird represented Plaintiff throughout the administrative proceedings before the Connecticut Commission on Human Rights and Opportunities ("CCHRO") and then filed a complaint in federal court on his behalf on January 22, 2003. As attested to by Attorney Baird, and as reflected in the court file and docket sheet, this case has involved a considerable number of pretrial matters, including a motion to dismiss, an amended complaint based on newly acquired evidence, substantial discovery, motions for summary judgment, and motions in limine, followed by jury selection, a five-day jury trial, and several post-trial motions. The docket sheet currently lists 148 documents filed by the parties. The total number of hours billed over a three-year period, from January 26, 2002 through February 21, 2005, was 383.57, of which Plaintiff is claiming 369.06 for purposes of this motion.

The Court has thoroughly reviewed all of Attorney Baird's time records and finds that the hours billed were reasonable. Attorney Baird has carefully documented the services [*36] rendered, and has recorded her time in increments of hundredths of an hour. Without exception, her billing entries reflect a reasonable amount of time for the legal services provided.

Defendant has objected to the hours claimed as excessive because they include time spent on Plaintiff's claims against Defendant Maryanne Rhodes, whom Plaintiff voluntarily dropped from the case following the trial. [14] Defendant suggests that a reasonable number of hours would be 362.56, as opposed to the 369.06 claimed by Plaintiff. [15] Although Maryanne Rhodes would still have been a critical witness had she not been a party, Attorney Baird would not have been able to serve her with interrogatories and might not have had separate dealings with her attorney. [16] The Court finds that Defendant's proposed reduction in the hours claimed is reasonable and warranted and will award Plaintiff fees based upon total hours of 362.56.
[*37]

### b. Reasonableness of the Rate Requested

Plaintiff has requested a fee award based upon an hourly rate of $ 300 per hour. In support of this requested rate, he has offered the affidavits of Attorney Baird and Attorney Prestley, who practices in Connecticut.

---

[14]   The Court had severed all claims against Defendant Rhodes from the claims against The Hartford.

[15]   Defendant asks the Court to exclude time spent on interrogatories to Ms. Rhodes and for a letter prepared to David Metzger, Ms. Rhodes' attorney.

[16]   Plaintiff has voluntarily excluded from his claimed attorney's fees and costs, the cost of serving the complaint on Ms. Rhodes, and 8.01 hours in time for responding to Ms. Rhodes' motion to strike.

2005 U.S. Dist. LEXIS 19902, *37

Attorney Baird received her law degree in 1992 from Yale Law School and was admitted to the Connecticut Bar in December 1991. She had thirteen years of legal experience at the time of this trial. She is a member of the District of Columbia Bar and Massachusetts Bar. She has been a sole practitioner for the past four years. During that time, at least fifty percent (50%) of her practice has been representing plaintiffs in employment matters, with a significant number of cases in federal court. From 1992 to 2000, she served as an Assistant Attorney General for the State of Connecticut. Attorney Baird billed Mr. Shorter at the hourly [*38] rate of $ 150, although she states that she has billed other clients as much as $ 300 per hour.

Defendant challenges the requested rate of $ 300 per hour on the grounds that it is twice what Attorney Baird was actually billing Plaintiff; that it is neither her customary rate nor a reasonable rate; and that the requested rate exceeds what the courts have awarded to other attorneys with her level of experience in Connecticut.

*HN18* The Supreme Court in Blum noted the inherent difficulty in determining an appropriate "market rate" for a lawyer's services but explained that

the burden is on the fee applicant to produce satisfactory evidence - that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation. A rate determined in this way is normally deemed to be reasonable, and is referred to - for convenience - as the prevailing market rate.

Blum, 465 U.S. at 896, n.11; see also Gierlinger, 160 F.3d at 882; Kirsch, 148 F.3d at 172 (holding that the lodestar should be based [*39] on prevailing market rates for comparable attorneys of comparable skill and standing in the pertinent legal community); Luciano v. Olsten Corp., 109 F.3d 111, 115-16 (2d Cir. 1997) (holding that the lodestar figure should be in line with the prevailing rates in the community,

that being the district in which the court sits); Omnipoint Communications, Inc. v. Planning & Zoning Comm'n, 91 F. Supp. 2d 497, 499 (D. Conn. 2000) (basing the determination of a reasonable hourly rate on the Court's extensive experience and knowledge of rates within the western Fairfield County area). Moreover, the courts have held that*HN19* the actual billing arrangement between an attorney and his client does not necessarily establish a ceiling on the rates that can be awarded, although it is a significant factor. See Blanchard v. Bergeron, 489 U.S. 87, 93, 103 L. Ed. 2d 67, 109 S. Ct. 939 (1989) (holding that a fee award under § 1988 is not limited by a contingent fee agreement between the attorney and his client. "Should a fee agreement provide less than a reasonable fee calculated [according to the lodestar method], the defendant should nevertheless be required to pay the [*40] higher amount."); Crescent Publishing Group, Inc. v. Playboy Enterprises, Inc., 246 F.3d 142, 148 (2d Cir. 2001) (allowing a higher rate than that actually billed in a Copyright Act case).

Plaintiff has provided the Affidavit of Attorney Peter B. Prestley, who has been practicing in Connecticut for thirty-three years and has extensive experience in the field of employment law. Attorney Prestley states in his affidavit that the hourly rate of $ 300 is "reasonable and consistent with the prevailing fee for attorneys with [Attorney Baird's] degree of experience and expertise." (Prestley Aff. P 12.) His hourly rate for handling similar matters is $ 385 per hour. Id.

Additionally, the Court has reviewed a number of fee award in cases in this district over the past ten years. In Conn. State Dep't of Soc. Servs. v. Thompson, 2003 U.S. Dist. LEXIS 18987 (D. Conn. 2003), Judge Underhill awarded fees at the rates of $ 325 per hour and $ 375 per hour. In so doing, he noted that other District of Connecticut judges who have considered this issue had concluded that an hourly rate of $ 250 to $ 300 was the prevailing market rate for attorneys [*41] with a high degree of expertise in their field of law. [17]2003 U.S. Dist. LEXIS 18987 at *17-18. The Court notes that many of

---

[17]   The Court cited the following cases: Lieberman v. Dudley, 1998 U.S. Dist. LEXIS 16809, 1998 WL 740827, at *4 (D. Conn. July 27, 1998) (approving an hourly rate of $ 250 for an experienced civil rights litigator with over 30 years of experience in Connecticut); Calovine v. City of Bridgeport, 1998 U.S. Dist. LEXIS 4764, 1998 WL 171432, at * 1 (D. Conn. Feb. 4, 1998) (same); Russo v. Coppola, No. 3:93CV1734 (AHN), slip op. (D. Conn. Feb. 6, 1995) (Ruling on Application for Attorneys' Fees and Costs Feb. 6, 1995) (awarding fees under § 1988 based on an hourly rate of $ 250 for a partner with over thirty years' experience in this district, and $ 150 per hour for two associate attorneys with two and three years of experience in this district); Omnipoint Communications, Inc. v. Planning and Zoning Comm'n of Town of Wallingford, 91 F. Supp. 2d 497 (D. Conn. 2000) (allowing fees at the hourly rate of $ 300 and $ 250 for partners in a Stamford firm); LaPointe v. Windsor Locks Board of Education, 162 F. Supp. 2d 10, 18 (D. Conn. 2001) (finding $ 275 to be a reasonable hourly rate for an attorney from Manchester, Connecticut with 20 years of experience); Evanauskas v. Strumpf, 2001 U.S. Dist. LEXIS 14326, 2001 WL 777477 (D. Conn. June 27, 2001) (finding reasonable an hourly rate of $ 275 for a solo practitioner in a consumer case based upon similar awards

these cases are five or more years old and presumably rates charged by attorneys with comparable experience have increased since then.

 [*42] Based on the affidavits submitted by Plaintiff, other awards in this District, as well as the Court's own knowledge of fees generally charged by attorneys practicing in this District with similar levels of experience as Attorney Baird, the Court finds that Plaintiff's requested rate of $ 300 per hour is reasonable. Applying that rate to the 362.56 hours yields an attorney's fee award of $ 108,768.00.

### c. Plaintiff's Requested Multiplier

Additionally, Plaintiff requests that the fee award be increased by a multiplier of two based upon his measure success at trial, the degree of risk associated with the claims in this litigation, and the fact that this litigation precluded counsel from representing other clients.

Defendant opposes the application of a multiplier based on the limited success Plaintiff achieved. Five of the original eleven counts never reached the jury and two of the claims submitted to the jury resulted in verdicts for The Hartford. Additionally, the jury's verdict was substantially less than Plaintiff's last settlement demand and the damages claimed in Plaintiff's damages analysis.

The Court agrees with Defendant that a multiplier is not appropriate in [*43] this case. As noted above, *HN20* there is a strong presumption that the lodestar is reasonable. See See Orchano, 107 F.3d at 99; Lunday v. Albany, 42 F.3d at 134. The party asking the Court to depart from the lodestar amount bears the burden of proving that such a departure is necessary to the calculation of a reasonable fee. See Grant v. Martinez, 973 F.2d 96, 99 (2d Cir. 1992). An upward adjustment is warranted only in rare instances. See Blum, 465 U.S. at 901.

In this case, most, if not all, of the reasons Plaintiff has cited for justifying a multiplier are subsumed within the initial lodestar calculation. See Id. at 899-901 (holding that the novelty and complexity of issues, quality of representation, special skill and experience of counsel, results obtained, and a contingency fee arrangement and risk of nonpayment are most often reflected in the lodestar calculation and cannot serve as independent bases for adjusting the basic fee award.) The Court denies Plaintiff's request to apply a multiplier of two to the attorney's fee award.

### 3. Defendant's Request for a Downward Departure

Based largely on [*44] Plaintiff's lack of success on a number of his original claims, Defendant urges the Court to reduce the fee award by thirty-three percent (33%). Defendant argues that Plaintiff's claim of sexual harassment, on which he did not prevail, was based on conduct that arose from his personal relationship with Ms. Rhodes and was unrelated to his violation of The Hartford's electronic communication policy and subsequent termination of his employment. Likewise, Plaintiff's claims of retaliation and invasion of privacy concerned post-termination events.

*HN21* Whether to reduce an attorney's fee award based on unsuccessful claims is a matter left to the sound discretion of the Court. See Saulpaugh, 4 F.3d at 145. The Second Circuit held in Dominic, that where the court determines that the successful and unsuccessful claims are "inextricably intertwined" and "involve a common core of facts or [are] based on related legal theories," it is not an abuse of discretion for the court to award the entire fee. Dominic, 822 F.2d at 1259; see also Hensley, 461 U.S. at 435.

In this case, the relationship between Plaintiff and Ms. Rhodes was the catalyst [*45] for the events leading up to Plaintiff's termination. The facts underlying Plaintiff's sexual harassment claim were "inextricably intertwined" with the facts surrounding his termination. Although several of Plaintiff's claims involving post-termination events did not go to the jury, the damages Plaintiff received on his successful claims afforded him full relief and any additional damages would have been duplicative. The Court concludes that a downward departure is not appropriate based on Plaintiff's success on less than all of his claims.

### 4. Plaintiff's Request for Costs

Last, Plaintiff seeks an award of costs in the amount of $ 2,813.41. *HN22* The Second Circuit has held that an award of fees in a civil rights suit includes reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients. LeBlanc-Sternberg, 143 F.3d at 763. Defendant has not opposed this request for costs.

As documented by contemporaneous computer print-outs, the costs that Plaintiff seeks to recover are comprised of the following:

District Court Filing Fee: $ 150.00

Service of Process on The Hartford: $ 71.25

in other cases and the Court's knowledge of hourly rates in Connecticut); Tsombanidis v. City of West Haven, 208 F. Supp. 2d 263, 276 (D. Conn. 2002) (granting a fee award based on an hourly rate of $ 275 under § 1988).

Subpoenas for Trial Witnesses: $ 242.50 [*46]

Deposition Transcripts: $ 1,813.98

Postage: $ 160.22

Legal Research: $ 13.13

Copies: $ 344.43

Cassette Tapes for Exhibits: $ 18.00

These costs have been well-documented and are recoverable.

## CONCLUSION

As set forth above, the Court GRANTS IN PART AND DENIES IN PART Plaintiff's Motions for Equitable Relief **[Doc. # # 125, 133]**. Plaintiff's request for reinstatement is DENIED. Plaintiff's request for an award of front pay is GRANTED. The Court awards Plaintiff $ 117,000 as front pay. In addition to the jury's award of $ 170,000 in back pay, Plaintiff is awarded back pay of $ 4,722 per month

from the date of the jury's verdict, January 28, 2005, until the date judgment is entered. Plaintiff's Motions for an Award of Prejudgment Interest, Post-Judgment Interest, and Attorney's Fees and Costs **[Doc. # # 127, 133]** are GRANTED to the following extent: Plaintiff shall be awarded prejudgment interest on his back pay award, based upon the rates set forth in 28 U.S.C. § 1961(a). Plaintiff's counsel is directed to submit a calculation of prejudgment interest in accordance with this Opinion within twenty (20) days, to which Defendant shall [*47] have ten (10) days to object. Plaintiff is also awarded post-judgment interest pursuant to 28 U.S.C. § 1961(a) on the entire damage award. Plaintiff is awarded attorney's fees in the amount of $ 108,768.00 and costs in the amount of $ 2,813.41.

It is SO ORDERED, this 31st day of May, 2005, at Bridgeport, Connecticut.

*/s/ William I. Garfinkel*

United States Magistrate Judge



Positive
As of: April 17, 2014 1:04 PM EDT

# Shorter v. Hartford Fin. Servs. Group, Inc.

United States District Court for the District of Connecticut
July 15, 2005, Decided
No. 3:03cv0149 (WIG)

**Reporter:** 2005 U.S. Dist. LEXIS 19903; 2005 WL 2231599

FERRON SHORTER, JR., Plaintiff, vs. HARTFORD FINANCIAL SERVICES GROUP, INC., Defendant.

**Subsequent History:** Motion granted by, in part, Motion denied by, in part Shorter v. Hartford Fin. Servs. Group, Inc., 2005 U.S. Dist. LEXIS 34979 (D. Conn., Dec. 20, 2005)

**Prior History:** Shorter v. Hartford Fin. Servs. Group, Inc., 2005 U.S. Dist. LEXIS 19902 (D. Conn., May 31, 2005)

---
**Core Terms**
---

prejudgment interest, calculate, backpay, back-pay, compensatory damages, jury's verdict

**Counsel:** [*1] For Ferron Shorter, Jr., Plaintiff: Rachel M. Baird, Law Office of Rachel M. Baird, Torrington, CT.

For Hartford Financial Svcs Group Inc, Defendant: James F. Shea, Margaret J. Strange, Jackson Lewis - Htfd, CT, Hartford, CT.

**Judges:** William I. Garfinkel, United States Magistrate Judge.

**Opinion by:** William I. Garfinkel

---
**Opinion**
---

## SUPPLEMENTAL RULING ON PLAINTIFF'S POST-TRIAL MOTIONS

On May 31, 2005, this Court ruled on Plaintiff's post-trial motions and instructed Plaintiff to submit a calculation of prejudgment interest in accordance with that ruling. On June 28, 2005, Plaintiff filed a Notice of Prejudgment Interest Calculation, seeking an award of prejudgment interest in the amount of $ 6,567.41 on his back-pay award from January, 23, 2002, to May 31, 2005. Defendants had ten (10) days to object and to provide an alternative calculation. To date, no objection has been received.

Accordingly, having reviewed Plaintiff's calculations and found them to be in accordance with this Court's ruling and the precedent cited therein, the Court awards Plaintiff prejudgment interest on his back-pay award in the amount of $ 6,567.41.

The Clerk is directed to enter judgment in favor of Plaintiff, [*2] Ferron Shorter, Jr., and against Defendant, Hartford Financial Services Group, Inc., in accordance with the Jury's Verdict, the Court's Ruling of May 31, 2005, and this Supplemental Ruling. Pursuant thereto:

. Plaintiff is awarded front pay in the amount of $ 117,000.00.

. Plaintiff is awarded back pay in the amount of $ 170,000.00, plus back pay of $ 4,722.00 per month from the date of the jury's verdict, January 28, 2005, until the date judgment is entered.

. Plaintiff is awarded prejudgment interest on his back pay award, based upon the rates set forth in 28 U.S.C. § 1961(a), in the amount of $ 6,567.41, from January 23, 2002, until May 31, 2005. Additionally, Plaintiff is awarded prejudgment interest at the rate of $ 18.75 per day [1] from June 1, 2005, until the date judgment is entered.

. Plaintiff is awarded compensatory damages in the amount of $ 85,000.00.

. Plaintiff is awarded post-judgment interest pursuant to 28 U.S.C. § 1961(a) on the entire back-pay, front-pay, and compensatory damage award.

. Plaintiff is awarded attorney's fees in the amount of $ 108,768.00 for work performed through February 22, 2005, and [*3] costs in the amount of $ 2,813.41, for costs incurred through February 22, 2005.

Judgment shall enter accordingly.

SO ORDERED, this 15th day of July, 2005, at Bridgeport, Connecticut.

---

[1]  The Court has calculated this daily rate by dividing the prejudgment interest figure for the last period submitted by Plaintiff, pay period 81, by 15.

2005 U.S. Dist. LEXIS 19903, *3

*/s/ William I. Garfinkel*                    United States Magistrate Judge

# EXHIBIT L



Caution
As of: April 17, 2014 1:09 PM EDT

# Kamat v. Kurtha

United States District Court for the Southern District of New York
January 19, 2007, Decided
05 CV 10618 (KMW)(THK)

**Reporter:** 2007 U.S. Dist. LEXIS 4593; 2007 WL 188738

SUNIL KAMAT, Plaintiff, -against- AZIZ KURTHA, Defendant.

**Subsequent History:** Magistrate's recommendation at, Summary judgment proceeding at *Kamat v. Kurtha, 2008 U.S. Dist. LEXIS 107102 (S.D.N.Y., Apr. 14, 2008)*

## Core Terms

paint, recommend

**Counsel:** [*1]  For Sunil Kamat, Plaintiff: Barbara T. Hoffman, LEAD ATTORNEY, The Law Office of Barbara Hoffman, New York, N.Y.

Aziz Kurtha, Defendant, Pro se, Dubai, U.A.E.

For Sotheby's Inc., Defendant: Dean R. Nicyper, Flemming Zulack Williamson Zauderer, LLP, New York, NY.

**Judges:** KIMBA M. WOOD, United States District Judge. Magistrate Judge Theodore H. Katz.

**Opinion by:** KIMBA M. WOOD

## Opinion

ORDER

KIMBA M. WOOD, U.S.D.J.:

Plaintiff Sunil Kamat ("Plaintiff") filed suit against Defendant Aziz Kurtha ("Defendant"), seeking declaratory judgment that he is the rightful owner of a 1971 Francis Newton Souza painting titled "Winter Trees in Central Park," (the "Painting"). On April 26, 2006, Defendant filed a motion to dismiss the Complaint for lack of subject matter jurisdiction and insufficient service of process,

pursuant to *Federal Rules of Civil Procedure 12(b)(1)* and *12(b)(5)*. On December 1, 2006, Magistrate Judge Theodore H. Katz issued a Report and Recommendation (the "Report"), familiarity with which is assumed, recommending that the Court deny Defendant's Motion to dismiss. For the reasons set forth below, [*2] the Court adopts the Report.

## I. Background[1]

The Report thoroughly recounts the background of this case; the Court repeats the facts here only as necessary. Plaintiff is a resident of California and a collector of contemporary Indian art. Compl. P 5. He purchased the Painting on July 9, 2003, from the Louise Korman Gallery in Edinburgh, Scotland, for £ 3,241.86, and remained in possession of it for a little over one year. Compl. PP 11, 14. On July 21, 2004, Plaintiff [*3] consigned the Painting to Sotheby's, Inc., for sale in its September 2004 Southeast Asian Auction. Compl. P 13.

On September 14, 2004, Defendant, a resident of Dubai, United Arab Emirates ("U.A.E."), informed Sotheby's that the Painting had been stolen from his collection in London and asserted his claim to it. Compl. P 14. Sotheby's withdrew the Painting from the auction and, pursuant to an Order of the Court, has retained possession on the Court's behalf pending resolution of this matter. Compl. PP 16-17; Order, July 13, 2006.

Plaintiff filed this declaratory judgment action, which Defendant has moved to dismiss for lack of subject matter jurisdiction and lack of personal jurisdiction as a result of improper service. On May 22, 2006, Plaintiff filed an

---

[1]   The facts as set forth in this order have been taken from the Complaint and are assumed to be true in accordance with the legal standard of review on a motion to dismiss. *See Anatian v. Coutts Bank (Switzerland) Ltd., 193 F.3d 85, 88 (2d Cir. 1999)*, *cert. denied, 528 U.S. 1188, 120 S. Ct. 1241, 146 L. Ed. 2d 100 (2000)*. In considering subject matter jurisdiction, it is proper to refer to evidence beyond the pleadings to resolve disputed jurisdictional facts. *Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).*

2007 U.S. Dist. LEXIS 4593, *3

Amended Complaint, [2] as well as a Cross-Motion for an Order Pursuant to *Rule 4(f)(3)*, permitting court-directed alternative means of service, and *Rule 4(n)*, for a writ of replevin. Plaintiff's request for a writ of replevin was resolved by the Court's July 13, 2006 Order, which instructed Sotheby's to retain possession of the Painting, subject to the Court's exclusive control, and dismissed Sotheby's as a party to the action.

[*4] Magistrate Judge Katz recommended that the Court deny Defendant's motion. Defendant timely objected, but only to the Report's recommendation that the Court has subject matter jurisdiction over the case.

## II. Discussion

Defendant states that he "respectfully disagree[s]" with the Report's recommendation to deny his motion to dismiss for insufficiency of process but "will not pursue the objection any further." Def.'s Objections P 1. Because Defendant does not formally object to that portion of the Report, the Court reviews it only for clear error. "'If no objections are filed, or where objections are merely perfunctory responses, argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original petition, reviewing courts should review a report and recommendation for clear error.'" *Edwards v. Fischer, 414 F. Supp. 2d 342, 346-47 (S.D.N.Y. 2006)* (quoting Vega v. Artuz, No. 97 Civ. 3775, 2002 WL 31174466, at *1, 2002 U.S. Dist. LEXIS 18270, *3 (S.D.N.Y. Sept. 30, 2002)).

The Court has reviewed the Report, and finds its conclusions pertaining to Defendant's motion to dismiss for insufficiency [*5] of process to be well-reasoned and free of any "clear error on the face of the record." Fed. R. Civ. P. 72(b) advisory committee's note; see also Nelson v. Smith, 618 F. Supp. 1186, 1189 (S.D.N.Y. 1985). The Court therefore accepts and adopts the Report's recommendation that Defendant's motion to dismiss for insufficiency of process be denied.

Defendant focuses his objections on the Report's conclusion that Plaintiff has properly invoked the Court's diversity of citizenship jurisdiction. Because Plaintiff's objections are specific, the Court reviews the Report's recommendation to deny Defendant's motion based on *Federal Rule of Civil Procedure 12(b)(1)* de novo. 28 U.S.C. § 636(b)(1); Fed. R. Civ. Pro. 72(b).

The requirements for subject matter jurisdiction under diversity of citizenship are familiar: the parties must be completely diverse and the amount in controversy must exceed $ 75,000. *28 U.S.C. § 1332(a)*. As the Report correctly states, the amount-in-controversy requirement depends upon the facts alleged [*6] at the time the complaint is filed. Chase Manhattan Bank, N.A. v. Am. Nat'l Bank & Trust Co., 93 F.3d 1064, 1070 (2d Cir. 1996) (quoting Tongkook Am., Inc. v. Shipton Sportswear Co., 14 F.3d 781, 784 (2d Cir. 1994)). Because there is "a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy," Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc., 166 F.3d 59, 63 (2d Cir. 1999), "the sum claimed by the plaintiff controls if the claim is apparently made in good faith." Chase Manhattan Bank, N.A., 93 F.3d at 1070 (citing St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 288-89, 58 S. Ct. 586, 82 L. Ed. 845 (1938)). "It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." Id.

Defendant's objections repeat much of what he argued before Magistrate Judge Katz. He points to the fact that, in preparation for a 2004 auction, Sotheby's estimated the value of the Painting to be between $ 15,000 and $ 20,000. [3] Def.'s Objections 2, 2(b), 2(d). Given the substantial difference [*7] between $ 20,000 and $ 75,000, he reasons, it is inappropriate to credit Plaintiff's allegation regarding the amount in controversy.

While the discrepancy between $ 20,000 and $ 75,000 is large, the Court agrees with the Report's conclusion that it is not possible to "say with legal certainty that Plaintiff had no basis for claiming an amount in controversy exceeding $ 75,000." Report 4. Although Plaintiff purchased the Painting for [*8] only £ 3,241.86, both the Complaint and the First Amended Complaint allege that its value has steadily increased. The First Amended Complaint also asserts that a London art expert familiar with Souza's oeuvre estimates the value of this Painting to be between $ 60,000 and $ 80,000. First Am. Compl. P 34. That expert -- Conor Macklin -- filed a declaration stating that the increasing affluence and number of collectors of contemporary Indian art supports his valuation. Decl. of Conor Macklin, May 10, 2006, 8. Finally, the Court notes that Plaintiff has requested compensatory and punitive

---

[2]  The Complaint and the First Amended Complaint are virtually identical. The primary difference between the two is that the First Amended Complaint includes a Fifth Cause of Action for Replevin against Sotheby's, which has been resolved.

[3]  Defendant has attached copies of letters memorializing settlement discussions to his objections. He states that these discussions support his argument that Plaintiff does not expect to recover more than $ 20,000. Def.'s Objections 4, 2(i). Because "[e]vidence [of settlement discussions] is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount," the letters are irrelevant to the calculation of the amount in controversy. Fed R. Evid. 408(a).

2007 U.S. Dist. LEXIS 4593, *8

damages for slander of title and tortious interference with contract. Because recovery on both or either of these claims is legally possible, see Colavito v. N.Y. Organ Donor Network, Inc., 438 F.3d 214, 221 (2nd Cir. 2006), they are appropriately considered in the amount-in-controversy calculation. A.F.A Tours, Inc. v. Whitchurch, 937 F2d 82, 87 (2d Cir. 1991). Thus, the Court concludes that Plaintiff has satisfactorily established that the amount in controversy exceeds the statutory minimum of $75,000.

For the above reasons, the Court adopts Magistrate Judge Katz's [*9] thorough and well-reasoned Report. Defendant's Motion to Dismiss [Docket # 6] is denied. Plaintiff's Cross-Motion for an Order pursuant to *Rule*

*4(f)(3)*, permitting court-directed alternative means of service is moot [Docket # 14]. The parties are instructed to comply with Magistrate Judge Katz's December 4, 2006 Order, as amended the the Court's December 13, 2006 Memorandum Endorsement.

SO ORDERED.

Dated: New York, New York

January 19, 2007

Kimba M. Wood

United States District Judge

# EXHIBIT M



Positive
As of: April 17, 2014 1:05 PM EDT

# Patino v. Birken Mfg. Co.

Superior Court of Connecticut, Judicial District of Hartford at Hartford

May 15, 2009, Decided; May 15, 2009, Filed

CV054016120S

**Reporter:** 2009 Conn. Super. LEXIS 1331

Luis Patino v. Birken Manufacturing Co.

**Notice:** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**Subsequent History:** Costs and fees proceeding at, Motion granted by Patino v. Birken Mfg. Co., 2009 Conn. Super. LEXIS 2166 (Conn. Super. Ct., Aug. 6, 2009) Affirmed by Patino v. Birken Mfg. Co., 2012 Conn. LEXIS 179 (Conn., May 1, 2012)

## Case Summary

**Procedural Posture**
Plaintiff former employee sued defendant former employer alleging a claim for hostile work environment. A jury found in favor of the employee and awarded him $ 94,500 in noneconomic damages. The employer filed a motion to set aside the verdict and a motion for remittitur.

**Overview**
The issue before the court was whether Conn. Gen. Stat. § 46a-81c imposed liability on the employer for failing to prevent its employees from creating a hostile work environment for the employee on account of his sexual orientation. The court concluded that the employer could be held liable because such a hostile work environment constituted discrimination with respect to the "conditions" of employment. The fact that § 46a-81c contained no explicit hostile work environment provision was not dispositive, as the statute prohibited discrimination in terms, conditions, or privileges of employment, an "expansive concept" authorizing hostile work environment claims in the context of discrimination against statutorily protected classes. The court further found the evidence was sufficient to support the jury's verdict, noting that the jury heard the employee's testimony that he heard derogatory words for homosexuals multiple times per week over an extended period and, despite many complaints, the employer took little action to address the problem. The court also held that the damages

award was supported by the evidence and was not patently unreasonable.

**Outcome**
The employer's motions to set aside the verdict and for remittitur were denied.

## LexisNexis® Headnotes

Civil Procedure > Judgments > Relief From Judgments > General Overview

**HN1** A trial court possesses inherent power to set aside a jury verdict that, in the court's opinion, is against the law or the evidence. The trial court should not set aside a verdict where it is apparent that there was some evidence upon which the jury might reasonably reach their conclusion, and should not refuse to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles.

Labor & Employment Law > ... > Gender & Sex Discrimination > Scope & Definitions > Sexual Orientation

**HN2** Pursuant to Conn. Gen. Stat. § 46a-81c, an employer may be held liable for sexual orientation discrimination if it fails to take reasonable steps to prevent its employees from harassing a fellow employee on account of his sexual orientation.

Governments > Legislation > Interpretation

**HN3** When construing a statute, a court's fundamental objective is to ascertain and give effect to the apparent intent of the legislature. In other words, the court seeks to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of the case, including the question of whether the language actually does apply. In seeking to determine that meaning, Conn. Gen. Stat. §1-2z directs the court first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute

2009 Conn. Super. LEXIS 1331, *1331

shall not be considered. When a statute is not plain and unambiguous, the court also looks for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter.

Labor & Employment Law > ... > Gender & Sex Discrimination > Scope & Definitions > Sexual Orientation

**HN4** See Conn. Gen. Stat. § 46a-81c.

Labor & Employment Law > Discrimination > Actionable Discrimination

**HN5** See Conn. Gen. Stat. § 46a-60(a)(1).

Labor & Employment Law > ... > Title VII Discrimination > Scope & Definitions > General Overview

**HN6** See *42 U.S.C.S. §2000e-2(a)*.

Governments > Legislation > Interpretation
Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Federal & State Interrelationships

**HN7** In matters involving the interpretation of Connecticut 's anti-discrimination laws, the Connecticut Supreme Court often looks to federal precedent because Connecticut state law is generally designed to be co-extensive with federal law.

Labor & Employment Law > ... > Title VII Discrimination > Scope & Definitions > General Overview

**HN8** The phrase "terms, conditions or privileges of employment" in Title VII of the Civil Rights Act of 1964 has been broadly interpreted by federal courts. These courts conclude that this phrase embodies an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination.

Labor & Employment Law > ... > Title VII Discrimination > Scope & Definitions > General Overview

**HN9** The phrase "terms, conditions, or privileges of employment" evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment. Thus, Congress did not intend that discrimination that affects the "conditions" of employment should be limited only to "economic" or "tangible" discrimination, but all actions that create a workplace filled with discriminatory intimidation, ridicule, and insult.

Labor & Employment Law > ... > Title VII Discrimination > Scope & Definitions > General Overview

**HN10** Sexual misconduct that does not effect a "quid pro quo" may still be considered sexual harassment under Title VII of the Civil Rights Act of 1964 where such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

Labor & Employment Law > ... > Harassment > Sexual Harassment > Hostile Work Environment

Labor & Employment Law > ... > Title VII Discrimination > Scope & Definitions > General Overview

**HN11** The protections of Title VII of the Civil Rights Act of 1964 extend beyond the economic aspects of a hostile work environment, providing a remedy for working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers.

Labor & Employment Law > ... > Gender & Sex Discrimination > Scope & Definitions > Sexual Orientation

Labor & Employment Law > ... > Harassment > Sexual Harassment > Hostile Work Environment

Labor & Employment Law > ... > Title VII Discrimination > Scope & Definitions > General Overview

**HN12** An employee who encountered pervasive discriminatory intimidation, ridicule, and insult at work suffers discrimination in the "terms, conditions or privileges of employment" because of the employee's membership in a protected class. Not all workplace conduct that may be described as "harassment" affects a "term, condition, or privilege" of employment within the meaning of Title VII of the Civil Rights Act of 1964. To be actionable, the conduct must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

Labor & Employment Law > ... > Title VII Discrimination > Scope & Definitions > General Overview

**HN13** A discriminatory and offensive work environment so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers' may constitute a violation of Title VIIof the Civil Rights Act of 1964.

Labor & Employment Law > ... > Sexual Harassment > Employer Liability > General Overview

Labor & Employment Law > ... > Harassment > Sexual Harassment > Hostile Work Environment

**HN14** Conn. Gen. Stat. § 46a-60(a)(1) imposes liability on employers who permit employees to create a hostile work environment that impacts members of protected classes enumerated under the statute. Once an employer has knowledge of a racially or sexually combative atmosphere in the workplace, he or she has a duty to take reasonable steps to eliminate it.

2009 Conn. Super. LEXIS 1331, *1331

Labor & Employment Law > ... > Harassment > Sexual Harassment > Hostile Work Environment

**HN15** A hostile work environment claim is not limited to sexual advances or sexual behavior. It also includes nonsexual behavior directed at an employee because of his or her gender and because of a plaintiff's race and membership in other protected classes.

Labor & Employment Law > ... > Harassment > Sexual Harassment > Hostile Work Environment

**HN16** The phrase "terms, conditions or privileges of employment" imposes liability on an employer for failing to prevent employees from creating a hostile work environment based on an individual's membership in a protected class.

Labor & Employment Law > ... > Gender & Sex Discrimination > Scope & Definitions > Sexual Orientation

**HN17** Conn. Gen. Stat. §§ 46a-81a through 46a-81n of the Gay Rights Law provide that it is the public policy of Connecticut that individuals are not to be discriminated against because of their sexual orientation - that is, the law prohibits discrimination against a person based on his or her preference for heterosexuality, homosexuality or bisexuality, history of such preference or being identified with such preference. Conn. Gen. Stat. §46a-81a. This public policy reaches a wide spectrum of activities, including: membership in licensed professional associations, Conn. Gen. Stat. § 46a-81b; employment, Conn. Gen. Stat. § 46a-81c; public accommodations Conn. Gen. Stat. § 46a-81d; housing, Conn. Gen. Stat. § 46a-81e; credit practices, Conn. Gen. Stat. § 46a-81f; employment in state agencies, Conn. Gen. Stat. §§ 46a-81h and 46a-81j; the granting of state licenses, Conn. Gen. Stat. § 46a-81k; educational and vocational programs of state agencies, Conn. Gen. Stat. § 46a-81m; and allocation of state benefits, Conn. Gen. Stat. § 46a-81n.

Labor & Employment Law > ... > Gender & Sex Discrimination > Scope & Definitions > Sexual Orientation

Labor & Employment Law > ... > Harassment > Sexual Harassment > Hostile Work Environment

**HN18** Connecticut courts have assumed without deciding that an employee may bring a hostile work environment claim pursuant to Conn. Gen. Stat. § 46a-81c.

Labor & Employment Law > ... > Sexual Harassment > Scope & Definitions > Sexual Harassment

**HN19** See Conn. Gen. Stat. § 46a-60(a)(8).

Governments > Legislation > Interpretation

**HN20** Courts have traditionally eschewed construction of statutory language that leads to absurd results or thwarts its manifest purpose.

Governments > Legislation > Interpretation

**HN21** In choosing between two constructions of a statute, one valid and one constitutionally precarious, courts will search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent.

Constitutional Law > Equal Protection > Gender & Sex

**HN22** Gays and lesbians are a "quasi-suspect" class entitled to equal protection under the Connecticut Constitution. The denial of the right of gays and lesbians to marry - a right available to heterosexual couples - cannot withstand constitutional scrutiny: To decide otherwise would require courts to apply one set of constitutional principles to gay persons and another to all others. The guarantee of equal protection under the law, and the courts' obligation to uphold that command, forbids courts from doing so.

Labor & Employment Law > ... > Harassment > Sexual Harassment > Hostile Work Environment

**HN23** To establish a claim of hostile work environment, the workplace must be permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. The environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. This is not, and by its nature cannot be, a mathematically precise test. Whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

Labor & Employment Law > Discrimination > Actionable Discrimination

**HN24** Discriminatory conduct does not need to be directed at the plaintiff or to his face in order to be actionable.

Labor & Employment Law > ... > Sexual Harassment > Employer Liability > General Overview

Labor & Employment Law > ... > Harassment > Sexual Harassment > Hostile Work Environment

**HN25** When an employer learns of a hostile work environment in its workplace, it has a duty to take reasonable steps to eliminate it. The standard is essentially a negligence one, and reasonableness depends among other things on the gravity of the harassment alleged, the

2009 Conn. Super. LEXIS 1331, *1331

severity and persistence of the harassment, the effectiveness of any initial remedial steps, the nature of the work environment, and the resources available to the employer. An employer's response should be evaluated to determine how prompt, appropriate, and adequate it was. To determine whether the remedial action was adequate, a court must consider whether the action was reasonably calculated to prevent further harassment. Once an employer has in good faith taken those measures which are both feasible and reasonable under the circumstances to combat the offensive conduct, the employer cannot be charged with discriminating on the basis of race or sex. Whether an employer has fulfilled its responsibility to take reasonable steps to remedy a discriminatory work environment is to be determined upon the facts in each case.

Labor & Employment Law > ... > Remedies > Damages > Compensatory Damages

Labor & Employment Law > ... > Remedies > Damages > Compensatory Damages

*HN26* Emotional distress damages are not equivalent to punitive damages; they are a form of compensatory damages designed to put a plaintiff in as good a condition as he would have been if he had not been forced to endure a hostile work environment.

Civil Procedure > ... > Jury Trials > Verdicts > General Overview

Civil Procedure > Judgments > Relief From Judgments > General Overview

*HN27* In considering a motion to set aside the verdict as excessive, a court should not act as the seventh juror with absolute veto power. Whether the court would have reached a different result is not in itself decisive. The court's proper function is to determine whether the evidence, reviewed in a light most favorable to the prevailing party, reasonably supports the jury's verdict. The size of the verdict alone does not determine whether it is excessive. The only practical test to apply to a verdict is whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Conforming Pleadings to Evidence

*HN28* A trial court may allow, in its discretion, an amendment to pleadings before, during, or after trial to conform to the proof. Conn. Gen. Prac. Book, R. Super. Ct. § 10-62.

**Judges:** [*1] Eliot D. Prescott, J.

**Opinion by:** Eliot D. Prescott

| Opinion |
| --- |

*MEMORANDUM OF DECISION ON MOTIONS TO SET ASIDE THE VERDICT (# 117) AND FOR REMITTITUR (# 118)*

In this employment discrimination case, the principal issue raised by the defendant in its post-trial motions is whether General Statutes §46a-81c imposes liability on a employer who fails to prevent his employees from creating a hostile work environment for a co-worker on account of his sexual orientation. The court concludes that an employer may be held liable, pursuant to §46a-81c, for a hostile work environment because such an environment constitutes discrimination with respect to the employee's "conditions" of employment.

*FACTS AND PROCEDURAL HSITORY*

The plaintiff, Luis Patino, commenced this action by service of process on the defendant, Birken Mfg. Co. ("Birken"), on August 23, 2005. The present action arises under a complaint that Patino filed with the commission on human rights and opportunities ("CHRO") on January 26, 2004, alleging retaliation and hostile work environment, which the CHRO released from its jurisdiction on May 23, 2005. Patino's initial complaint contained six counts but he elected to proceed to the jury on only one count.

The case [*2] was heard before a jury beginning on January 27, 2009. At trial, the jury reasonably could have found the following facts. Patino began working as a machinist at Birken in 1977 and his employment ended on November 8, 2004, when he was fired. [1] (Trial Transcript, January 27, 2009 [Tr.], pp. 3, 18, 90.) Beginning in 1991, some of Patino's co-workers began calling him derogatory names for homosexuals in Spanish such as "pato" and "maricon," and also used slang words about homosexuals in Italian and English such as "pira," "faggot" and "homo." (Tr., pp. 15-16.) He heard these words "very often:" "Oh, I would say two, three times a day sometimes. Sometimes I didn't hear anything. I would say five times a week or so." (Tr., p. 22.) The derogatory words were not spoken to Patino directly, but were made in his presence, such as directly behind his back, while he was concentrating on his work. (Tr., pp. 108, 122, 128-29.) Patino is a quiet person who dislikes confrontation, so he did not initially complain about hearing these words. (Tr., p. 22.) Patino was

---

[1]  Patino does not **[*3]** allege that he was fired because of his sexual orientation. Instead, in a separate proceeding before a federal agency, he claimed that he was fired for engaging in certain whistleblowing activities.

devastated and "overwhelmed by anger and by frustration and the humiliation" because of this harassment. (Tr., p. 23.)

After five or six years of hearing these words, he brought a complaint to his supervisor. (Tr., p. 23.) The supervisor arranged a five- or ten-minute meeting with himself, Patino, the owner of the company, and two of Patino's co-workers, during which the owner said that "bad words" were being said and "they're going to stop." (Tr., pp. 23-24.) The situation improved for a few weeks but then the harassment began again, and Patino again raised the problem with his supervisor. (Tr., p. 25.) The supervisor agreed to transfer one of the co-workers who had harassed Patino to another building, but kept the other co-worker at Patino's facility. (Tr., p. 25.) This move did not solve the problem, as other co-workers "join[ed] in the brouhaha . . ." (Tr., p. 26.)

Patino retained an attorney, who sent a letter to Birken on April 13, 1995. (Tr., p. 28; Pl's Exh. 1.) Patino received a reply from Gary Greenberg, who was Birken's vice president and general counsel; (Pl.'s Exh. 2.); suggesting that if Patino [*4] were suffering from mental and psychological stress as a result of his workplace, then Patino should be evaluated by a doctor because Patino works with precision instruments. (Tr., pp. 30-31.) Subsequently, Patino continued to suffer similar harassment, which he described as: "Some several guys screaming these words to each other, or going in back of my machine, they were screaming these words." (Tr., p. 32.)

Patino recorded what his co-workers were saying in a series of diaries. (Pl.'s Exh. 31-A through 31-E.) The first entry is in 1991 and the last entry is November 5, 2004. (Tr., p. 33.)

Additionally, Patino filed five complaints with the CHRO. (Tr., p. 34.) The first complaint was filed on September 30, 1996. (Tr., p. 36; Pl's Exh. 3.) After a hearing with the CHRO, Patino wrote a letter to Greenberg on September 3, 1997, describing incidents where co-workers had called him derogatory names. (Tr., p. 41; Pl's Exh. 4.) Greenberg responded with a letter dated September 9, 1997, which stated that he had completed an investigation of Patino's complaints and found that none of the co-workers accused of harassing Patino knew anything about the alleged occurrences and that none of Patino's [*5] named witnesses observed any of the alleged occurrences. [2] (Tr., p. 43; Pl.'s Exh. 5.) Patino and Greenberg exchanged further correspondence regarding the alleged harassment.

(Pl's Exh. 6 and 7.) On September 16, 2007, Patino sent Greenberg a letter; (Pl's Exh. 8.); stating that he would not describe any more harassment incidents with Birken because it would be "an exercise in futility." (Tr., p. 48.)

Patino and Birken settled the initial CHRO complaint by Birken agreeing to hold a workplace harassment seminar for all of Birken's workers in November 1997. (Tr., pp. 37, 40.) At the seminar, an attorney conducting the seminar stated that if an individual employee was caught making derogatory remarks, the employee could lose his job, be suspended, or even be sued by the company. (Tr., p. 48.) Some of the co-workers who harassed Patino did not attend this seminar, and Patino testified that he continued to be called "pato," "faggot" and "pira" afterwards. (Tr., pp. 38-39.)

Patino filed a second CHRO complaint in 1998. (Tr., p. 48; [*6] Pl's Exh. 9.) Patino withdrew the complaint, however, and wrote a letter to Greenberg on March 20, 1998, explaining his reasons for withdrawing the complaint. (Tr., pp. 50-51; Pl's Exh. 10.) Patino filed a third CHRO complaint in October 7, 1999. (Tr., p. 55; Pl's Exh. 17.) This action did not resolve the problem and Patino continued to write letters to Greenberg complaining of harassment. (Tr., pp. 56-59; Pl's Exh. 18 through 23.) Subsequently, Patino filed a fourth CHRO complaint on March 1, 2002; (Pl.'s Exh. 24.); and continued writing letters to Greenberg describing incidents of harassment. (Tr., pp. 66-67; Pl's Exh 25 through 27.) Patino filed a fifth CHRO complaint in January 2004; (Pl.'s Exh. 28.); which is the underlying subject of the present action. (Tr., p. 67.)

In the count that went to the jury, Patino alleged that Birken violated General Statutes §46a-81c by creating "a hostile work environment because of the plaintiff's sexual orientation, failing to take adequate measures to alleviate the harassment or to remedy the hostile work environment after learning of their existence." (Complaint, P19.) This count further alleged that "[a]s a result of the defendant's conduct, [*7] the plaintiff has and will continue to suffer past and future economic, physical and emotional harm." (Complaint, P20.) For this count, Patino claimed "compensatory economic damages," costs, attorneys fees, interest and "such other further and different relief as to this Court may deem just and equitable."

The court in relevant part instructed the jury as follows: "The plaintiff alleges that the defendant committed a discriminatory employment practice in violation of Connecticut General Statutes §46a-81c. This statute

---

[2]  Patino's testimony contradicted Greenberg's letter, however, as Patino testified that he had never asked any of his co-workers to be his witnesses. (Tr. p. 45.)

provides in relevant part: "It shall be a discriminatory practice . . . for an employer to discriminate against [an individual] in conditions of employment because of the individual's sexual orientation."

"For the purposes of this statute, sexual orientation means in relevant part 'having a preference for homosexuality.' Conditions of employment include the right to work in a non-hostile work environment."

"In this case, the plaintiff contends that between June 26, 2002, to November 8, 2004, he was harassed by co-workers on account of his sexual orientation and that harassment created a hostile work environment."

"To establish a claim of hostile work environment, the plaintiff [*8] has the burden to prove by a fair preponderance of the evidence that the workplace was permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create a hostile work environment."

"The plaintiff must prove that the work environment was both subjectively and objectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. You may determine whether an environment is sufficiently hostile or abusive by looking at all of the facts and circumstances you find to have existed."

"Now, even if you find that Mr. Patino has proven that other employees created a hostile work environment for Mr. Patino, you must next decide whether Birken manufacturing should be held liable for the acts of individual employees. Under our law an employer, like Birken, is not necessarily liable for individual discriminatory conduct committed by one or more of its employees."

"Under what circumstances may an employer be held responsible for harassment conducted by one or more of its employees? Well, an employer may not stand by and allow an employee [*9] to be harassed by co-workers because of his sexual orientation. Thus, an employer will be held liable for harassment perpetrated by its employees if the employer provided no reasonable avenue for the plaintiff to complain of the harassment or the employer knew or should have known of the harassment but unreasonably failed to stop it."

"In other words, once an employer knows of sexual orientation harassment in the workplace, it has a duty to take reasonable steps to stop it. The reasonableness of the employer's action depends, among other things, on the nature and scope of the employer's investigation of the

harassment claims, the severity and persistence of the harassment alleged, the effectiveness of any of the initial remedial steps, the nature of the work environment, and the resources available to the employer."

"An employer's response should be evaluated to determine how prompt, appropriate, and adequate it was. If an employer has in good faith taken measures that are both feasible and reasonable under the circumstances to combat the offensive conduct, it cannot be charged with discriminating on the basis of sexual orientation."

"In sum, for the plaintiff to establish that Birken [*10] manufacturing is liable to him, he must prove by a fair preponderance of the evidence the following elements: (1) The plaintiff was employed by the defendant; (2) the plaintiff was discriminated against in the conditions of employment because he was forced to labor in a hostile work environment; (3) the discrimination was on account of the plaintiff's actual or perceived sexual orientation; and (4) Birken should be held legally responsible for any discriminatory conduct by its individual employees . . ."

On February 3, 2009, the jury found in favor of Patino and awarded him $ 94,500 in noneconomic damages.

Birken filed a motion to set aside the verdict and a motion for remittitur on February 17, 2009, and a supporting memorandum of law on February 20, 2009. Birken seeks to have judgment rendered in accordance with its motion for directed verdict, filed on January 28, 2009. Patino filed a memorandum of law in opposition to Birken's motions on March 6, 2009. Birken filed a sur-reply on March 13, 2009. Additionally, with permission of the court, amicus curiae briefs were filed by the Connecticut Employment Lawyers' Association on March 5, 2009, and the Lambda Legal Defense and Education [*11] Fund, Inc., on March 13, 2009. The court heard argument on Birken's motions on March 16, 2009.

*DISCUSSION*

*I. MOTION TO SET ASIDE THE VERDICT*

Birken advances several claims in its motion to set aside the verdict. First, Birken contends that the court incorrectly charged the jury because an employer may not be held liable pursuant to General Statutes §46a-81c for sexual orientation discrimination based upon a claim of "hostile work environment." Second, Birken asserts that even if §46a-81c contained language authorizing a hostile work environment claim against an employer, Patino could not prevail because the facts that the jury could reasonably have found do not support a finding of a hostile work environment. Third, Patino argues Patino failed to establish a prima facie case pursuant to §46a-81c. Finally,

Birken contends that Patino presented no evidence of damages and that the court should not have submitted a claim for emotional distress damages to the jury.

In response, Patino argues (1) that §46a-81c provides a remedy for employment discrimination claims based on sexual orientation in circumstances where an employer fails to prevent its employees from creating a hostile work environment, [*12] (2) he provided sufficient evidence upon which the jury could reasonably find that he suffered firm a hostile work environment, (3) he established a prima facie cause of action under §46a-81c and (4) the jury's award of damages is supported by the evidence.

*HN1* "The trial court possesses inherent power to set aside a jury verdict [that], in the court's opinion, is against the law or the evidence . . . [The trial court] should not set aside a verdict where it is apparent that there was some evidence upon which the jury might reasonably reach their conclusion, and should not refuse to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles . . ." (Internal quotation marks omitted.) *Jackson v. Water Pollution Control Authority*, 278 Conn. 692, 702, 900 A.2d 498 (2006).

*A. Hostile Work Environment*

The court first addresses whether General Statutes §46a-81c permits a claim of sexual orientation discrimination with respect to employment based on a hostile work environment. The court concludes that, *HN2* pursuant to General Statutes §46a-81c, an employer may be held liable for sexual [*13] orientation discrimination if it fails to take reasonable steps to prevent its employees from harassing a fellow employee on account of his sexual orientation.

*HN3* "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply . . . In seeking to determine that meaning, General Statutes §1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to

implement, and to its relationship to existing legislation and common law principles governing [*14] the same general subject matter." (Internal quotation marks omitted.) *Friezo v. Friezo*, 281 Conn. 166, 181-82, 914 A.2d 533 (2007).

General Statutes §46a-81c provides in relevant part: *HN4* "It shall be a discriminatory practice in violation of this section: (1) For an employer, by himself or his agent . . . to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against him in compensation or in terms, conditions or privileges of employment because of the individual's sexual orientation Patino claims that an employer may be liable for permitting its employees to create a hostile work environment under §46a-81c because that statute makes it a discriminatory practice for an employer to discriminate against an individual in the "terms, conditions or privileges of employment" based on the individual's sexual orientation . . ." He argues that the phrase "terms, conditions or privileges of employment" [*15] encompasses claims of employment discrimination against homosexuals based on a hostile work environment. Birken disputes this interpretation, arguing that the phrase cannot be construed to impose liability on an employer for a hostile work environment.

It is important to note, at the outset, that this phrase is identical to language in General Statutes §46a-60(a)(1), which protects employees from discrimination on account of the employee's race, sex, marital status, or other delineated characteristics, and is nearly identical to language in federal laws that prohibit workplace discrimination.

For example, Connecticut's Fair Employment Practices Act, General Statutes §46a-51 et seq., provides in relevant part: *HN5* "It shall be a discriminatory practice in violation of this section: (1) For an employer or the employer's agent . . . to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disability, [*16] mental retardation, learning disability or physical disability, including, but not limited to, blindness." General Statutes §46a-60(a)(1).

Likewise, Title VII of the Civil Rights Act of 1964 §703(a)(1), *42 U.S.C. §2000e-2(a)* provides in relevant part: *HN6* "It shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms,

2009 Conn. Super. LEXIS 1331, *16

conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . ."

No Connecticut court has squarely addressed the question of whether the phrase "terms, conditions or privileges of employment" in §46a-81c protects employees who are gay and lesbian, or perceived to be gay and lesbian, from a "hostile work environment."

*HN7* In matters involving the interpretation of our state's anti-discrimination laws, however, the Connecticut Supreme Court often looks to federal precedent because our state law is generally designed to be co-extensive with federal law. [3] *Dept. of Health Services v. Commission on Human Rights & Opportunities*, 198 Conn. 479, 489, 503 A.2d 1151 (1986). *HN8* The phrase [*17] "terms, conditions or privileges of employment" in Title VII has been broadly interpreted by federal courts. These courts conclude that this phrase embodies "an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination." (Internal quotation marks omitted.) *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

In *Meritor Savings Bank, FSB v. Vinson, supra*, 477 U.S. 62, the court heard a challenge to a ruling of the United States Court of Appeals for the District of Columbia that a Title VII action could be predicated on two types of sexual harassment: "harassment that involves the conditioning of concrete employment [*18] benefits on sexual favors, and harassment that, while not affecting economic benefits, creates a hostile or offensive working environment."

In affirming the Court of Appeals, the United States Supreme Court held that *HN9* "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment." (Internal quotation marks omitted.) *Id.*, 64. Thus, Congress did not intend that discrimination that affects the "conditions" of employment should be limited only to "economic" or "tangible" discrimination, but all actions that create a workplace filled with "discriminatory intimidation, ridicule, and insult." *Id.*, 64-65. In addition, the court concluded that *HN10* sexual misconduct that does not effect a "quid pro quo" may still be considered sexual harassment under Title VII where "such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Id.*, 65.

Based on a broad understanding of Congress' goals in enacting Title VII, the *Meritor* court held that *HN11* Title VII protections extend "beyond [*19] the economic aspects of employment" and into the psychological trauma associated with a hostile work environment, providing a remedy for "working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers." (Internal quotation marks omitted.) *Id.*, 66. All of these conclusions by the Supreme Court in *Meritor* were grounded in its construction of the meaning of the phrase "terms, conditions or privileges of employment," which the court broadly construed to include protection from a hostile work environment. *Id.* The court reasoned that *HN12* an employee who encountered pervasive "discriminatory intimidation, ridicule, and insult" at work suffered discrimination in the "terms, conditions or privileges of employment" because of the employee's membership in a protected class. *Id.*, 66-67. The court cautioned that "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Id.*, 67. To be actionable, the conduct "must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an [*20] abusive working environment." (Internal quotation marks omitted.) *Id.*

The *Meritor* court's broad construction of the phrase "terms, conditions or privileges of employment" has not been confined to cases involving gender discrimination. Instead, federal courts have construed this phrase to permit members of other protected classes, such as racial minorities, to bring hostile work environment claims. For example, in upholding a district court's finding that African-American and Hispanic prison guards were subject to a racially-hostile environment that their employer failed to remedy, the United States Court of Appeals for the Second Circuit held that "[i]t is well-established in other Circuits that a working environment overrun by racial antagonism constitutes a Title VII violation. *Gilbert v. City of Little Rock*, 722 F.2d 1390 (8th Cir. 1983); *Walker v. Ford Motor Co.*, 684 F.2d 1355 (11th Cir. 1982); *Johnson v. Bunny Bread Co.*, 646 F.2d 1250 (8th Cir. 1981). The Fifth Circuit put it succinctly, *HN13* 'a discriminatory and offensive work environment so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers' may constitute

---

[3]   It is true that Connecticut law is not perfectly coextensive with federal law because there is no provision in Title VII that prohibits employment discrimination on account of an individual's sexual orientation. Nevertheless, courts' interpretation of the phrase "terms, conditions and privileges of employment" in federal law is still instructive as to what meaning should be ascribed to the same language in Connecticut's employment statutes.

2009 Conn. Super. LEXIS 1331, *21

[*21] a violation of Title VII.' *Vaughn v. Pool Offshore Co.*, 683 F.2d 922, 924 (5th Cir. 1982) (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971), cert. denied, *406 U.S. 957, 92 S. Ct. 2058, 32 L. Ed. 2d 343 (1972))." *Snell v. Suffolk County*, 782 F.2d 1094, 1102-3 (2d Cir. 1986).

Connecticut courts, guided by this broad construction of the phrase "terms, conditions or privileges of employment," have construed §46a-60(a)(1) to **HN14** impose liability on employers who permit employees to create a hostile work environment that impacts members of protected classes enumerated under the statute. Our law is clear that "once an employer has knowledge of a racially [or sexually] combative atmosphere in the workplace, he [or she] has a duty to take reasonable steps to eliminate it." (Internal quotation marks omitted.) *Brittell v. Dept. of Correction*, 247 Conn. 148, 168, 717 A.2d 1254 (1998).

For example, in *Tosado v. State*, Superior Court, judicial district of Fairfield, Docket No. CV 03 0402149, 2007 Conn. Super. LEXIS 756 (March 15, 2007, Gilardi, J.), the court denied an employer's motion for summary judgment, holding that issues of fact existed on the issue of whether an employee had endured a hostile work environment based [*22] on her race, sex and ancestry. The court held that **HN15** "a hostile work environment claim . . . is not limited to sexual advances or sexual behavior . . . It also includes nonsexual behavior directed at an employee because of her gender . . . and because of the plaintiff's *race and membership in other protected classes.*" (Citation omitted; emphasis added; internal quotation marks omitted.) *Id.*; see also *Bramwell v. State*, Superior Court, judicial district of New Britain, Docket No. CV 97 0481200, 2002 Conn. Super. LEXIS 985 (March 28, 2002, Kocay, J.) (hostile work environment claim based on racial discrimination); *Hartford v. Casati*, Superior Court, judicial district of Hartford, Docket No. CV 00 0599086 (October 25, 2001, Berger, J.) [30 Conn. L. Rptr. 639, 2001 Conn. Super. LEXIS 3146] (Section 46a-60 precludes creation and maintenance of a hostile work environment featuring discrimination based on race, ethnicity, national origin and gender).

Thus, both state and federal courts construe **HN16** the phrase "terms, conditions or privileges of employment" to impose liability on an employer for failing to prevent employees from creating a hostile work environment based on an individual's membership in a protected class. This broad construction is particularly [*23] warranted in light of the remedial purposes underlying General Statutes §46a-60(a)(1). See, e.g., *Thibodeau v. Design Group One Architects, LLC*, 260 Conn. 691, 709, 802 A.2d 731 (2002).

A similarly broad construction applies to interpreting Connecticut's Gay Rights Law, which includes §46a-81c. See *Gay & Lesbian Law Students Assn. v. Board of Trustees*, 236 Conn. 453, 490, 673 A.2d 484 (1996) (Borden, J., concurring) ("Remedial statutes such as the Gay Rights Law must be liberally construed in favor of those whom the legislature intended to benefit [i.e., gay men and lesbians] . . .").

"General Statutes §§46a-81a through 46a-81n**HN17** of the Gay Rights Law provide that it is the public policy of this state that individuals are not to be discriminated against because of their sexual orientation--that is, the law prohibits discrimination against a person based on his or her 'preference for heterosexuality, homosexuality or bisexuality, history of such preference or being identified with such preference . . .' General Statutes §46a-81a. This public policy reaches a wide spectrum of activities, including: membership in licensed professional associations (§46a-81b), employment (§46a-81c), public [*24] accommodations (§46a-81d), housing (§46a-81e), credit practices (§46a-81f), employment in state agencies (§§46a-81h and 46a-81j), the granting of state licenses (§46a-81k), educational and vocational programs of state agencies (§46a-81m), and allocation of state benefits (§46a-81n)." *Gay & Lesbian Law Students Assn. v. Board of Trustees, supra*, 482 n.24.

In particular, the legislature enacted §46a-81c "to protect people from pervasive and invidious discrimination on the basis of sexual orientation." *Gay & Lesbian Law Students Assn. v. Board of Trustees, supra*, 236 Conn. 481-82. As Connecticut's Supreme Court recently recognized, "[t]he antidiscrimination provisions of our gay rights law . . . represent a legislative consensus that sexual orientation discrimination, like gender discrimination several decades ago, is widespread, invidious and resistant to change." (Citation omitted.) *Kerrigan v. Commissioner of Health*, 289 Conn. 135, 209, 957 A.2d 407 (2008). To effect this purpose, the legislature added the designation of sexual orientation to the protected classes already enumerated in the state's antidiscrimination statutes. See 34 S. Proc., Pt. 3, 1991, p. 976, remarks of Senator [*25] Avallone. Although not squarely addressing the present claim, **HN18** Connecticut courts have assumed without deciding that an employee may bring a hostile work environment claim pursuant to §46a-81c. [4]

Despite the broad construction of the phrase "terms, conditions or privileges of employment" in both federal

---

[4]   For example, one judge of the Superior Court has assumed that a plaintiff, whose decedent allegedly suffered harassment based on his sexual orientation, could bring a hostile work environment claim under §46a-81c. *Bogdahn v. Hamilton Space Systems International, Inc.*, 46 Conn.Sup. 153, 158, 740 A.2d 1003 (1999) [25 Conn. L. Rptr. 183, 1999 Conn. Super. LEXIS 2063]. Likewise, the United States District Court for the District of Connecticut has held, without analysis, that §46a-81c

and state law, Birken contends that the phrase in §46a-81c cannot be construed to include a hostile work environment claim in the context of sexual [*26] orientation discrimination. In asserting this claim, Birken relies heavily on the fact that §46a-60(a)(8) contains specific language authorizing hostile work environment claims in the context of gender discrimination, but that §46a-81c, governing sexual orientation discrimination, does not. The omission of such language in §46a-81c, Birken contends, indicates a legislative intent that §46a-81c does not permit hostile work environment claims with respect to sexual orientation. See *Napoletano v. CIGNA Healthcare of Connecticut, Inc.*, 238 Conn. 216, 252, 680 A.2d 127 (1996) ("[T]he use of different words [or the absence of repeatedly used words in the context of] the same [subject matter] must indicate a difference in legislative intention"). Thus, Birken argues that this court is prohibited by well-established canons of statutory construction from reading into §46a-81c a provision that "clearly [is] not contained therein." (Internal quotation marks omitted.) *Teresa v. Ragaglia*, 272 Conn. 734, 745, 865 A.2d 428 (2005).

Birken's claim, while superficially appealing, cannot prevail. Initially, it is important to examine the precise language upon which Birken relies. General Statutes §46a-60(a)(8) [*27] provides: *HN19* "It shall be a discriminatory practice in violation of this section: (8) For an employer, by the employer or the employer's agent . . . to harass any employee, person seeking employment or member on the basis of sex. 'Sexual harassment' shall, for the purposes of this section, be defined as any unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature when (A) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (B) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (C) such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment."

Thus, by its very terms, §46a-60(a)(8) only applies to gender discrimination claims and does not explicitly apply to the other forms of discrimination, such as racial, ethnic,

or religious discrimination, prohibited by §46a-60(a)(1). Moreover, §46a-60(a)(1), like §46a-81c, does not contain any explicit language authorizing hostile work environment claims. [*28] As a result, Birken's argument, taken to its rational conclusion, would mean that hostile work environment claims may be brought only with regard to gender discrimination cases and may not be brought by employees alleging, for example, racial, ethnic or religious discrimination. Accordingly, if Birken were correct, an employer could not be held liable pursuant to General Statutes §46a-60(a)(1) for allowing white employees to intimidate and harass minority employees by displaying racially offensive symbols such as a noose. See, e.g., *Burke v. Civil Service Commission*, Superior Court, judicial district of Fairfield, Docket No. CV 93 0308415, 1996 Conn. Super. LEXIS 615 (March 7, 1996, Tobin, J.) (Hangman's noose placed on truck of African-American police officer's car). *HN20* Courts have "traditionally eschewed construction of statutory language that leads to absurd results or thwarts its manifest purpose." (Internal quotation marks omitted.) *Washington v. Commissioner of Correction*, 287 Conn. 792, 812, 950 A.2d 1220 (2008).

Contrary to Birken's interpretation, the legislature's purpose in enacting §46a-60(a)(8) was not to provide a new cause of action for a hostile work environment claims that would be available only [*29] in gender discrimination cases or to foreclose such claims with respect to members of other protected classes. Instead, it was enacted to clarify what claims could be brought by victims of sex discrimination under §46a-60

Section §46a-60(a)(8) was adopted in 1980; see Public Acts 1980, No. 80-285; at a time when the legislature was aware that sexual harassment laws needed reinforcement. Susan Bucknell, the executive director of the permanent commission on the status of women, testified before the labor and public employees committee that her commission had been working on sexual harassment claims with the state's commission on human rights and opportunities, [5] and that the language of the Fair Employment Practices Act needed to be amended to educate employers about the definition of gender discrimination. Conn. Joint Standing Committee Hearings, Labor and Public Employees, Pt. 1, 1980 Sess., p. 88. Under federal law, gender discrimination was not limited

---

permits a plaintiff to introduce evidence of harassment based on sexual orientation to support a hostile work environment claim. *Morales v. ATP Health & Beauty Care, Inc.*, United States District Court for the District of Connecticut, Docket No. 3:06CV01430, 2008 U.S. Dist. LEXIS 63540 (D. Conn. August 18, 2008).

[5]    Interestingly, Bucknell testified about a gender discrimination case brought pursuant to the Fair Employment Practices Act as a hostile work environment claim. Conn. Joint Standing Committee Hearings, Labor and Public Employees, Pt. 1, 1980 Sess., p. 87. She described this case as a type of sexual harassment "where there has been a difference in terms and conditions of the employment." *Id*. In the case, a waitress sued her employer, "an exclusive men's dining club" because a supervisor asked every new waitress "was subjected to attempts to secure sexual favors." *Id*. The plaintiff "felt that the supervisor could make her working *conditions* so unpleasant that she really would have had to quit . . ." (Emphasis added.) *Id*.

simply to cases, for example, in which a woman is denied a promotion solely on account of her gender, but also included cases involving sexual harassment, where there is not any direct adverse employment action by an employer on account [*30] of gender, but instead, an employee is subjected to unwelcome advances or requests for sexual favors or an employer permits a culture within the workplace that is so demeaning or intimidating that it interferes with work performance or creates a hostile work environment.

Bucknell's testimony indicates that employees had been bringing hostile work environment claims against their employers under the Fair Employment Practices Act prior to the 1980 amendment, but that advocates [*31] in this field had discovered deficiencies in that Act regarding sexual harassment claims. As she explained to the committee, "[c]urrently, the [CHRO's] interpretation, to its credit, of the Fair Employment Practices Act, is that sexual harassment is sexual discrimination. What I think [the committee] is addressing here is the need for language to ensure, and for the public to see that that is the case." Conn. Joint Standing Committee Hearings, *supra*, p. 89. Senator Curry agreed with her analysis, saying "that an explicit statement within the statutes of the state guaranteeing the right to be protected from this kind of harassment is something that we ought to accomplish in this session." Conn. Joint Standing Committee Hearings, *supra*, p. 90.

Further supporting the conclusion that this legislation was intended to clarify existing law, rather than to create a new cause of action available only in gender discrimination cases, is the testimony of Representative Balducci, who remarked before the House of Representatives that "[t]hat this particular piece of proposed legislation is in [no] way intended to limit or modify current interpretations of the Fair Employment Practices Act in terms [*32] of prohibiting any form of discriminatory harassment including racial or religious harassment What we intend to do is set our scope a bit more clearly on a situation of sexual harassment." 23 H.R. Proc., Pt. 14, 1980 Sess., p. 4099.

In clarifying sexual harassment law, the legislature intended their amendment to conform to the interim guidelines on discrimination published in the Federal Register on April 11, 1980. See 23 H.R. Proc., Pt. 14, 1980 Sess., p. 4101, remarks of Representative Belden. As the

United States Supreme Court recognized in *Meritor Savings Bank, FSB v. Vinson, supra*, 477 U.S. 65, the EEOC promulgated regulations in 1980 that defined two types of misconduct as "sexual harassment" actionable under Title VII: quid pro quo, meaning favorable treatment in return for sought sexual favors, or hostile work environment. See 29 C.F.R. §1604.11(a). [6] In light of these regulations, Representative Belden remarked that "the federal government has already in their interim regulation covered a lot of the ground in terms of interpretation that might be necessary in the enforcement in Connecticut of this particular statute when enacted." 23 HR. Proc., *supra*, p. 4102.

Thus, the legislative history of §46a-60(a)(8) shows that the legislature did not intend to foreclose the ability that existed before 1980 of other protected classes to bring hostile work environment claims, but rather to clarify the types of claims that could be brought in a sexual harassment action pursuant to the Fair Employment Practices Act.

Finally, Birken's construction of §46a-81c is unwarranted because it would arguably place §46a-81c in constitutional jeopardy. *HN21* "[I]n choosing between two constructions of a statute, [*34] one valid and one constitutionally precarious, we will search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent." (Internal quotation marks omitted.) *State v. Jenkins*, 288 Conn. 610, 626, 954 A.2d 806 (2008).

In *Kerrigan v. Commissioner of Health, supra*, 289 Conn. 175, the Connecticut Supreme Court concluded that *HN22* gays and lesbians are a "quasi-suspect" class entitled to equal protection under the state constitution. The *Kerrigan* court held that the denial of the right of gays and lesbians to marry--a right available to heterosexual couples--could not withstand constitutional scrutiny: "To decide otherwise would require us to apply one set of constitutional principles to gay persons and another to all others. The guarantee of equal protection under the law, and our obligation to uphold that command, forbids us from doing so." *Id.*, 262-63.

In this case, Birken's construction of §46a-81c could mean that gays and lesbian employees are barred from seeking redress for a hostile work environment while such an action would be available to similarly-situated individuals

---

[6]   29 C.F.R. §1604.11(a) [**33**] provides: "Harassment on the basis of sex is a violation of section 703 of Title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."

who fall into one of the protected classes enumerated in §46a-60(a)(1). [*35] In other words, an African-American or Hispanic employee could bring a hostile work environment claim against his employer for failing to prevent co-workers from making racially-offensive remarks, while a gay or lesbian employee would be forced to endure similar harassment without legal recourse. Such a result may be untenable under the principles of constitutional equality outlined in *Kerrigan*. Thus, Birken's construction would arguably place §46a-81c in constitutional jeopardy.

In conclusion, §46a-81c provides a remedy for employment discrimination claims based on sexual orientation, including claims stemming from the employer's failure to prevent co-workers from creating a hostile work environment. The fact that §46a-81c contains no explicit hostile work environment provision is not dispositive because the statute prohibits discrimination "in terms, conditions or privileges of employment," which the United States Supreme Court has held is an "expansive concept" that authorizes hostile work environment claims in the context of discrimination against statutorily protected classes. *Meritor Savings Bank, FSB v. Vinson, supra, 477 U.S. 66.*

### B. Sufficiency of the evidence

Birken's second [*36] claim for setting aside the verdict is that even if §46a-81c authorizes a hostile work environment claim in the context of a discrimination claim based on sexual orientation, there was insufficient evidence for the jury to conclude that Patino endured a hostile work environment. Birken argues that Patino has not met this "traditionally high bar" and urges the court to apply a five-part test outlined by the Fifth Circuit Court of Appeals that a judge of the Superior Court adopted in *Majewski v. Board of Education, Superior Court, judicial district of Fairfield, Docket No. CV 03 0406893, 2005 Conn. Super. LEXIS 209 (January 20, 2005, Arnold, J.).* [7]

Our [*37] Supreme Court has adopted the following test, however, to determine if the plaintiff has established the elements of a hostile work environment claim. **HN23** "To establish a claim of hostile work environment, the workplace [must be] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . ." (Internal quotation marks omitted.) *Brittell v. Dept. of*

*Correction, supra,* 247 Conn. 166-67. The environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id., 167.* The United States Supreme Court has explained that "[t]his is not, and by its nature cannot be, a mathematically precise test . . . [W]hether [*38] an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." (Citations omitted.) *Harris v. Forklift Systems, Inc., 510 U.S. 17, 22-23, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).*

Under this standard, upon which the jury was explicitly instructed, the jury could reasonably have found that Patino was forced to endure a workplace that was permeated with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment. The jury heard Patino testify that he heard derogatory words for homosexuals multiple times per week over an extended period of time, and that this treatment made him feel angry, frustrated and humiliated. Furthermore, the jury also had the opportunity to review Patino's diaries in which he recorded many of these incidents. This evidence provided more than a sufficient basis for the jury's [*39] finding for Patino.

Birken further argues that Patino has failed to offer adequate proof of a hostile work environment because the derogatory words he heard on the job were not directed at him and some of these words were spoken in languages that he admittedly did not know, such as Italian. (Tr., p. 112.)

Federal courts hold that **HN24** discriminatory conduct does not need to be directed at the plaintiff or to his face in order to be actionable. For example, the Second Circuit Court of Appeals held that an employee who knew that her supervisor was saying offensive comments about her gender and ethnic background outside of her presence could constitute an objectively and subjectively hostile environment. *Torres v. Pisano, 116 F.3d 625, 633 (2d Cir. 1997).* See also *Schwapp v. Avon, 118 F.3d 106, 111 (2d Cir. 1997)* ("Just as a racial epithet need not be directed at a plaintiff in order to contribute to a hostile work environment . . . the fact that a plaintiff learns second-hand

---

[7] "To maintain a workplace sexual harassment claim, the claimant must show that (1) she belongs to a protected class; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment (i.e., that the harassment was sufficiently pervasive or severe to create an abusive work environment); and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action." *Hirras v. National Railroad Passenger Corp., 95 F.3d 396, 399 (5th Cir. 1996).*

2009 Conn. Super. LEXIS 1331, *39

of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment").

Here, Patino consistently overheard his co-workers making derogatory remarks about his sexual orientation [*40] in his presence, if not to his face. The fact that he did not speak Italian is irrelevant because he knew what the particular Italian slur meant in English. Based on these facts, Patino's workplace was both objectively and subjectively hostile because a reasonable person would find it abusive and Patino in fact perceived it to be hostile.

Furthermore, the cases cited by Birken on the issue of indirect or second-hand hostility are factually dissimilar from the present case. See *Leibovitz v. New York City Transit Authority*, 252 F.3d 179, 182 (2d Cir. 2001) (no hostile work environment where plaintiff allegedly suffered due to her subjective belief that other women in her office were being sexually harassed); *Nurriddin v. Goldin*, 382 F.Sup.2d 79, 108 (D.D.C. 2005) (no hostile work environment where plaintiff's only evidence of racial hostility was one computer file on a co-workers' computer containing racist jokes and stories); *Ledan v. Danbury, Superior Court, complex litigation docket at Waterbury, Docket No. X01 CV 04 4001301 (July 18, 2006, Sheedy, J.) (41 Conn. L. Rptr. 750, 2006 Conn. Super. LEXIS 2209)* (no hostile work environment where plaintiff heard a single crude sexual remark about a female co-worker).

Finally, [*41] Birken contends that Patino failed to establish that it acted unreasonably in response to his allegations. *HN25* When an employer learns of a hostile work environment in its workplace, it has a duty to take reasonable steps to eliminate it. "The standard is essentially a negligence one . . . and reasonableness . . . depends among other things on the gravity of the harassment alleged . . . the severity and persistence of the harassment . . . and . . . the effectiveness of any initial remedial steps . . . and the nature of the work environment . . . and the resources available to the employer . . . An employer's response should be evaluated to determine how prompt, appropriate, and adequate it was . . . [T]o determine whether the remedial action was adequate, we must consider whether the action was reasonably calculated to prevent further harassment . . . [O]nce an employer has in good faith taken those measures which are both feasible and reasonable under the circumstances to combat the offensive conduct we do not think [it] can be charged with discriminating on the basis of race [or sex] . . . Whether an employer has fulfilled [its] responsibility [to take reasonable steps to remedy a discriminatory [*42] work environment] is to be determined upon the facts in each case." (Citations omitted; internal quotation marks omitted.) *Brittell v. Dept. of Correction, supra*, 247 Conn. 168-69.

The jury could reasonably have found that Birken's response was inadequate given the gravity of the harassment alleged by Patino over the course of many years. Despite numerous complaints from Patino about the harassment, Birken took little action to address the problem aside from conducting a brief investigation; (Tr., p. 43; Pl's Exh. 5); and holding a seminar that was not attended by some of the co-workers who harassed him. (Tr., p. 38.) Although Birken management did interview some employees regarding whether they had spoken the derogatory words, these employees would deny the allegations and Birken would simply credit their statements over Patino's complaints. (Tr., pp. 43-44.) In fact, rather than take affirmative steps to stop the abuse, Birken's vice president and general counsel Greenberg responded to one incident of harassment by telling Patino that he should seek mental health counseling because Patino's ability to operate precision machinery could be compromised by his distress. (Tr., pp. 30-31.) [*43] These facts support the jury's finding that the Birken's actions were not reasonably calculated to prevent further harassment.

*C. Prima face cause of action under General Statutes §46a-81c*

Birken's third argument for setting aside the verdict is that Patino has not established a prima facie case cause of action under General Statutes §46a-81c. Birken argues that Patino has not proven that he was directly discriminated against by Birken in the "terms, conditions or privileges of employment" because of his sexual orientation. This claim is premised on Birken's prior claim that §46a-81c does not impose liability on an employer for permitting a hostile work environment. Because the court has rejected Birken's statutory construction claim and concluded that an employer may be held liable for a hostile work environment as it relates to sexual orientation discrimination, Birken's argument fails.

*D. Damages*

Finally, Birken argues that the verdict should be set aside because Patino presented no evidence of his actual damages and was not entitled to receive damages for emotional distress because he failed to request them in his complaint. Birken also argues that the jury erred in awarding Patino [*44] compensatory non-economic damages in the amount of $ 94,500 because these damages were tantamount to an award of punitive damages.

It is true, as Birken contends, that Patino did not seek economic damages such as back pay or medical expenses, but he did request, as discussed in greater detail below, emotional distress damages. *HN26* Emotional distress damages are not equivalent to punitive damages; they are

a form of compensatory damages designed to put the plaintiff in as good a condition as he would have been if he had not been forced to endure a hostile work environment. Thus, the jury was instructed that they could award damages for ″any emotional distress and mental anguish″ that Patino suffered from June 26, 2002, through November 8, 2004, as a proximate cause of Birken's wrongful conduct. At trial, Patino testified that the harassment he suffered over this period made him feel angry, sad, humiliated and diminished. (Tr., p. 78.) He left work feeling depressed and had difficulty sleeping. (Tr., p. 92.) Yet Birken management's response to Patino's complaints was to ″diagnose″ him as having a ″paranoid delusion″ and to advise him to obtain psychiatric care. (Tr., pp. 92-93.) We assume  [*45] that the $ 94,500 award constituted the jury's common sense evaluation of Patino's emotional distress.

Birken also claims the jury's damages award was excessive. *HN27* ″In considering a motion to set aside the verdict as excessive, the court should not act as the seventh juror with absolute veto power. Whether the court would have reached a different [result] is not in itself decisive . . . The court's proper function is to determine whether the evidence, reviewed in a light most favorable to the prevailing party, reasonably supports the jury's verdict.″ (Citation omitted; internal quotation marks omitted.) *Campbell v. Gould*, 194 Conn. 35, 41, 478 A.2d 596 (1984). ″The size of the verdict alone does not determine whether it is excessive. The only practical test to apply to this verdict is whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption.″ (Internal quotation marks omitted.) *Mather v. Griffin Hospital*, 207 Conn. 125, 139, 540 A.2d 666 (1988).

The jury's award was not patently unreasonable.  [*46] For example, in *Delgado v. Cragganmore Associates Ltd. Partnership*, United States District Court for the District of Connecticut, Docket No. 3:01CV1633, 2001 U.S. Dist. LEXIS 24314 (D.Conn. October 31, 2001), the court reviewed numerous discrimination cases where the plaintiffs received emotional distress awards and held that a prejudgment remedy of approximately $ 77,000 reflecting potential emotional distress damages was ″not unreasonable for very serious discrimination cases.″ The court considered compensatory damage awards for severe discrimination cases that ranged from $ 100,000 to $ 400,000. The court also found that a range of emotional distress awards from $ 5,000 to $ 65,000 were appropriate for less severe discrimination cases. Viewed in the light most favorable to the plaintiff, the evidence supports a jury finding that Patino suffered sufficiently severe discrimination that warranted a compensatory damage award on the higher end of this scale.

Finally, Birken argues that the court's jury instruction concerning damages was improper because Patino's prayers for relief for count one of his complaint, which was the count submitted to the jury, requested ″compensatory economic damages″ but did not seek  [*47] damages for emotional distress or pain and suffering. First, it is important to note that although the specific prayer for relief that pertains to count one does not mention emotional distress or harm, count one itself, in paragraph twenty, refers to emotional harm as a category of damages. Second, at the time of the case's submission to the jury, Birken raised no objection to the jury considering emotional distress damages. Indeed, the court specifically inquired of Birken whether it had any objection to the plaintiff's verdict form or to the court's jury instructions. Birken stated that it had no objections beyond its on-going assertion that §46a-81c does not permit hostile work environment claims. Finally, Birken itself submitted a request to charge on emotional distress and pain and suffering. Under all of these circumstances, the court concludes that Birken was not prejudiced by any lack of clarity in Patino's complaint regarding the types of damages he sought.

To cure any technical defect in his complaint, Patino has submitted an amended complaint, pursuant to Practice Book §10-60, that adds non-economic damages to the claims for relief sought for count one in the original complaint.  [*48] *HN28* ″A trial court may allow, in its discretion, an amendment to pleadings before, during, or . . . after trial to conform to the proof . . . see also Practice Book §10-62.″ (Citation omitted; internal quotation marks omitted.) *Stuart v. Stuart*, 112 Conn.App. 160, 182, 962 A.2d 842 (2009). The court has granted Patino permission to amend the complaint.

For all of the reasons set forth above, the motion to set aside the verdict is denied.

*II. MOTION FOR REMITTITUR*

Birken's motion for remittitur essentially repeats aspects of its fourth argument for setting aside the verdict. Birken argues that because the jury had no basis for finding actual damages, its verdict amounted to punitive damages, which was outside the jury instructions. Furthermore, Birken argues that the verdict shocks the conscience.

As stated above, the jury's award of non-economic damages conformed to the court's instructions and did not constitute an award of punitive damages. The award does not shock the conscience because it falls ″within the necessarily uncertain limits of fair and just damages;″

2009 Conn. Super. LEXIS 1331, *48

*Campbell v. Gould, supra*, 194 Conn. 42; and is proportional to compensatory damages awarded in cases. Therefore, Birken's motion  [*49] for remittitur is denied.

Prescott, J.

# EXHIBIT N



Neutral
As of: April 17, 2014 1:05 PM EDT

# Wise v. Marriott Int'l, Inc.

United States District Court for the Southern District of New York
July 30, 2007, Decided; July 30, 2007, Filed
06 Civ. 11439 (LAP)

**Reporter:** 2007 U.S. Dist. LEXIS 55611; 2007 WL 2200704

DUDLEY EPHRAIM WISE, Petitioner, -against- MARRIOTT INTERNATIONAL, INC., Respondent.

**Subsequent History:** Motion granted by, Application denied by Wise v. Marriott Int'l, Inc., 2007 U.S. Dist. LEXIS 70512 (S.D.N.Y., Sept. 24, 2007)

---
**Core Terms**
---

arbitrate, federal question, amount in controversy, arbitration award, vacate, arbitration proceedings, original jurisdiction, district court, backpay, confirm, oral argument, federal law, vacatur

**Counsel:** [*1] For Dudley Ephraim Wise, Petitioner: Marlen Suyapa Bodden, LEAD ATTORNEY, The Legal Aid Society, Civil Division, New York, NY.

For Marriott International, Inc., Respondent: Brian Scott Cousin, Eric Bruce Sigda, Lauren Rachel Tanen, LEAD ATTORNEYS, Greenberg Traurig, LLP, New York, NY.

For Marriott International, Inc., Counter Claimant: Lauren Rachel Tanen, LEAD ATTORNEY, Greenberg Traurig, LLP, New York, NY.

**Judges:** LORETTA A. PRESKA, U.S.D.J.

**Opinion by:** LORETTA A. PRESKA

---
**Opinion**
---

*MEMORANDUM AND ORDER*

LORETTA A. PRESKA, U.S.D.J.

This case involves an employment dispute between Petitioner Dudley Ephraim Wise and Respondent Marriott International, Inc. that was submitted to arbitration and resolved in Respondent's favor. (Pet. P 1.) [1] Petitioner seeks to vacate the Award, and Respondent seeks to confirm the Award. Before the Court now is Petitioner's motion to remand the case due to an asserted lack of subject matter jurisdiction. For the reasons set forth below, the motion is denied.

*BACKGROUND*
[2]

1. *Employment*

Petitioner is a citizen of New York and a self-described "African-American and gay man." (Pet. PP 2, 20.) Respondent is a Delaware corporation with its principal place of business in Maryland. (Removal P 4.) [3]

Respondent employed Petitioner from 1989 through 2004. (Answer P 2.) [4] Beginning in 2001, Petitioner worked as International Events Manager at the New York Marriott Marquis Hotel. (*Id.* at P 19.) On December 11, 2003, Petitioner received a written disciplinary warning which contained counseling to improve his performance. (*Id.* at P 44.) In February 2004, Respondent created a DVD titled "Queer Eye for the Sales Guy." (Award at 6.) [5] The DVD was shown at an annual Marriott sales conference. (Answer P 30.) Petitioner asserts that he "was coerced by his supervisors into participating" in the production of this DVD, [*3] which he contends was "anti-gay . . . offensive, [and] homophobic . . . ." (Pet. P 27.) On April 6, 2004,

---

[1] "Pet." refers to Petitioner's "Verified Petition" filed in the Supreme Court of the State of New York, New York County, on September 8, 2006 and attached as Ex. A to the Notice of Removal ("Removal") [*2] filed in this Court on October 27, 2006.

[2] Although Petitioner's application to remand is not a motion for summary judgment, the Court has undertaken an independent review of the record and, unless otherwise noted, only those facts that are undisputed are recounted herein.

[3] "Removal" refers to Respondent's "Notice of Removal" filed on October 27, 2006.

[4] "Answer" refers to Respondent's "Answer" filed on November 3, 2006.

[5] "Award" refers to the arbitrator's "Order and Final Award" dated June 23, 2006 and attached as Ex. B to the Notice of Removal ("Removal") filed in this Court on October 27, 2006.

Petitioner received a second written disciplinary warning unrelated to the DVD. (Award at 8.) Respondent suspended Petitioner following the second warning. (*Id.*) Thereafter, Respondent terminated Petitioner's employment. (*Id.*)

### 2. *Arbitration*

In September 2004, Petitioner commenced an arbitration proceeding against Respondent before the American Arbitration Association ("AAA") alleging "[w]rongful termination and discrimination based on race and sexual orientation." (Demand at 1.) [6] Petitioner's Demand did not state specifically the laws under which he brought his claims; however, in the arbitration the parties and the arbitrator agreed that Petitioner was claiming violations of New York State Human Rights Law, Executive Law § 296, and *New York City Administrative Code § 8-107*. (Countercl. P 4; Answer to Countercl. P 4; Award at 1, 16.) [7] [*4] Petitioner sought "[r]einstatement to [sic] position and monetary damages for back pay and compensatory damages for the indignity and humiliation of discrimination." (Demand at 1.) On March 31, 2006, Respondent moved for summary judgment. (Countercl. P 10.) Both parties submitted briefs, and, on June 9, 2006, the arbitrator heard oral argument. (*Id.* at PP 10, 11.) On June 23, 2006, the arbitrator issued his Award granting summary judgment in favor of Respondent. (*Id.* at P 12; *see generally* Award.)

### 3. *State Court and Removal Proceedings*

On September 8, 2006, Petitioner filed an action in New York State Supreme Court pursuant to N.Y. C.P.L.R. § 7511 seeking to vacate the Award and remand the arbitration proceedings for an evidentiary hearing. (Pet. P 1.) On October 27, 2006, Respondent removed the action to this Court pursuant to *28 U.S.C. § 1441(a)* asserting that this Court has original jurisdiction under both *28 U.S.C. § 1331* and *28 U.S.C. § 1332(a)*. (Removal P 2.) Thereafter, the parties began to brief the merits of whether the Award should be vacated or confirmed. On November 3, 2006,

Respondent filed its cross-motion to confirm the Award (*see* Countercl.), and, on February 28, 2007, its memorandum of law in support (*see* Confirm. Mem). [8] Then, on March 29, 2007, Petitioner submitted a letter seeking, for the first time, a remand to state court. (*See* Bodden Ltr. at 1.) [9] At Petitioner's request, the Court construed his letter application as a formal motion to remand to state court for lack of subject matter jurisdiction. On April 9, 2007, Respondent submitted its opposition. (*See* Sigda Ltr. at 1-2.) [10] On July 10, 2007, the Court heard oral argument.

### *DISCUSSION*

### 1. *Legal Standard for Removal and Remand*

Under *28 U.S.C. § 1441(a)*, a defendant may remove to federal court "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." However, under *28 U.S.C. § 1447(c)*, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." "Where, as here, jurisdiction is asserted by a defendant in a removal petition, it follows that the defendant has the burden of establishing that removal is proper." *United Food & Commercial Workers Union, Local 919 v. CenterMark Props. Meriden Square, Inc., 30 F.3d 298, 301 (2d Cir. 1994).*

### 2. *Legal Standard for Federal Question Jurisdiction Over an Arbitration Petition*

One of two bases for a district court's original jurisdiction is federal [*7] question jurisdiction. Under *28 U.S.C. § 1331* a "district court[] shall have original jurisdiction of all civil actions arising under the . . . laws . . . of the United States."

The Court of Appeals has held that "[s]imply raising federal-law claims in the underlying arbitration is insufficient" to confer federal question jurisdiction. *Greenberg v. Bear, Stearns & Co., 220 F.3d 22, 26 (2d Cir. 2000).* "Nevertheless, federal jurisdiction may still lie if

---

[6]   "Demand" refers to Petitioner's "Demand for Arbitration" dated Sept. 28, 2004 and submitted to this Court as "Joint Exhibit A" on June 20, 2007.

[7]   "Countercl." refers to Respondent's "Counterclaim to Confirm the Award" filed on November 3, 2006. "Answer to Countercl." refers to Petitioner's "Answer to Counterclaims" filed on December 12, 2006. While a post-arbitration document states that Petitioner was also claiming a violation of Title VII, 42 U.S.C. § 2000e (*see* Pet. P 17), the parties agreed at oral argument that this was an error. In the interests of justice and because this is a novel issue, the Court has decided to address whether this fact is sufficient to confer federal question jurisdiction. **[*5]** (*See infra* at 6-9.)

[8]   "Confirm. **[*6]** Mem." Refers to Respondent's "Memorandum of Law in Support of Respondent's Motion to Confirm the Arbitration Award of Alfred G. Feliu," filed on February 28, 2007.

[9]   "Bodden Ltr." refers to the letter from Marlen S. Bodden to the Court dated March 29, 2007.

[10]   "Sigda Ltr." refers to the letter from Eric D. Sigda to the Court dated April 9, 2007.

the ultimate disposition of the matter by the federal court 'necessarily depends on resolution of a substantial question of federal law.'" *Id.* (internal citation omitted). As here, *Greenberg* involved a petition to vacate an arbitration award. Faced with such an application, "[courts] must decide whether the petition . . . to vacate an arbitral award presents a substantial question of federal law." *Id.* The issue "turns on the ground for the Petitioner's challenge to the award." *Id.* If the petition to vacate contends that the award was rendered in "manifest disregard of federal law," then, the Court of Appeals held, a substantial federal question is presented. *Id.* However, if the petition to vacate contends that the arbitration process [*8] was improper or unfair, then a substantial federal question is not presented. *Id.* at 27. As examples of grounds for review that do not present a substantial federal question, the Court of Appeals cited, *inter alia,* perjury, "alleged misdeeds of the arbitrators," "fraud, corruption, undue means, evident partiality, and failure to consider pertinent and material evidence[.]" *Id.* (internal citations omitted).

### 3. *Application of Federal Question Jurisdiction*

In his motion for remand, Petitioner asserts that this proceeding "does not present a federal question because it was commenced under state law, the Civil Practice Law and Rules" of New York, § 7511. (Bodden Ltr. at 1.) It is undisputed that N.Y. C.P.L.R. § 7511, a state civil procedure law under which Petitioner moves to vacate the Award, is not a federal statute. [11] Thus, N.Y. C.P.L.R. § 7511 does not provide the Court with a basis to assert federal question jurisdiction.

Respondent contends that, in the underlying arbitration, Petitioner "alleged discrimination on account of his race and sexual orientation in violation of Title VII, 42 [] U.S.C. § 2000e *et seq.,* which provides the court with federal question jurisdiction." (Sigda Ltr. at 2.) At oral argument, Respondent's counsel amplified this argument and stated that resolution of a summary judgment motion in response to a Title VII claim necessarily "presents a substantial question of federal law," *Greenberg,* 220 F.3d at 26, because the arbitrator had to analyze the record to determine if there were any genuine issues of material fact under the applicable Title VII legal standards.

Petitioner alleges that "[i]n making the award without holding a hearing, when there were numerous genuine issues of triable fact, the arbitrator violated the rules of the

AAA and exceeded his power." (Pet. P 1.) Thus, the gravamen of Petitioner's [*10] claim is that the arbitration process was flawed because there was no trial. The Court of Appeals has held, however, that review of the record in an arbitration proceeding to determine whether summary judgment is appropriate on a Title VII claim does not "so immerse[] the federal court in questions of federal law and their proper application that federal question subject matter jurisdiction is present." *Greenberg,* 220 F.3d at 27. Accordingly, federal question jurisdiction is not present.

### 4. *Legal Standard for Diversity Jurisdiction Over an Arbitration Petition*

The other basis for a district court's original jurisdiction is diversity jurisdiction. Under 28 U.S.C. § 1332(a)(1) a "district court[] shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $ 75,000 . . . and is between . . . citizens of different States."

Again, Respondent bears the burden of proving all the necessary jurisdictional facts. With respect to the amount in controversy, Respondent must show "that it appears to a reasonable probability that the claim is in excess of the statutory jurisdictional amount." *United Food,* 30 F.3d at 305. To overcome the "reasonable [*11] probability" showing, the party opposing jurisdiction, here Petitioner, must prove "'to a legal certainty' that the amount recoverable" is less than $75,000. *Scherer v. Equitable Life Assur. Soc'y,* 347 F.3d 394, 397 (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 288-89, 58 S. Ct. 586, 82 L. Ed. 845 (1938)).

As noted by Judge McKenna in *North American Thought Combine, Inc. v. Kelly,* 249 F. Supp. 2d 283, 285 (S.D.N.Y. 2003), the Court of Appeals has not directly addressed the issue of how to determine the amount in controversy when a petitioner seeks review of an arbitration award. However, courts in this District have had occasion to address the procedure for making such a determination. *See, e.g., Hough v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 757 F. Supp. 283, 285-86 (S.D.N.Y. 1991); *Brean Murray, Carret & Co. LLC v. Cornette,* No. 07 Civ. 2381, 2007 U.S. Dist. LEXIS 45034, 2007 WL 1789118, at *1 (S.D.N.Y. June 20, 2007).

The amount in controversy analysis depends on the type of relief a petitioner seeks in the district court after the arbitration award has been rendered. When a petitioner

---

11   Further, neither side contends that 9 U.S.C. § 10, the federal analogue to N.Y. C.P.L.R. § 7511, provides the Court with a basis for federal question jurisdiction. *See, e.g., Greenberg,* 220 F.3d at 25 ("[F]ederal jurisdiction does not arise simply because [**9] a petitioner brings a claim under § 10 of the FAA; there must be 'an independent basis of jurisdiction' before district courts may entertain petitions to vacate.") (quoting *Harry Hoffman Printing Inc. v. Graphic Commc'ns, Int'l Union, Local 261,* 912 F.2d 608, 611 (2d Cir. 1990)).

seeks confirmation or vacatur of an award, without seeking a remand for further arbitration proceedings, "the amount in controversy [*12] is the value of the award itself to the petitioner." *N. Am. Thought Combine,* 249 F. Supp. 2d at 285. In other words, it is the amount by which the petitioner will benefit if the Court grants the requested relief. The underlying reasoning is that because the petitioner accepts the arbitrator's award as final, the arbitration defendant, during the remainder of the litigation, will be exposed to liability only for the amount of the award. *See Brean Murray,* 2007 U.S. Dist. LEXIS 45034, 2007 WL 1789118, at *1 ("[Petitioner] does not seek a new arbitration hearing at which [Respondent] would have a second opportunity to support his claim for $ 100,000; it merely seeks an order vacating and setting aside the award of $ 70,947.45. Accordingly, the value of relief sought in [this petition for vacatur] is [the amount of the award,] $ 70,947.45."). Judge McKenna explains further, in *North American Thought Combine,* that

> [t]his rule will not prejudice prevailing defendants who wish to confirm an arbitration award. If the award itself were the sole determinant, the numeric value of the arbitrator's award would be zero in a case where a defendant had prevailed in the arbitration. This is why the true value of the award in such [*13] cases should be measured by the value of the award to the petitioning defendant. This can be achieved by looking to the underlying [arbitration demand] because this is the value to the defendant of prevailing in the arbitration.

*Id.* at 285-86.

When a petitioner seeks a vacatur of the award and a remand for further arbitration proceedings, this Court looks to the underlying amount claimed in the arbitration demand to determine the amount in controversy. *See, e.g., Hough,* 757 F. Supp. at 285-86 (holding that the amount in controversy was satisfied where the petitioners sought vacatur of the $ 17,500 arbitration award and remand to arbitration for a rehearing of their original $ 3,000,000 arbitration claim); *Brean Murray,* 2007 U.S. Dist. LEXIS 45034, 2007 WL 1789118, at *1 (holding that the amount in controversy was not satisfied where the petitioner sought vacatur of the $ 70,947.45 arbitration award but did not seek remand to arbitration proceedings for rehearing of its original $ 100,000 arbitration claim). The underlying reasoning, similarly, is that because the petitioner does not accept the arbitrator's award as final, he seeks reopening of the arbitration proceedings which could once again

expose the defendant [*14] to liability for the relief sought in the arbitration demand. *See Hough,* 757 F. Supp. at 287 ("Since an arbitration panel upon a rehearing of the case could award plaintiffs damages [in excess of the statutory jurisdictional amount], we cannot say 'to a legal certainty' that the amount [in controversy] is less than the jurisdictional minimum.").

5. *Application of Diversity Jurisdiction*

Respondent alleges that "[m]ore than $ 75,000 exclusive of interest and costs is in controversy in this action." (Removal P 9.) Respondent asserts in its opposition to remand that because Petitioner is seeking both back pay and "all other damages available to him[,] the potential damages that could possibly be awarded . . . is [sic] much greater than . . . $ 75,000[.]" (Sigda Ltr. at 1.) Thus, Petitioner, as the party seeking remand, has the burden to prove "to a legal certainty" that he cannot obtain more than $ 75,000.

Petitioner attempts to satisfy this burden by swearing that he only seeks his back pay. (Wise Decl. at P 4.) [12] Because the Court performs the subject matter jurisdiction analysis at the time of removal, Petitioner may not use this post-removal document to destroy the Court's diversity [*15] jurisdiction. *See St. Paul Mercury Indem. Co.,* 303 U.S. at 292 ("And though, as here, the plaintiff after removal, by stipulation, by affidavit[,] or by amendment of his pleadings, reduces the claim below the requisite amount, this does not deprive the district court of jurisdiction."). Even if the Court considered this post-removal submission, at oral argument Petitioner's counsel stated that Petitioner was seeking not only back pay but also reinstatement. For the reasons described below, it cannot be said to a legal certainty that the value of such equitable relief would amount to less than $ 75,000.

In his arbitration demand, Petitioner sought back pay, reinstatement and "compensatory damages for the indignity and humiliation of discrimination." (Demand at 1.) At oral argument, Petitioner's counsel represented that, although he has since obtained more lucrative employment, Petitioner still desires reinstatement. Petitioner's counsel conceded that, if obtained, such employment would be at will and thus could last indefinitely. The potential monetary value of this injunctive [*16] relief alone precludes Petitioner from proving "to a legal certainty" that the actual amount in controversy is less than $ 75,000. In addition, Petitioner seeks damages for back pay of $ 13,282 (Wise Decl. P 4) and unspecified "indignity and humiliation" damages, which also could satisfy the jurisdictional amount. Thus,

---

[12] "Wise Decl." refers to the "Declaration" of Dudley Ephraim Wise attached to the "Bodden Ltr." filed on April 25, 2007.

2007 U.S. Dist. LEXIS 55611, *16

Petitioner falls far short of satisfying his burden to prove that, after a remand for further arbitration proceedings, he could not obtain more than $ 75,000. Accordingly, the amount in controversy is satisfied, and diversity jurisdiction is present.

*CONCLUSION*

For the reasons stated above, Petitioner's motion to remand is denied. Petitioner shall file and serve the opposition to Respondent's cross-motion no later than August 13, 2007. Respondent shall file its reply, if any, no later than August 20, 2007. Courtesy copies shall be submitted to chambers.

SO ORDERED:

Dated: New York, New York

July 30, 2007

LORETTA A. PRESKA, U.S.D.J.

# EXHIBIT O

SHORTER JR. v. HARTFORD FINANCIAL SERVICE; RHODES, JVR No. 806258 (2005)

JVR No. 806258, 2005 WL 4256090 (Unknown State Ct. (Conn.)) (Verdict and Settlement Summary)

Copyright (c) 2012 Thomson Reuters/West
Unknown Connecticut State Ct.

SHORTER JR. v. HARTFORD FINANCIAL SERVICE; RHODES

3:03-CV-00149(WIG)
DATE OF TRIAL: January, 2005

TOPIC:


**SUMMARY**
**Outcome: Plaintiff Verdict**
**Non Verdict Award:**
**Total Verdict: $255,000**
**Judge Reduced Award To:**
**Claimed Past Medical:**
**Claimed Future Medical:**
**Claimed Past Wage Expense:**
**Claimed Future Wage Expense:**
Plaintiff's Economist:

Defendant's Economist:


**EXPERT-WITNESSES:**
**ATTORNEY:**
Plaintiff: Rachel Baird, Torrington, CT
Defendant: Margaret J. Strange, Hartford, CT
James F. Shea, Hartford, CT

RANGE AMOUNT: $200,000 - 499,999

STATE: Connecticut
COUNTY: Not Available

**SUMMARY**
**PLAINTIFF:**
Sex: Male

Age: An adult of undetermined age.

Race: Black


**PRIMARY STATUTE OR GROUND: Wrongful Discharge-Torts-Emot. Distress**
**SECONDARY STATUTE OR GROUND:**
**GENERAL ENTITY TYPE: Finance Industry**
**SPECIFIC ENTITY TYPE: Security and Commodities Brokers, Dealer**

SHORTER JR. v. HARTFORD FINANCIAL SERVICE; RHODES, JVR No. 806258 (2005)

**ADVERSE EMPLOYMENT ACTION: Termination, Harassment**
**DAMAGES:**
Past Medical:

Future Medical:

Past Wage: $170,000

Future Wage:

Pain and Suffering: $85,000

Other:

Total: $255,000

Punitive:

Hedonic:

Other:

Interest:

Loss of Services:


**FACTS:**
A male former employee sued the defendant financial service company and a female coworker claiming wrongful discharge in violation of federal law. The plaintiff alleged that he was subjected to harassment by the codefendant after their relationship ended and she accused him of harassing her and he was wrongfully terminated by the defendant. The defendant denied the allegations.


Jury Verdict Research
COURT:

---

**End of Document**                                               © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT P

Case 3:14-cv-00515-JAM   Document 1-1   Filed 04/17/14   Page 108 of 117

KIMBERLY BACHIOCCHI v. SOUTHERN NEW ENGLAND..., JAS CT Ref. No....

JAS CT Ref. No. 242494WL, 2008 WL 6894517 (D.Conn.) (Verdict and Settlement Summary)

Copyright (c) 2012 Verdict Research Group
United States District Court, D. Connecticut.

KIMBERLY BACHIOCCHI v. SOUTHERN NEW ENGLAND TELEPHONE

3:02-908

DATE OF VERDICT/SETTLEMENT: July 8, 2008

TOPIC: EMPLOYMENT EMPLOYMENT - DISCRIMINATION - SEXUAL HARASSMENT - SEXUAL HARASSMENT - DISCRIMINATION - PUNITIVE DAMAGES

**SUMMARY:**
Result: Verdict: $100,000. Breakdown: $20,000 in compensatory damages and $80,000 in punitive damages.

**ATTORNEY:**
Plaintiff's: Peter E. Gillespie, Westport
Defendant's: Lori B. Alexander, New Haven

JUDGE: Christopher F. Droney

RANGE AMOUNT: $100,000-199,999

STATE: Connecticut
COUNTY: New Haven Judicial District

ALLEGED INJURY: Sexual harassment and hostile work environment resulting in depression.

**SUMMARY:**
**Plaintiff Information:**
Sex: F

Occupation: Phone engineer

**FACTS:**
A sexual harassment suit was brought by a woman against her employer. Plaintiff worked in a male dominated field and alleged she was retaliated against when she complained of sexual harassment by her co-workers. Defendant denied plaintiff's allegations, but plaintiff was awarded $100,000 by a federal jury in New Haven, which included $80,000 in punitive damages.

Plaintiff Kimberly Bachiocchi was employed by Defendant Southern New England Telephone as a phone engineer. Part of her duties included designing phone systems for customers. She was the only female in her office in Derby. Plaintiff complained to her supervisors about rude and crude remarks made by her male co-workers.

Plaintiff alleged sexual discrimination and harassment by her co-workers. She claimed she was subjected to conversations in which women were talked about in a defamatory manner. Plaintiff asserted that, after she made her complaints, she came under unfounded criticism and increased scrutiny. Plaintiff maintained she had to take time off work due to depression caused by the

hostile work environment. Plaintiff claimed she transferred to another job when she returned to work and the new job paid less money and required a longer commute.

Defendant denied plaintiff's allegations and contended that the environment in which plaintiff worked was not sexually-charged.

JAS Publications, Inc.
United States District Court

PUBLISHED IN: Vol. 21, No. 2

---

**End of Document**                                         © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT Q

Case 3:14-cv-00515-JAM   Document 1-1   Filed 04/17/14   Page 111 of 117

BJORLIN v. IRA P. HERSH INC., F/K/A MACARTHUR..., JVR No. 1401030005...

JVR No. 1401030005, 2013 WL 6912802 (Conn.Super.) (Verdict and Settlement Summary)

Copyright (c) 2012 Thomson Reuters/West
Superior Court of Connecticut, Judicial District of Fairfield.

BJORLIN v. IRA P. HERSH INC., F/K/A MACARTHUR EQUITIES LTD.

FBT-CV-11-6021296-S
DATE OF INCIDENT: May 27, 2009
DATE OF FILING: August 16, 2011
DATE OF TRIAL/SETTLEMENT: November 07, 2013

**SUMMARY**
**Outcome: Plaintiff Judgment**
**Total: $2,569,155**
HIGH AMOUNT: $0

LOW AMOUNT: $0

**Related Court Documents:**
Plaintiff's complaint: 2011 WL 11536394

Defendants' answer: 2011 WL 11536388

**EXPERT-WITNESSES:**
**ATTORNEY:**
Plaintiff: Francis D. Burke, Mangines & Burke LLC, West Hartford, CT
Defendant: Craig M. Bonnist, McCarter & English LLP, Stamford, CT

JUDGE: John F. Kavanewsky Jr.

Range Amount: $2,000,000 - 4,999,999

STATE: Connecticut
COUNTY: Fairfield

**SUMMARY**
**PLAINTIFF:**
Sex: F

Age: Adult, 49

General Occupation: Accountant

**DEFENDANT:**
Sex: O

Organization Type: Ira P. Hersh Inc., f/k/a MacArthur Equities Ltd.

**DAMAGES:**
Compensatory Pain & Suffering: $25,000

Compensatory Past Wages: $758,819

Compensatory Future Wages: $1,098,000

Total Compensatory Award: $1,881,819

Punitive Damages: $0

Hedonic Damages: $0

Property Damages: $0

Interest: $45,529

Other Damages: $0

Loss of Services: $0

**ADVERSE ACTION**
Closer Supervision: false

Constructive Discharge: true

Demotion: false

Denial Tenure: false

Failure Accomodate: false

Failure Grant Leave: false

Failure Hire: false

Failure Promote: false

Suspension: false

Sexual Harassment: false

Harassment: true

Hostile Work Env: true

BJORLIN v. IRA P. HERSH INC., F/K/A MACARTHUR..., JVR No. 1401030005...

Isolation: true

Lay Off: false

Loss Benefits: true

Loss Pay: true

Loss Seniority: false

Negative Eval: false

Negative Reference: false

Pay Increase Denial: false

Reassignment: false

Reduction Pay: false

Reprimands: true

Restrictions: false

Termination: false

**Entity Type: General Business Entity**
**STATUTES**
**Primary Specific Statue**
Primary Name: State

**Primary General Statute**
**Primary Name: Age Discrimination**
Primary General Statute Discrimination: true

Specific Statute: State

**General Statute: Sex Discrimination**
General Statute Discrimination: true

Specific Statute: General

**General Statute: Equal Pay**
General Statute Discrimination: false

Specific Statute: General

BJORLIN v. IRA P. HERSH INC., F/K/A MACARTHUR..., JVR No. 1401030005...

**General Statute: Retaliation**
General Statute Discrimination: false

Comparative Negligence Percentage: 0

**FACTS:**

Lenore Bjorlin, a 49-year-old accountant, brought this action against Ira P. Hersh Inc., f/k/a MacArthur Equities Ltd. for age and sex discrimination, violations of the Equal Pay Act, retaliation, constructive discharge, and a hostile work environment, pursuant to the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. Sec. 46a-60, et seq. The plaintiff, who began working for the defendant in November 2003, claimed in November 2006, Hersh hired a male employee in his early thirties to work as an accountant, that although their jobs were similarly-situated with the same educational background and the same levels of skill, the male coworker had less work experience than her, and that she trained him and continued to provide direction with his work until her separation from employment in May 2009. She alleged the defendants paid the male accountant significantly more than her $80,000 annual base salary, and he was also allowed to participate in the group medical insurance plan, but she was not. She asserted when she confronted Hersh regarding the disparity, he denied any disparity in pay and simply stated, you are being paid fairly, and when she requested participation in the health plan, he denied the existence of a medical plan. Thereafter, she claimed Hersh created a hostile work environment by swearing at her, belittling her in front of other employees, and otherwise treating her in a demeaning manner, and she heard him state to employment recruiters on more than one occasion, don't send me any more women. Bjorlin contended in light of the increasingly hostile workplace, she retained an attorney to help her address these issues, but this made matters worse, that Hersh began a campaign of retaliation against her, and he attempted to isolate her from other employees. Furthermore, she was given difficult projects with unrealistic deadlines, but after she failed to meet the impossible deadlines, he put her on a Performance Improvement Plan, and this plan was created in an effort to force her to resign, or provide a pre-textual basis for her termination. She averred this campaign of hostility and intimidation caused her tremendous physical and emotional stress, that the impact on her health resulted in her constructive discharge, and that the defendant's actions constitutes age and gender discrimination in violation of C.G.S. Sec. 46a-60(a)(1). The defendant denied the allegations and claimed the employee, for which the plaintiff compared herself to, was not similarly-situated, but he was hired as a Tax Manager, and as part of his job duties, he was responsible for supervising the plaintiff. Furthermore, Hersh maintained that any differential in Bjorlin's wages was the result of her performing a job that did not require equal skill, effort or responsibility. They also claimed the plaintiff's own conduct caused, in whole or in part, whatever damages she incurred, that her age and sex were not motivating factors in any employment decision, and they would have taken the same action in the absence of any such impermissible factors. The judge entered judgment in favor of the plaintiff on the age and gender discrimination claims, and the hostile work environment claim.

Jury Verdict Research
COURT: Superior

---

**End of Document**                                   © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT R

TERRI TUCKER v. JOURNAL REGISTER EAST, JAS CT Ref. No. 240461WL (2008)

JAS CT Ref. No. 240461WL, 2008 WL 4925070 (D.Conn.) (Verdict and Settlement Summary)

Copyright (c) 2012 Verdict Research Group
United States District Court, D. Connecticut.

TERRI TUCKER v. JOURNAL REGISTER EAST

3:06CV307

DATE OF VERDICT/SETTLEMENT: July 24, 2008

TOPIC: CIVIL RIGHTS EMPLOYMENT - WRONGFUL DISCHARGE - RETALIATION - EMPLOYMENT - WRONGFUL DISCHARGE

**SUMMARY:**

Result: Verdict: $4,000,000. Breakdown: $1,000,000 in compensatory damages and $3,000,000 in punitive damages.

**ATTORNEY:**

Plaintiff's: Jeffrey S. Bagnell, New Haven

Defendant's: Lawrence Peikes, Stamford

JUDGE: Stefan R. Underhill

RANGE AMOUNT: $2,000,000-4,999,999

STATE: Connecticut

COUNTY: New Haven Judicial District

ALLEGED INJURY: Wrongful termination and retaliation in violation of plaintiff's civil rights. Plaintiff sought back pay, compensatory damages for her emotional stress, attorney's fees and punitive damages for a combined total of approximately $5,000,000.

**SUMMARY:**

**Plaintiff Information:**

Age: Early 40's

Sex: F

Occupation: Manager

**Insurance Carrier: None**

**FACTS:**

A New Haven jury awarded a woman $4,000,000 after finding her former employer violated both Title VII of the Civil Rights Act of 1964 and the Connecticut Fair Employment Act. The award included $3,000,000 in punitive damages.

Plaintiff Terri Tucker was hired by Defendant Journal Register East in August 2000 as a telemarketing manager. In the same year, a co-worker filed a complaint with the Connecticut Commission of Human Rights and Opportunities claiming she was sexually harassed by her male supervisor, who was one of plaintiff's subordinates. Between December 2002 and February

TERRI TUCKER v. JOURNAL REGISTER EAST, JAS CT Ref. No. 240461WL (2008)

2003, plaintiff assisted defendant in responding to the allegations. She also presented a signed statement that she had never personally observed or overheard any conversations of a sexual nature between the named parties. However, in April 2003, plaintiff observed the accused making sexually inappropriate actions in the direction of a female co-worker and confronted the employee. She documented this incident in her own files, but did not document the incident to defendant's Human Resources Department until several months later when another female employee complained of similar misconduct. Plaintiff prepared a memo documenting the complaint and issued a copy to the named employee. Plaintiff then went on maternity leave for several months.

During her leave, plaintiff independently investigated the problem employee and learned that he had a substantial criminal background. Upon her return from maternity leave, she reported her findings to her superiors along with her concerns of testifying in the pending harassment suit based on her observances. In October, defendant investigated the acceptance of collect calls by plaintiff in response to a letter penned by the male employee accused of sexual harassment. The investigation revealed eight collect calls received from a prison were sent to plaintiff's department. On October 16, 2003, plaintiff met with Kevin Walsh, defendant's publisher and chief executive officer, as well as two of her other superiors. She was asked if she knew a former employee who had since been incarcerated and if she had written a letter on his behalf to the presiding judge detailing his favorable past work performance. She acknowledge both and agreed that she may have accepted one collect call from him at some point. A few hours later, Walsh terminated plaintiff's employment.

Plaintiff alleged defendant violated Title VII of the Civil Rights Act of 1964, the Connecticut Fair Employment Practices Act, Conn. Gen. Stat., and Conn. Gen. Stat. u31-51q, which prohibits an employer from discharging an employee for the employee's exercise of First Amendment free speech rights. Specifically, plaintiff claimed she was terminated in retaliation for voicing her reluctance to testify as a witness on behalf of defendant regarding the sexual harassment claim. Plaintiff noted that defendant's investigation revealed multiple collect calls received by various other employees, none of whom were terminated, and further argued that company policy allowed employees to use the phone system for personal reasons if they reimbursed the company. She said she was not given the opportunity to reimburse defendant for the alleged calls.

Defendant denied plaintiff's allegations and claimed she was terminated for violating a company policy which prohibited the acceptance of collect calls from correctional facilities. Defendant admitted that several other employees who also accepted collect calls were not terminated, but argued that plaintiff's conduct warranted termination because of her management level position. In addition, defendant cited plaintiff's use of poor judgment in writing letters of recommendation on behalf of felons as a contributing factor to her termination.


**EDITOR'S NOTE:**
Per other published reports and court documents, in a pretrial defense motion for summary judgment on the First Amendment issues, the court was asked to determine whether plaintiff, in communicating her concerns about testifying for the defendant in the harassment suit, was speaking 'as a citizen upon matters of public concern' or 'instead as an employee upon matters only of personal interest.' The court held that plaintiff's speech could constitute a 'matter of public concern' and therefore was protected and, if infringed upon, may entitle her to relief under C.G.S. 31-51q.


JAS Publications, Inc.
United States District Court

PUBLISHED IN: Vol. 20, No. 10

**End of Document**                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.